**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| ARCHBISHOP MITCHELL T. ROZANSKI, FR. CHRISTOPHER SCHROEDER, ARCHDIOCESE OF ST. LOUIS<br><br>*Plaintiffs*,<br><br>v.<br><br>SHERIFF GARY STOLZER, MAJOR JASON SCHOTT, and LT. ANDREW JOHNSON, in their official capacities, MARKWAYNE MULLIN, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, DAVID J. VENTURELLA, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and JENNIFER M. FENTON, ASSOCIATE DIRECTOR, OFFICE OF PROFESSIONAL RESPONSIBILITY, in their official capacities.<br><br>*Defendants*. | ) | CASE NO.: |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Under the First Amendment—and federal and state statutes that protect the rights enshrined in it—the government may not (a) ban the exercise of religion or (b) treat religious practice differently than it treats analogous secular activity. Yet the Ste. Genevieve County Detention Center manages to commit both sins by imposing a visitation policy that prevents Catholic priests from meaningfully ministering to Catholic federal detainees housed there (while readily allowing exceptions to the policy for non-religious reasons).

2. Devoted to the command of Matthew 25:36, and committed to bringing the peace of Christ to the imprisoned, Catholic priests seek to offer—and Catholic detainees want to receive—the sacraments of communion and confession, as well as other pastoral care. The jail's visitation policy prohibits this basic religious exercise in two ways. First, it allows only "no contact" visits, which are not private and prevent face-to-face interactions. This prevents priests from administering the sacraments of confession and communion. Second, the policy permits clergy visits for only a single, four-hour period once a week. This severely restricts priests' ability provide pastoral care, as priests cannot meet with all detainees who wish to see a Catholic priest (and have only limited time with those they do visit). Priests are also prohibited from saying Mass. A policy prohibiting participation in religious exercise offends core constitutional values.

3. Worse still, the policy applies to clergy but not to lawyers or consular officials, for whom exceptions to the policy are readily made. That constitutes more favorable treatment for secular activity than religious exercise, disparate treatment the constitution does not permit. That this policy targets some of our nation's most vulnerable—civil ICE detainees awaiting deportation to foreign countries—exacerbates a constitutional concern and a canonical one, because it withholds from the weakest among us the thing most precious to all of us.

4. As explained below, the visitation policy violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the Free Exercise Clause of the First Amendment, the Missouri Religious Freedom Restoration Act ("Missouri RFRA") (as to the Missouri defendants) and the federal Religious Freedom Restoration Act ("RFRA") (as to the federal defendants). To right these wrongs, Plaintiffs seek a declaratory judgment that Defendants have violated these statutory and constitutional protections, an injunction against the Missouri Defendants requiring them to cease enforcing the visitation policy, and an injunction against the federal Defendants requiring them to stop turning a blind eye by refusing to enforce meaningful religious-liberty protections for federal detainees.

**BACKGROUND**

5. The Ste. Genevieve detention center houses approximately 150 civil immigration detainees, who are federal detainees of U.S. Immigration and Customs Enforcement ("ICE"), in addition to other state and local offenders. Since mid-2025, about 3,000 different ICE detainees have been housed at the detention center.

6. The jail imposes a visitation policy that treats Catholic clergy—who want to visit detainees to offer them spiritual counseling—differently and worse than it treats other visitors to the jail. The policy is posted in two places on the jail's website and attached as Exhibit 1.[1] The posted FAQs state: "Clergy must visit during regular visitation hours/days. Clergy visit will be as any other visit: 30 minutes in duration, no contact visits, first come/first served. . . . Absolutely no items . . . or religious materials, etc. will be passed during visitation." Ex. 1. The posted visitation policy excerpt reiterates: "NO CONTACT VISITS ARE ALLOWED." *Id.*

---

[1] *See* tinyurl.com/SteGenPolicy. The court may take judicial notice of these pages and the other materials discussed throughout that are drawn from publicly available websites. *Enter. Rent-A-Car Co. v. U-Haul Int'l, Inc.*, 327 F. Supp. 2d 1032, 1042 n.4 (E.D. Mo. 2004). Most such sources are attached as exhibits for convenience.

7. Though the posted policy states the 4-hour visitation window is Sundays, in practice for priests (as the priests' declarations explain), the jail allows clergy to visit only for a 4-hour window on Mondays.[2]

8. The NO CONTACT policy means that clergy and detainees are not physically present in the same room, and are separated by a glass partition.

9. This visitation policy effectuates a *total ban* on clergy offering (and detainees receiving) the Catholic sacraments, including communion and confession, and severely limits the basic spiritual counseling that clergy may provide (and which detainees desperately seek).

10. Federal ICE detainees at the jail have repeatedly asked to see a priest and to receive the sacraments. The Sheriff of Ste. Genevieve County, his Chief Deputy, and his Jail Administrator have refused to permit it, citing their visitation policy.

**PARTIES, JURISDICTION, AND VENUE**

11. Plaintiffs, the Archdiocese of St. Louis, the Archbishop of the Archdiocese, and a priest with the Archdiocese who ministers to these

[2] Separately, ICE purports to show *a different* visitation policy for the same facility, attached as Exhibit 2, tinyurl.com/ICESteGen ("Hours of Visitation" tab). According to ICE, "Clergy may visit detainees at any time" and the "non-contact" rule applies only to "family and other social visits." *Id.* As explained throughout, that is *not* the rule in practice.

detainees, bring these religious liberty claims on their own behalf to vindicate their rights.

12. Plaintiff Archdiocese of St. Louis is the ecclesiastical territory of the Roman Catholic Church that encompasses Ste. Genevieve County and includes among its ministries service to Catholics detained at the Ste. Genevieve County Detention Center.

13. Plaintiff Archbishop Mitchell Rozanski is the Archbishop of the Archdiocese of St. Louis, Missouri. Under canon law (the code of ecclesiastical laws governing the Catholic Church), the Archbishop has a responsibility and a duty to ensure the spiritual welfare of Roman Catholics within the geographical limits of the Archdiocese, including Ste. Genevieve County. Ex. 3, Ramacciotti Decl. ¶¶ 38–39.

14. Plaintiff Fr. Christopher Schroeder is a Roman Catholic priest of the Archdiocese of St. Louis and serves as pastor of Christ the King parish in University City, Missouri. As part of his ministry, he visits Spanish-speaking ICE detainees held at the Ste. Genevieve County Detention Center. Ex. 4, Schroeder Decl. ¶¶ 1, 3.

15. Plaintiffs bring claims on their own behalf and also on behalf of the Catholic detainees housed at Ste. Genevieve County Detention Center whose rights the policy also tramples. Third party standing allows this, because these detainees seek access to Catholic priests for spiritual counseling

and wish to participate in the sacraments of communion or confession. These detainees have a special and close relationship to the clergy plaintiffs and cannot participate in this litigation because they possess a well-founded fear of retaliation. Ex. 5, Drost Decl ¶ 7.

16. The Archdiocese also brings some of these claims on behalf of its unnamed priests through associational standing. It may do so because the priests themselves have standing to assert these claims (their religious exercise is burdened by defendants' actions), the religious-liberty rights at issue here are germane to the Archdiocese's religious mission, and there is no need for the priests' individual participation.

17. Defendants are Sheriff Gary Stolzer, the Sheriff of Ste. Genevieve County, Missouri, who operates the Ste. Genevieve County Detention Center; Chief Deputy Major Jason Schott, who oversees the day-to-day operation of the jail, and has been one of the most vocal officials in articulating and defending the visitation policy; and Jail Administrator Lt. Andrew Johnson, who administers the jail on a day-to-day basis and enforces the visitation policy (together, the "Missouri Defendants"). Sheriff Stolzer is the final county policymaker with authority over matters regarding the jail, and the other two Missouri Defendants enforce the Sheriff's policies. All three are sued in their official capacities.

18. Defendants also include senior officials of ICE and the Department of Homeland Security (the "ICE Defendants"), who have acquiesced in and enabled these violations by weakening religious-liberty protections at contractor facilities and refusing to enforce even the diminished standards that remain.

19. The ICE Defendants include Defendant Markwayne Mullin, the Secretary of the Department of Homeland Security, which oversees ICE; Defendant David J. Venturella, the Acting Director of ICE; and Defendant Jennifer M. Fenton, the Associate Director of ICE's Office of Professional Responsibility (OPR), which oversees the Office of Detention Oversight (ODO) and is responsible for ensuring that ICE contractor detention facilities, including the Ste. Genevieve County Detention Center, follow federal law, including by inspecting for compliance with ICE's national detention standards. Each ICE defendant is sued in his or her official capacity.

20. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs allege violations of RLUIPA, 42 U.S.C. § 2000cc *et seq.*; RFRA, 42 U.S.C. § 2000bb *et seq.*; and the First Amendment of the United States Constitution. This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to grant declaratory and further relief. This Court has supplemental jurisdiction over Plaintiffs' Missouri RFRA claim under 28 U.S.C. § 1367

because that claim arises from the same case or controversy as Plaintiffs' federal claims.

21. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1)(B) because the harms alleged occurred at the Ste. Genevieve County Detention Center, which lies within the Southeastern Division of the Eastern District of Missouri.

22. This Court has general personal jurisdiction over the Missouri Defendants because each is a resident of the State of Missouri. Alternatively, the Court has specific personal jurisdiction over the Missouri Defendants because their employment by the county is a substantial contact with the state that this dispute arises from or relates to. Similarly, the Court has specific personal jurisdiction over each ICE Defendant because ICE's housing of detainees in Missouri is a substantial contact with the state that this dispute arises from or relates to.

## FACTS COMMON TO ALL COUNTS

### I. Priests Have Requested Accommodations To Provide Religious Counsel To Detainees.

23. The detention center houses multiple groups of detained individuals, including detainees awaiting trial on state criminal charges, civil detainees committed as sexually violent predators under Missouri law, and civil immigration detainees held by ICE pursuant to a contract between the

detention center and ICE. A true and correct copy of the agreement, which is available online, is attached hereto as Exhibit 6. Under the contract, ICE pays the jail $103 per day, per detainee, to house federal ICE detainees. *Id.* at 1. ICE requires the jail to house detainees "in accordance with all state, local, and federal laws, standards, regulations, policies, and court orders," and the jail must "provide prisoners with reasonable opportunities to participate in religious practices." *Id.* at 3-4. Thus, the jail receives "Federal financial assistance" as defined in RLUIPA. 42 U.S.C. § 2000cc(a)(2).

24. The jail refused requests by priests and the Archdiocese for religious accommodations. Ex. 7, Lydon Decl. ¶¶ 3–4.

25. In late 2025, Father Michael Lydon, as a representative of the Archbishop, spoke by phone with Lt. Johnson and asked for permission for clergy to visit detainees face-to-face to administer the communion and confession. *Id.* ¶ 4.

26. Lt. Johnson responded that this would not be possible because the facility's visitation policy requires no contact. *Id.* Lt. Johnson told Father Lydon that the visitation policy was implemented by ICE and that he had no authority to change it. *Id.*

27. On May 18, 2026, the Archbishop followed up with a letter to Lt. Johnson requesting (1) that priests be allowed to visit detainees face-to-face to administer the Eucharist and Confession, (2) that priests be allowed to

celebrate Mass for detainees, and (3) that clergy visiting hours be expanded beyond the current Monday, 12 p.m. to 4 p.m. window. *Id.* ¶ 5 & Ex. A.

28. The Archbishop received no response. *Id.* ¶ 6.

29. In late August 2026, Father Lydon attempted to renew the request by leaving a voicemail for Lt. Johnson. *Id.* ¶ 7. Lt. Johnson's supervisor, Chief Deputy Major Jason Schott, called Father Lydon back and stated that the requests were still denied and that the Sheriff's department would not discuss the topic further. *Id.*

30. When Father Schroeder asked to visit detainees in person to offer the sacraments, he was told by a Detention Center official that this was not possible; instead, at every visit, he has had to speak with detainees through a glass panel over a phone. Schroeder ¶¶ 4, 14.

31. The first and only time any jail official has proposed any accommodation for religious exercise was in response to a reporter. Major Schott proposed that clergy pass communion in a plastic bag to a prison guard who could then deliver it to the detainee. Ex. 8, Charlie Brennan, *'No Contact' Means No Communion for Jailed Immigrants*, St. Louis Bus. J. (Aug. 26, 2026).[3]

---

[3] tinyurl.com/BrennanICE.

32. As explained below, this is no accommodation at all. Catholic communion cannot be given through a third party because it must be passed directly from priest to participant. Ramacciotti Decl. ¶¶ 32–35.

33. In sum, each time Plaintiffs or a detainee have requested an accommodation in order to allow for spiritual counseling, Mass, or provision for the sacraments, that request has been denied.

## II. Catholic Priests Have an Obligation to Provide the Sacraments to the Detainees in the Diocese and the Detainees Have an Obligation to Receive Them.

34. As part of their religious calling and ministry, Catholic priest are obligated to say Mass and administer the sacraments of the Eucharist (commonly called communion) and Reconciliation (commonly called confession). The Second Vatican Council called communion "the source and summit of the Christian life." Ex. 9, Kiblinger Decl. ¶ 2; Ex. 10, Nord Decl. ¶ 2.

35. The visitation policy prevents Catholic priests like Father Schroeder from carrying out these obligations, which are central tenets of the Catholic faith. That is because the Catholic faith does not allow the provision of the sacraments under the conditions the policy imposes.

36. Catholic priests, the Archbishop, and Catholic lay persons are all bound by canon law. These laws find their roots in the Bible and Catholic tradition, and can only be revised by the Pope and the College of Cardinals acting together. Ramacciotti Decl. ¶¶ 4–5.

37. The Catholic faith obligates priests to hear confession. They must "make provision so that the confessions of the faithful entrusted to them are heard when they reasonably seek to be heard and that they have the opportunity to approach individual confession." *Id.* ¶ 20.

38. The sacrament of confession involves a penitent meeting with a priest in private and confessing to the priest all grave sins committed. *Id.* ¶¶ 19–22. What the penitent says to the priest is bound by the "sacramental seal" of confession and "is inviolable." *Id.* ¶¶ 23–25. In other words, a Catholic priest can never share with anyone what he hears in confession.

39. Because of the private and intimate nature of confession, it must be done in person, without the aid of a telephone or other electronic device, and without the possibility that someone besides the priest is listening to the confession. To hear a confession otherwise would be considered betraying the penitent. *Id.* It is punishable by excommunication. *Id.* ¶ 9.

40. As part of his role as a priest, Father Schroeder feels spiritually obliged to hear the confessions of the detainees. Schroeder Decl. ¶ 9. The Archbishop, as the pastor responsible for all Catholics within his jurisdiction, also has a moral obligation to ensure, through his priests, that the sacrament of confession is available to the detainees. Ramacciotti Decl. ¶¶ 20, 38.

41. Catholic laypersons also have an obligation to participate in confession. They must confess their sins at least once a year, and are obligated

to confess mortal sins (sins committed knowingly relating to a grave matter) as soon as possible. *Id.* ¶ 21. Mortal sin separates a person from God, and the Catholic Church teaches that confession is the primary means of restoring a person to grace.

42. Catholic priests also owe an obligation to Catholics within their diocese as it relates to communion. Communion is "the most August sacrament" of the Catholic Church, and Christ himself is offered in it to the Catholic faithful. *Id.* ¶ 27. Generally, communion is to be celebrated during Mass, but Catholic priests are still obligated to provide communion outside of Mass to any baptized person who requests it and who is properly disposed to do so under Church teaching. *Id.* ¶ 31.

43. Because the celebration of communion is a central piece of the Catholic faith, and because the transubstantiation that occurs in this sacrament involves the real presence of Christ, the Catholic faith imposes strict rules on how communion may be administered. Communion may only be administered by a minister specifically appointed for the purpose. *Id.* ¶¶ 32–35. Catholics receiving communion may only receive the host directly from a priest or an appointed minister. *Id.*

44. The host likewise cannot be left on a table or in a drawer to be picked up later, that would be considered a "profanation of the Eucharist," and

violate Catholic teaching. *Id.* ¶¶ 9, 32–35; Kiblinger Decl. ¶ 14; Schroeder Decl. ¶ 12.

45. As with confession, all Catholics are obligated to partake in communion at least once per year. Ramacciotti Decl. ¶ 30. Communion, too, is a central tenet of Catholicism.

46. As part of his role as a priest, Father Schroeder is spiritually obliged to administer the Eucharist to detainees at the St. Genevieve County Detention Center. Schroeder Decl. ¶ 9; Ramacciotti Decl. ¶ 31. The Archbishop also has a moral obligation to ensure that the Eucharist is available to Catholics within his jurisdiction. Ramacciotti Decl. ¶¶ 38–39.

## III. The No-Contact Policy Bars the Sacraments of Communion and Confession.

47. The no contact, time-limited visitation makes it impossible for a priest to administer either communion or confession to a detainee because doing so in these circumstances would violate canon law.

48. Once, when a detainee asked Father Kiblinger to hear his confession over the jail's telephone line, Father Kiblinger had to decline because he could not hear a confession that was not private or one that was conducted over a phone. Kiblinger Decl. ¶ 13. On information and belief, the phone lines can be monitored and may be recorded. *See id.*

49. The glass partition that separates detainees from visitors prevents any items to be passed from the priest to the detainee and blocks all physical contact, so the visitation policy operates as a complete bar on a priest administering the sacrament of communion (and prohibits a detainee receiving it). Kiblinger Decl. ¶ 14; Schroeder Decl. ¶¶ 10–11; Ex. 11, Olsen Dec. ¶¶ 10–11.

50. Likewise, the visitation policy prevents confession in two ways. *First*, it requires the use of a telephone for the priest and detainee to speak, which independently prevents the priest from hearing the detainee's confession and the detainee from offering a confession. *Second*, the telephone discussion is monitored and may be recorded, so the call is not private as the sacrament requires. This also independently prevents the priest from hearing the detainee's confession and the detainee from confessing. Kiblinger Decl. ¶ 13; Schroeder Decl. ¶¶ 10–11; Olsen Decl. ¶¶ 10–11.

51. Because of the visitation policy and the lack of privacy, some detainees elect not to meet with the priests at all because they know that the conversation will not be private. Ex. 12, Walentik Decl. ¶ 4.

## IV. The Visitation Policy Contains Exceptions.

52. The visitation policy contains at least two exceptions. First, attorneys—including public defenders and counsel for civil detainees—are permitted to meet with their clients in person for contact visits at any time

during business hours by arrangement with jail administration. Ex. 13, Chase Decl. ¶ 3. These meetings occur face-to-face, without a screen or divider, in one of three or four conference rooms able to accommodate such visits. *Id.* ¶¶ 4–6. These attorneys are also able to pass papers and other objects to their clients during these visits. *Id.* ¶¶ 3–6; *see also* Ex. 14, Kinsky Decl. ¶ 5–6. Second, the jail also allows consular visits at any time by consular officials from the detainees' home country. Ex. 2.

## V. The Visitation-Hours Policy Sharply Limits Clergy Access Compared to Other Visitors.

53. In addition to the narrow, 4-hour time window for clergy visits, other barriers prevent meaningful access to clergy. Once inside the facility, staff frequently take fifteen to twenty minutes (or more) to change over between detainees, which cuts significantly into the limited time available to minister. Kiblinger Decl. ¶ 6; Nord Decl. ¶ 8; Olsen Decl. ¶ 13. As a result, clergy often must cut their visits with detainees short, and they are rarely able to see all of the detainees who have asked to speak with a priest. Kiblinger Decl. ¶¶ 6–7; Schroeder Decl. ¶¶ 5, 16; Nord Decl. ¶ 8; Olsen Decl. ¶ 13.

54. For example, on Father Kiblinger's first visit to the Detention Center, he was turned away entirely and not allowed to see any detainees, even though he arrived during the clergy visitation window. No detainee who had asked to see a priest that week was able to do so. Kiblinger Decl. ¶ 8.

55. Father Schroeder's experience has been similar. On one visit, after repeatedly asking the guard station for over 45 minutes to bring the first detainee to see him, he was able to speak with only one of the detainees on his list before the 4 p.m. visitation window closed, despite arriving at around 1:45 p.m. Schroeder Dec. ¶ 16. On another visit, Father Schroeder was able to see only three detainees before time ran out. Schroeder Decl. ¶ 17.

56. Fr. Nord and Fr. Olsen have had similar experiences with delay causing them not to be able to meet with all the detainees who asked to see them. Nord Decl. ¶ 8; Olsen Decl. ¶ 13.

57. If the visitation window were expanded to include more hours or more days, clergy would be able to see all of the detainees who ask for a meeting and would not need to cut visits short. Kiblinger Decl. ¶ 9; Schroeder Decl. ¶ 18; Olsen Decl. ¶ 13.

58. By contrast, attorneys may schedule contact visits with their clients at any time during business hours simply by making arrangements with jail administration. Chase Decl. ¶ 3; *see also* Ex. 1; Ex. 2.

59. Attorneys can meet with their clients in one of the three to four conference rooms available for that purpose. These rooms could also accommodate meetings between detainees and clergy. *See* Chase Decl. ¶ 6.

## VI. Catholics Held at the Detention Center Have Repeatedly Sought Access to Clergy and the Sacraments.

60. Abide In Love Ste. Genevieve ("AIL") is a nonprofit organization that supports detained immigrants and their families through volunteer efforts. Each AIL volunteer maintains a pen-pal relationship with 15 to 20 detainees, and every Friday, volunteers ask their pen pals whether they need anything; detainees frequently respond by requesting to see a Catholic priest or to receive the sacraments. Drost Decl. ¶¶ 3–5. AIL passes these requests along to the Archdiocese, which ensures that Catholic clergy visiting the facility have a list of detainees who have requested a visit by a Catholic priest. *Id.*

61. AIL began its work at the facility in July 2025. Since that time, detainees have consistently expressed a desire to receive confession and communion. *Id.* ¶¶ 2, 5.

62. Father Kiblinger has found that many of the detainees he visits are parishioners who used to regularly attend Mass and receive the sacraments before their detention. But after being detained, they have not been able to do so either for weeks or months. Kiblinger Decl. ¶ 5. On at least one occasion, a detainee directly asked Father Kiblinger, over the jail's recorded telephone line, to hear his confession. Kiblinger Decl. ¶ 13.

63. As discussed, the visitation policy makes this impossible because it would violate canon law for Father Kiblinger to hear a confession under these circumstances.

64. Many of the detainees are particularly in need of ministry given the circumstances they face. After being detained and facing deportation, many experience a profound spiritual crisis or spiritual hunger, and many ask for Bibles or rosaries or for help learning to pray the Rosary. Kiblinger Decl. ¶ 5. Many detainees have asked the priests who do visit to hear their confessions, either immediately or in the near future. Kiblinger Decl. ¶ 10.

65. Despite this widespread desire for greater access to religious practice, out of fear of retaliation, detainees have been unwilling to submit declarations or join this litigation as plaintiffs. Drost Decl. ¶ 7; Walentik Decl. ¶ 3.

## VII. The Archbishop and His Priests Have Sought to Provide Counsel, Mass, and the Sacraments to the Detainees.

66. Since mid-2025, and consistent with their Biblical obligation to minister to the imprisoned and to immigrants, *see* Matthew 25:36, priests of the Archdiocese have sought to minister to ICE detainees held at the jail, including by offering communion and confession. Lydon Decl. ¶¶ 2–3. This ministry is frustrated by the detention center's visitation policy. Lydon Decl. ¶ 3.

67. Father Schroeder visits the facility as part of his ministry to Spanish-speaking detainees, whom he has found to be in extreme need of spiritual counsel and of the grace the sacraments provide. Schroeder Decl. ¶¶ 3–4. Fr. Schroeder believes he has a spiritual obligation to provide the sacraments to these detainees. *Id.* ¶ 9.

68. Several other Spanish-speaking priests of the archdiocese likewise feel a moral obligation to minister to these detainees, including by providing them the sacraments. Kiblinger Decl. ¶¶ 3–4, 10; Nord Decl. ¶¶ 5, 6, 9; Olsen Decl. ¶ 6.

69. Both communion and confession are particularly important for these detainees. Communion affirms Christ's presence for those facing isolation, and confession becomes of the utmost importance for any detainee who has been separated from God by mortal sin because detainees may face danger during and immediately after deportation, and confession is the way to protect the detainee's soul. Schroeder Decl. ¶ 5; Ramacciotti Decl. ¶¶ 27–28. Attendance at Mass is also integral to the practice of the Catholic faith. Catholics *must* attend Mass every Sunday and holy day of obligation. Ramacciotti Decl. ¶ 30.

70. In the past, the detention center has allowed visiting clergy to not just meet in person with detainees, but also to celebrate "in-person religious services" during those visits. Kinsky Decl. ¶ 4. Now, neither practice is

allowed. On information and belief, this past practice never resulted in any documented security threat or issue with the passage of contraband. *See id.*

71. Priests are commonly allowed to meet with detainees in person and provide the sacraments at other jails and prisons. Father Lydon has frequently been permitted to visit detainees in person at the Lincoln County Jail, including to administer the sacraments, without any suggestion that in-person clergy visits pose a security or contraband risk. Lydon Decl. ¶ 8. Similarly, Fr. Eric Olsen has visited in person with detainees (both civil and criminal) and brought them the sacraments at the Lincoln County and Warren County jails. Olsen Decl. ¶ 4–5. At the Lincoln County jail, he and other priests were allowed to celebrate mass for detainees on a monthly basis. *Id.* ¶ 4. None of this ever created any security or contraband issue. *Id.* ¶¶ 4–5.

## VIII. The Jail Defends Its Policy As Necessary For "Security" and to "Prevent Contraband.

72. The jail offers scant defense for its visitation policy and, what it does offer is either patently insulting or tone-deaf: Catholic priests are a "safety and security" risk—including because the priest might smuggle "contraband" to the detainee.

73. Major Schott explained: the "detention center is a no-contact visitation facility" with the no contact rules designed to "maintain[] the safety and security of the facility, staff, visitors, and detainees." Ex. 8. Additionally,

according to Major Schott, "this policy is . . . designed to prevent illegal contraband or other prohibited items from being passed from outside individuals to detainees housed within out facility." *Id.* Major Schott does not explain how the host, which as consecrated is the body of Christ—the very thing priests want to "pass to detainees"—could be contraband.

## IX. ICE Publishes Detention Standards And Is Aware That Contractor Facilities Violate Them.

74. Even though the Missouri Defendants discussed above were the direct perpetrators of these religious-liberty deprivations, they were only able to do so because of the acquiescence and approval of ICE, which first lowered its detention standards surrounding religious practice for contractor facilities (as a matter of "convenience" to them) and then refused to enforce what standards remained, all in the face of widespread religious-liberty violations at ICE contractor facilities nationwide.

75. The first standards governing the civil detention of immigration detainees were promulgated by the Department of Immigration and Naturalization Services (INS) in 2000. INS Detention Standard 5.5, governing "Religious Practices," required contractor facilities that housed immigration detainees to allow private meetings with clergy in the same manner as an attorney upon request: if requested by a detainee, the chaplain or designee was to facilitate arrangements for pastoral visits by a clergyperson or

representative of the detainee's faith, with accommodation made for privacy through use of the attorney/client area. Ex. 15, INS Detention Standard 5.5(III)(J).[4]

76. After the Department of Homeland Security, including ICE, took over INS's immigration-enforcement functions, it adapted INS's detention standards, but split them in two, with one set governing ICE-run facilities (the Performance-Based National Detention Standards (the "PBNDS"), most recently revised in 2016).[5] The PBNDS largely replicated INS's Standard 5.5 in Standard 5.5, "Religious Practice." *See* Ex. 16, 2016 PBNDS Standard 5.5. It provided for private pastoral visits, using the same accommodations as private attorney-client meetings: pastoral visits were ordinarily to take place in a private visiting room during regular visiting hours, with accommodation made in the legal visitation area when available. *Id.*, Standard 5.5(V)(F).

77. But for contractor facilities, like this one, ICE imposed different standards. Instead of the robust protections of the PBNDS, ICE only holds these facilities to the "National Detention Standards" (NDS), most recently revised earlier this year, which, according to ICE's website, are "streamline[d]" in order to "reduce the burden on our detention operators." *2026 National*

---

4 tinyurl.com/INS-Standard-5-5.

5 tinyurl.com/PBDNS-2016.

*Detention Standards*, ICE.[6] The NDS "Religious Practice" standard, now Standard 5.3, is indeed streamlined, from nine pages of guidance in the PBNDS to four pages in the NDS. *See* Ex. 17, 2026 NDS Standard 5.3.[7] Notably, instead of calling for private pastoral visits and pointing to the attorney-client setting as the proper measure of this accommodation, the NDS simply states that detainees of a different religious faith than the Chaplain may request access to pastoral care and counseling from external clergy and religious service providers, with no reference to the availability of private pastoral visits or accommodation in the attorney visitation area. *Id.*, Standard 5.3(II)(J).

## X. The Reduced NDS Standards That Apply To This Facility Still Commit ICE to Protecting Religious Practice.

78. The NDS still affirmatively commit ICE to "ensur[ing]" that "detainees of various religious beliefs have reasonable and equitable opportunities to participate in the practices of their faith, limited only by documented threats to safety, security, and the orderly operation of the facility." *Id.*, Standard 5.3(I).

79. The NDS further provide that the facility administrator may discontinue a religious activity or practice, or limit participation, only when

---

6 tinyurl.com/ICE-NDS-posting.
7 tinyurl.com/NDS-2026.

necessary for security or order and only after consulting with the chaplain or RSC, with facility records documenting any limitation or discontinuance and the reason for it; that detainees must be provided the opportunity to participate in group religious activities, limited only by documented threats to the facility's safety, security, or orderly operation; that the facility shall establish a policy to facilitate the observance of significant religious holidays and holy days while maintaining safety, security, and orderly operations; and that the Chaplain or RSC shall ensure detainees have access to religious items, including worship and prayer materials, specialty food items, and religious headwear and other garb, necessary to practice their religion or spiritual beliefs, consistent with facility safety, security, and orderly operation. *Id.*, Standard 5.3(II)(B), (H), (I), (K).

## XI. ICE Became Aware of Widespread Denial of Religious Liberty at Detention Facilities and Refused to Protect Religious Liberty By Implementing ICE's Standards.

80. In November 2025, Bishop Robert Barron, a member of the Department of Justice's Religious Liberty Commission, contacted senior officials at the Department of Homeland Security and raised the Catholic Church's concerns regarding detainees' access to the sacraments. Those officials assured Bishop Barron that the matter was "under careful review."

Ex. 18, Kate Scanlon, *Barron: Administration 'Assured' Him Detainees' Access to Sacraments 'Under Careful Review'*, OSV News (Nov. 4, 2025).[8]

81. More than ten months later, that review has not resulted in any action to address the ongoing denial of sacraments to ICE detainees. Instead, two other groups of clergy have had to sue ICE and obtain preliminary injunctions earlier this year to enter ICE detention facilities and provide the sacraments to detainees they minister to.

82. This is not the first time ICE has been challenged for violating the religious liberty rights of its detainees. There is a well-documented pattern of publicly available challenges to ICE's policies—at its own facilities as well as contractor facilities—restricting religious practice for detainees under ICE's care. The examples are myriad, and the Court may take judicial notice of the fact each of these challenges is publicly available (and thus known to ICE). For ease of reference, a catalogue of these problems is attached to this Complaint as Exhibit 23 (cataloging 24 recent media and litigation accounts of religious liberty violations at various ICE detention facilities).

83. Despite ICE's awareness of religious liberty violations at its contractor facilities, Associate Director Fenton and the inspectors working under her in ICE's Office of Detention Oversight have not implemented any

---

8 tinyurl.com/Barron-Careful-Review.

policy or procedure to inspect ICE detention facilities for compliance with the religious-liberty provisions of ICE's national detention standards. This is so notwithstanding that two other groups of clergy have obtained preliminary injunctions against ICE earlier this year based on similar denials of sacramental access at other ICE detention facilities. *See* Ex. 19, *Coal. for Spiritual & Pub. Leadership v. Noem*, 2026 WL 396349, at *1 (N.D. Ill. Feb. 12, 2026); Ex. 20, *Minn. Area Synod of the Evangelical Lutheran Church in Am. v. U.S. Dep't of Homeland Sec.*, No. 0:26-CV-01576 (D. Minn. Mar. 20, 2026), ECF No. 57.

84. ICE's Office of Professional Responsibility has likewise done nothing, even though it purportedly "inspects, audits and reviews ICE . . . programs to assess compliance with federal laws, applicable policies and procedures, and the agency's detention standards." *See Office of Professional Responsibility*, ICE.[9] The OPR has implemented no policy or procedure to inspect contractor facilities for compliance with the religious-liberty provisions of ICE's standards. According to the Missouri defendants, ICE audits this facility weekly. *See* Ex. 21, Michael Boyd Jr., *Sheriff Speaks up After Accusations Made on Inmate Treatment*, Ste. Genevieve Herald (June 6, 2026)

---

[9] www.ice.gov/opr.

(quoting Major Schott stating, "We are inspected by . . . DHS ICE on a weekly basis.").[10]

85. Even though the St. Genevieve County Detention Center has a no-contact policy in place that leads to violations of the religious freedom of both clergy and the detainees, ICE's Office of Detention Oversight inspected the St. Genevieve County Detention Center on July 9, 2026, and awarded the facility a "Superior" rating, identifying only two total "Deficiencies." And these related to medical and dental screening. Compl. Ex. 21, ICE ODO Inspection Report (Ste. Genevieve Co. Jail, June 10-July 9, 2026), at 4, 6.[11] Neither the narrative description of the inspection process nor the topic-by-topic evaluation in that report contains any reference to detainees' religious rights or any indication that inspectors were instructed to verify compliance with ICE's own religious-practices standard. *See generally id.* The official ODO inspection form provides no mechanism to issue a "Deficiency" based on a constitutional rights violation, much less to report specifically on detainees' access to religious accommodations. *Id.*

10 https://tinyurl.com/Sheriff-speaks

11 https://tinyurl.com/SteGenInspection.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq.

***Brought by Archbishop Rozanski and Father Schroeder, on Behalf of the Detainees, Against the Missouri Defendants.***

86. The Archbishop and Fr. Schroeder incorporate and reallege the allegations of the preceding paragraphs as if set forth fully herein.

87. The Ste. Genevieve County Detention Center is an "institution" within the meaning of RLUIPA, and the detainees are "institutionalized persons" confined there. 42 U.S.C. § 1997(1)(B)(ii); 42 U.S.C. § 2000cc-1(a).

88. The Detention Center receives federal financial assistance within the meaning of 42 U.S.C. § 2000cc-1(b)(1).

89. The visitation policy is an action of the Missouri Defendants, acting under color of state law, that substantially burdens the detainees' sincerely held religious exercise, including their ability to receive the sacraments of communion and confession, to attend Mass, and to meet with clergy.

90. The visitation policy is not the least restrictive means of furthering any compelling governmental interest.

91. The Archbishop and Father Schroeder have standing to assert the detainees' rights under RLUIPA because the Plaintiffs have suffered an injury

in fact through the frustration of their religious ministry, they have a close relationship to the detainees as their priests and pastors and the only means through which the detainees may receive communion and confession, and the detainees face a well-founded fear of government retaliation that hinders their ability to assert their own rights.

92. The Archbishop and Father Schroeder have also suffered an independent injury in fact from the visitation policy because they have been prevented from fulfilling their religious obligations.

93. As a direct and proximate result of the Missouri Defendants' violation of RLUIPA, the detainees have suffered and continue to suffer irreparable harm.

WHEREFORE, Plaintiff Archbishop Rozanski and Father Schroeder, on behalf of the detainees, respectfully request that this Court (1) enter a declaratory judgment that the Missouri Defendants have violated RLUIPA; (2) enjoin the County Defendants, including their officers and agents, from enforcing the visitation policy; (3) award Plaintiffs their reasonable costs and attorney's fees; and (4) enter such other and further relief as the Court deems just and proper.

## COUNT II

## Violation of the Free Exercise Clause of the First Amendment and the Fourteenth Amendment, 42 U.S.C. § 1983.

***Brought by the Archdiocese, Archbishop Rozanski, and Father Schroeder, Individually; the Archbishop and Father Schroeder on Behalf of the Detainees; and the Archdiocese on Behalf of Its Unnamed Member Priests; against the Missouri Defendants.***

94. Plaintiffs incorporate and reallege the allegations of the preceding paragraphs as if set forth fully herein.

95. The visitation policy is the official policy or practice of the Missouri Defendants, adopted and enforced under color of state law.

96. The visitation policy burdens the sincere religious exercise of the detainees and of the clergy, who have an independent right under the Free Exercise Clause to perform sacramental and pastoral functions for the detainees.

97. The visitation policy is neither neutral nor generally applicable because it permits attorneys, and as it relates to the time-limitation aspect of the policy, consular officials, to visit detainees in person and outside the restricted weekly window, while categorically barring or restricting comparable visits by clergy. In short, the policy treats comparable secular activity more favorably than religious activity.

98. The policy does not survive strict scrutiny because it amounts to a total ban on participating in core tenets of the Catholic faith, including attend

Mass and receiving the sacraments of confession and communion. The time-limitation component of the policy also separately burdens the religious-liberty rights of the clergy and the detainees because the four-hour-a-week window for clergy visits severely restricts—and in some cases totally bans—access to spiritual counseling. The Missouri Defendants cannot demonstrate that either aspect of the visitation policy is narrowly tailored to serve a compelling governmental interest.

99. The Archbishop and Father Schroeder have standing to assert the detainees' rights on their behalf for the reasons set forth in Count I. the Archdiocese has standing to assert the rights of its unnamed priests, because the priests have standing (in the same manner as Father Schroeder), the rights vindicated here are germane to the Archdiocese's mission of ministry to the faithful within its territory, and the individual priests' participation is not required in this suit for uniform injunctive relief.

100. The Archdiocese, the Archbishop, and Father Schroeder have also suffered an independent injury in fact from the visitation policy because they have been prevented from fulfilling their religious obligations.

101. As a direct and proximate result of the Missouri Defendants' violation of the Free Exercise Clause, Plaintiffs have suffered and continue to suffer irreparable harm.

WHEREFORE, Plaintiffs Archbishop Rozanski and Father Schroeder, individually and on behalf of the detainees, and the Archdiocese, individually and on behalf of its unnamed priests, respectfully request that this Court (1) enter a declaratory judgment that the Missouri Defendants have violated the Free Exercise Clause of the First Amendment; (2) enjoin the Missouri Defendants, including their officers and agents, from enforcing the visitation policy; (3) award Plaintiffs their reasonable costs and attorney's fees; and (4) enter such other and further relief as the Court deems just and proper.

## COUNT III
## Violation of the Missouri Religious Freedom Restoration Act, RSMo. § 1.302

***Brought by the Archdiocese, Archbishop Rozanski, and Father Schroeder, Individually; the Archbishop and Father Schroeder on Behalf of the Detainees; and the Archdiocese on Behalf of Its Unnamed Member Priests; Against the ICE Defendants.***

102. Plaintiffs incorporate and reallege the allegations of the preceding paragraphs as if set forth fully herein.

103. The County Defendants are "governmental authorities" within the meaning of Missouri's Religious Freedom Restoration Act, RSMo. § 1.302.

104. The visitation policy restricts the free exercise of religion of the detainees and the Archbishop and Father Schroeder within the meaning of RSMo. § 1.302.1.

105. The visitation policy is not generally applicable and does not satisfy the heightened scrutiny Missouri law requires, as RSMo. § 1.302.1(1)–(2) describes. *See Marianist Province of U.S. v. City of Kirkwood*, 944 F.3d 996, 1003–04 (8th Cir. 2019) (Missouri's RFRA is "more protective of religious exercise than the Federal RFRA statute").

106. The Archbishop and Father Schroeder have standing to assert the detainees' rights on their behalf for the reasons set forth in Count I. The Archdiocese has standing to assert the rights of its unnamed priests for the reasons set forth in Count II.

107. The Archdiocese, the Archbishop, and Father Schroeder have also suffered an independent injury in fact from the visitation policy because they have been prevented from fulfilling their religious obligations.

108. As a direct and proximate result of the County Defendants' violation of Missouri RFRA, Plaintiffs have suffered and continue to suffer irreparable harm.

WHEREFORE, Plaintiffs Archbishop Rozanski and Father Schroeder, individually and on behalf of the detainees, and the Archdiocese, individually and on behalf of its unnamed priests, respectfully request that this Court (1) enter a declaratory judgment that the County Defendants have violated Missouri's Religious Freedom Restoration Act; (2) enjoin the Missouri Defendants, including their officers and agents, from enforcing the visitation

policy; (3) award Plaintiffs their reasonable costs and attorney's fees; and (4) enter such other and further relief as the Court deems just and proper.

## COUNT IV
## Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

***Brought by the Archdiocese, Archbishop Rozanski, and Father Schroeder, Individually; the Archbishop and Father Schroeder on Behalf of the Detainees; and the Archdiocese on Behalf of Its Unnamed Member Priests; Against the ICE Defendants.***

109. Plaintiffs incorporate and reallege the allegations of the preceding paragraphs as if set forth fully herein.

110. The ICE Defendants are part of the federal "government" within the meaning of RFRA, 42 U.S.C. § 2000bb-2(1), and act under color of federal law.

111. The ICE Defendants have substantially burdened the religious exercise of the detainees, the Archbishop, and Father Schroeder through their weakening of religious-liberty protections for contractor facilities and their deliberate indifference to widespread, foreseeable violations of those protections, including at the Ste. Genevieve County Detention Center.

112. The ICE Defendants' failure to supervise contractor facilities for compliance with religious-liberty protections was highly likely, given the circumstances, to give rise to the substantial burden on Plaintiffs' religious exercise alleged herein.

113. ICE refused to require contractor facilities to live up to the standards that ICE imposes.

114. ICE cannot satisfy strict scrutiny because the ICE Defendants cannot demonstrate that their actions and omissions are the least restrictive means of furthering a compelling governmental interest.

115. The Archbishop and Father Schroeder have standing to assert the detainees' rights on their behalf for the reasons set forth in Count I. The Archdiocese has standing to assert the rights of its unnamed priests for the reasons set forth in Count II.

116. The Archdiocese, the Archbishop and Father Schroeder have also suffered an independent injury in fact from ICE's failure to protect religious liberty at the Ste. Genevieve County Detention Center because the failure has prevented them from fulfilling their spiritual obligations.

117. As a direct and proximate result of the ICE Defendants' violation of RFRA, Plaintiffs have suffered and continue to suffer irreparable harm.

WHEREFORE, Plaintiffs Archbishop Rozanski and Father Schroeder, individually and on behalf of the detainees, and the Archdiocese, individually and on behalf of its unnamed priests, respectfully request that this Court (1) enter a declaratory judgment that the ICE Defendants have violated RFRA; (2) enjoin the ICE Defendants, including their officers and agents, to (a) apply their standards requiring private pastoral-visits (as outlined in the

Performance-Based National Detention Standards) to the Ste. Genevieve County Detention Center; (b) implement inspection policies and procedures reasonably designed to detect religious-liberty violations at contractor detention facilities, including the denial of private clergy visits and the denial of access to the sacraments; and (c) issue deficiencies to contractor detention facilities found not to comply with applicable religious-liberty detention standards, subjecting non-compliant facilities to loss of funding; (3) award Plaintiffs their reasonable costs and attorney's fees; and (4) enter such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

A. Enter a declaratory judgment that Defendants have violated RLUIPA, RFRA, the Missouri Religious Freedom Restoration Act, and the Free Exercise Clause of the First Amendment;

B. Enjoin Defendants as follows:

***Missouri Defendants***. Enjoin the Missouri Defendants, and their agents and successors, from:

(a) enforcing the no-contact policy to prevent priests from meeting face-to-face and in private with detainees who request a clergy visit, and instead allow priests access to detainees on the same terms as attorneys;

(b) enforcing the 4-hour time-restriction to limit clergy visits, and instead allow clergy visits during business hours, on the same terms as lawyers and consular officials; and

(c) enforcing the visitation policy to prevent the celebration of Mass on reasonable terms.

***The ICE Defendants.*** Enjoin the ICE Defendants, and their agents and successors, from:

(a) paying any federal funds to the Ste. Genevieve detention center for housing ICE detainees until the detention center has implemented the religious accommodations requested above;

(b) housing new ICE detainees at the Ste. Genevieve detention center until the detention center has implemented the religious accommodations requested above;

(c) relocating any Catholic ICE detainee who is currently within or who enters the territorial boundaries of the Archdiocese of St. Louis to any other detention facility that does not provide substantially the same religious accommodations requested above; and

(d) paying any federal funds for housing ICE detainees to any detention facility to which an ICE detainee described in (c) might be transferred unless that facility allows substantially the same religious accommodations requested above;

(e) omitting religious-liberty criteria—including criteria regarding the availability of private, in-person pastoral visits—from the inspection protocol applicable to the Ste. Genevieve detention center and to any other detention facility to which the detainees described in (c) may be transferred.

C. Award Plaintiffs their reasonable costs and attorney's fees; and

D. Enter such other and further relief as the Court deems just and proper.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Christopher J. Schmidt*

Christopher J. Schmidt #53362 (MO)
Barbara Smith Tyson #66237 (MO)
Edward G. Houser #77733 (MO)*
BRYAN CAVE LEIGHTON PAISNER LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102
Phone: (314) 259-2000
christopher.schmidt@bclplaw.com
barbara.smith@bclplaw.com
ed.houser@bclplaw.com

Clayton Buckner #72730 (MO)*
BRYAN CAVE LEIGHTON PAISNER LLP
1200 Main St Ste 3800,
Kansas City, MO 64105
Phone: (816) 374-3200
clayton.buckner@bclplaw.com

Caleb T. Mathena, *pro hac vice forthcoming*
BRYAN CAVE LEIGHTON PAISNER LLP
1201 Third Ave., Suite 5000
Seattle, WA 98104
Phone: (206) 600-6641
caleb.mathena@bclplaw.com

**Application for admission forthcoming*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing, together with the Summons and Complaint, will be served on Defendants, on or about October 5, 2026, as follows: (i) upon Sheriff Gary Stolzer, Major Jason Schott, and Lieutenant Andrew Johnson by personal service at the Ste. Genevieve County Detention Center, 5 Basler Drive, Ste. Genevieve, MO 63670; (ii) upon Secretary Markwayne Mullin by service on the U.S. Department of Homeland Security, Office of the General Counsel, in accordance with Fed. R. Civ. P. 4(i)(2); and (iii) upon Acting Director David J. Venturella and Associate Director Jennifer M. Fenton by service on U.S. Immigration and Customs Enforcement, Office of the Principal Legal Advisor, in accordance with Fed. R. Civ. P. 4(i)(2); in each case together with service on the United States in accordance with Fed. R. Civ. P. 4(i)(1), by certified mail addressed to the United States Attorney for the Eastern District of Missouri and the Attorney General of the United States.

*/s/ Barbara Smith Tyson*

## EXHIBITS

**1** Ste. Genevieve County Detention Center webpage with FAQs and Visitation Policy Excerpt, tinyurl.com/SteGenPolicy.

**2** ICE webpage on Ste. Genevieve County Detention Center, tinyurl.com/ICESteGen.

**3** Declaration of Msgr. James Ramacciotti

*Exhibit A:* Provisions from the Code of Canon Law and the Catechism of the Catholic Church.

**4** Declaration of Rev. Chris Schroeder

**5** Declaration of Sara Drost

**6** Intergovernmental Agreement, Ste. Genevieve County Detention Center

**7** Declaration of Very Rev. Michael J. Lydon, V.E.

*Exhibit A*: May 18, 2026 Letter from Archbishop Rozanski to Lt. Johnson

**8** Charlie Brennan, 'No Contact' Means No Communion for Jailed Immigrants, St. Louis Bus. J. (Aug. 26, 2026), tinyurl.com/BrennanICE.

**9** Declaration of Rev. David Kiblinger, S.J.

**10** Declaration of Rev. Aaron Nord

**11** Declaration of Rev. Eric Olsen

**12** Declaration of Kris Walentik

**13** Declaration of Kevin Chase

**14** Declaration of Carl Kinsky

**15** INS Detention Standard 5.5 (2000), tinyurl.com/INS-Standard-5-5.

**16** 2016 Performance Based National Detention Standards, Standard 5.5, tinyurl.com/PBDNS-2016.

**17** 2026 National Detention Standards, Standard 5.3, tinyurl.com/NDS-2026.

**18** Kate Scanlon, *Barron: Administration 'Assured' Him Detainees' Access to Sacraments 'Under Careful Review'*, OSV News (Nov. 4, 2025), tinyurl.com/Barron-Careful-Review.

**19** Order granting preliminary injunction in *Coalition for Spiritual & Public Leadership v. Noem.*

**20** Order granting preliminary injunction in *Minneapolis Ares Synod of the Evangelical Lutheran Church in America v. DHS*.

**21** Michael Boyd Jr., *Sheriff Speaks up After Accusations Made on Inmate Treatment*, Ste. Genevieve Herald (June 6, 2026), https://tinyurl.com/Sheriff-speaks.

**22** July 9, 2026 ICE Inspection, Ste. Genevieve County Detention Center, https://tinyurl.com/SteGenInspection.

**23** Declaration of Barbara Smith Tyson

*Exhibits A–X:* Publicly available materials relating to religious liberty violations at ICE detention facilities.