**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| ARCHBISHOP MITCHELL T. ROZANSKI, FR. CHRISTOPHER SCHROEDER, ARCHDIOCESE OF ST. LOUIS,<br><br>*Plaintiffs*,<br><br>v.<br><br>SHERIFF GARY STOLZER, MAJOR JASON SCHOTT, and LIEUTENANT ANDREW JOHNSON, in their official capacities; MARKWAYNE MULLIN, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, DAVID J. VENTURELLA, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and JENNIFER M. FENTON, ASSOCIATE DIRECTOR, OFFICE OF PROFESSIONAL RESPONSIBILITY, in their official capacities.<br><br>*Defendants*. | ) | CASE NO.: 1:26-cv-00224 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

*Oral Argument Requested*

## TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

I. The Sainte Genevieve Detention Center, Which Ordinarily Houses Local Criminals, Opts Into Housing Federal ICE Detainees And Imposes A No-Contact, Time-Restricted Visitation Policy. ..... 3

A. The Detention Center Houses ICE Detainees. ..... 3

B. The Detention Center Imposes A Strict Visitation Policy As To Clergy But Makes Exceptions To The Policy For Lawyers And Consular Officials. ..... 4

C. The Jail Defends The Policy As Necessary For "Safety" And To Prevent "Contraband." ..... 6

II. ICE Detainees Request Access To Catholic Priests, Priests Cannot Provide Religious Care, And Catholic Leaders Request Access To Do So. ..... 6

III. ICE Officials' Active Acquiescence in the Denial of Religious Liberty ..... 9

LEGAL STANDARD ..... 12

ARGUMENT ..... 13

I. Plaintiffs Are Likely To Succeed On Their Religious Liberty Claims Because The Visitation Policy Fails Strict Scrutiny. ..... 14

A. The Visitation Policy Violates Detainees' Rights Under RLUIPA. ..... 14

1. <u>The Visitation Policy Substantially Burdens Detainees' Sincerely Held Religious Beliefs.</u> ..... 15

2. Prison "Safety" Is Not A Compelling Government Interest, And (Even If It Were) The Policy Is Not The Least Restrictive Means of Furthering It. .................... 19

3. Plaintiffs Have Standing To Raise These Claims on Behalf of Detainees. .................... 23

B. The Visitation Policy Violates the First Amendment Rights of the Detainees, Priests, and the Archbishop .................... 26

1. The Policy Burdens Religious Exercise. .................... 27

2. The Policy Is Not Generally Applicable. .................... 28

3. The Policy Fails Strict Scrutiny. .................... 30

C. The State and Local Defendants Are Liable Under Missouri's RFRA For Their Enforcement Of The Policy. .................... 30

II. Plaintiffs Are Likely To Succeed On Their RFRA Claims Against the ICE Defendants. .................... 31

III. Plaintiffs Have Suffered Irreparable Harm, and the Balance of the Equities And Public Interest Favor an Injunction. .................... 39

CONCLUSION .................... 40

# TABLE OF AUTHORITIES

## Statutes

Religious Land Use and Institutionalized Persons Act (RLUIPA)
42 U.S.C. § 2000cc....................passim

Religious Freedom Restoration Act (RFRA)
42 U.S.C. § 2000bb-1....................passim

Missouri RFRA
RSMo. § 1.302.1.................... 13

## Cases

*Abundant Life Baptist Church of Lee's Summit, Mo. v. Jackson County*
539 F. Supp. 3d 978 (W.D. Mo. 2021) .................... 29

*Brandt ex rel. Brandt v. Rutledge*
47 F.4th 661 (8th Cir. 2022) .................... 40

*Burwell v. Hobby Lobby Stores, Inc.*
573 U.S. 682 (2014).................... 14, 20, 23

*Calvary Chapel Dayton Valley v. Sisolak*
591 U.S. 1042 (2020).................... 26

*Cath. Benefits Ass'n v. Burrows*
732 F. Supp. 3d 1014 (D.N.D. 2024) .................... 40

*Cigna Corp. v. Bricker*
103 F.4th 1336 (8th Cir. 2024) .................... 12

*City of Boerne v. Flores*
521 U.S. 507 (1997).................... 30

*Coal. for Spiritual & Pub. Leadership v. Noem*
No. 25 C 14168, 2026 WL 396349 (N.D. Ill. Feb. 12, 2026)............ 11, 36

*Craig v. Boren*
429 U.S. 190 (1976).................... 25

*Fulton v. City of Philadelphia*
593 U.S. 522 (2021) .......... 21, 30

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*
546 U.S. 418 (2006) .......... 20

*Griswold v. Connecticut*
381 U.S. 479 (1965) .......... 25

*Holt v. Hobbs*
574 U.S. 352 (2015) .......... passim

*In re Grand Jury Investigation*
918 F.2d 374 (3d Cir. 1990) .......... 17

*Kennedy v. Bremerton Sch. Dist.*
597 U.S. 507 (2022) .......... 26, 28, 30

*Kowalski v. Tesmer*
543 U.S. 125 (2004) .......... 24

*Mahmoud v. Taylor*
606 U.S. 522 (2025) .......... 26, 27, 30

*Maisonet v. Comm'r, Ala. Dep't of Corr.*
No. 22-10023, 2022 WL 4283560 (11th Cir. Sep. 16, 2022) .......... 27

*Marianist Province of U.S. v. City of Kirkwood*
944 F.3d 996 (8th Cir. 2019) .......... 12, 31

*Maryland Shall Issue, Inc. v. Hogan*
971 F.3d 199 (4th Cir. 2020) .......... 25

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*
584 U.S. 617 (2018) .......... 26

*Minn. Area Synod of the Evangelical Lutheran Church in Am. v. U.S. Dep't of Homeland Sec.*
No. 0:26-CV-01576 (D. Minn. Mar. 20, 2026) .......... 11, 36

*Missouri v. Trump*
128 F.4th 979 (8th Cir. 2025) .......................................................... 39

*Mockaitis v. Harcleroad*
104 F.3d 1522 (9th Cir. 1997) .......................................................... 27

*Monteer v. ABL Mgmt. Inc.*
No. 4:21-CV-756 ACL, 2021 WL 3570301 (E.D. Mo. Aug. 12, 2021) ....... 3

*Murphy v. Mo. Dep't of Corr.*
372 F.3d 979 (8th Cir. 2004) .................................... 16, 17, 18, 19, 22

*Native Am. Council of Tribes v. Weber*
897 F. Supp. 2d 828 (D.S.D. 2012) .............................................. 21, 22

*Partridge v. City of Benton, Arkansas*
157 F.4th 970 (8th Cir. 2025) .......................................................... 33

*Patel v. Bureau of Prisons*
125 F. Supp. 3d 44 (D.D.C. 2015) ........................................... 33, 34, 38

*Powers v. Ohio*
499 U.S. 400 (1991) ....................................................................... 24, 25

*Ramirez v. Collier*
595 U.S. 411 (2022) .......................................................................passim

*Randolph v. Rodgers*
253 F.3d 342 (8th Cir. 2001) .......................................................... 32

*Religious Sisters of Mercy v. Becerra*
55 F.4th 583 (8th Cir. 2022) ....................................................... 31, 39

*Remmers* v. *Brewer*
529 F.2d 656 (8th Cir. 1976) .......................................................... 29

*Rizzo v. Goode*
423 U.S. 362 (1976) ......................................................................... 33

*Roberts v. Neace*
958 F.3d 409 (6th Cir. 2020) .......................................................... 29

*Roman Catholic Diocese of Brooklyn v. Cuomo*
592 U.S. 14 (2020) ........................................................................ 39

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*
508 U.S. 520 (1993) ............................................................ 13, 26, 28

*Smith v. Muccino*
223 F. Supp. 2d 396 (D. Conn. 2002) ................................................ 31

*Tandon v. Newsom*
593 U.S. 61 (2021) (per curiam) .............................................. 2, 28, 29

*Tanzin v. Tanvir*
592 U.S. 43 (2020) ................................................................... 31, 32

*The Presbyterian Church (U.S.A.) v. United States*
870 F.2d 518 (9th Cir. 1989) .............................................................. 23

*Trammel v. United States*
445 U.S. 40 (1980) ........................................................................ 17

*Trinity Lutheran Church of Columbia v. Comer*
582 U.S. 449 (2017) .......................................................................... 2

*Turner v. Safley*
482 U.S. 78 (1987) ........................................................................ 26

*U.S. Dep't of Labor v. Triplett*
494 U.S. 715 (1990) ........................................................................ 25

*Weir v. Nix*
114 F.3d 817 (8th Cir. 1997) .............................................................. 16

*Wisconsin v. Yoder*
406 U.S. 205 (1972) ................................................................... 27, 30

*Zadvydas v. Davis*
533 U.S. 678 (2001) ........................................................................ 26

## INTRODUCTION

The Ste. Genevieve County Detention Center imposes a "no contact" visitation policy that prohibits clergy from meeting privately and face-to-face with ICE detainees housed there and limits all clergy visits to a single 4-hour window once weekly. This policy directly infringes the religious liberty rights of Catholic detainees and the Catholic priests who minister to them. Because the policy both (1) bans the Catholic sacraments and severely limits spiritual counseling; and (2) treats clergy differently and worse than other visitors, the policy offends religious liberty protections twice-over. Each of these infringements, on its own, would merit relief. Combined, they demand it.

First, the visitation policy *bans* priests from offering, and detainees from receiving, the sacraments of confession and communion, which are central to the Catholic faith. What spiritual care priests can offer is truncated by the limited time allowed for no-contact clergy visits—a single 4-hour window on Mondays. In most weeks, this means many detainees who have requested a pastoral visit cannot have one. Banning religious practice (combined with the policy's lack of justification) merits an injunction.

But it gets worse, because the visitation policy does not apply universally. Lawyers can arrange contact visits with their clients on demand to speak face-to-face, in private, and to pass legal papers back and forth. The policy also exempts consular officials, who can likewise see foreign nationals

on demand.

Because the jail's time-restricted, no-contact visitation policy makes an exception for lawyers and consuls, the jail cannot deny the same accommodation to clergy. The Constitution "protects religious observers against unequal treatment[.]" *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449, 458 (2017) (cleaned up). It requires neutrality between religious and non-religious activity, so the right to legal counsel may not transcend the right to spiritual counsel. When a government rule "treat[s] *any* comparable secular activity more favorably than religious exercise," it is "not neutral and generally applicable, and therefore trigger[s] strict scrutiny[.]" *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (citation omitted). This policy fails strict scrutiny because it is not narrowly tailored to any substantial government interest.

A preliminary injunction will right these wrongs. Plaintiffs are likely to succeed on their claims, because the policy (1) infringes detainees' RLUIPA rights (which these priests bring in a third-party capacity); (2) violates the First Amendment rights of clergy and detainees; and (3) violates federal and state statutes (state RFRA as to the Missouri defendants and federal RFRA as to ICE defendants). A complete denial of First Amendment rights is irreparable harm per se, and the balance of equities and public interest favor protecting religious liberty. The Court should enter the requested injunction.

## FACTUAL BACKGROUND

### I. The Ste. Genevieve Detention Center, Which Ordinarily Houses Local Criminals, Contracts To House Federal ICE Detainees And Imposes A No-Contact, Time-Restricted Visitation Policy.

#### A. The Detention Center Houses ICE Detainees.

The Ste. Genevieve County Detention Center is operated by County Sheriff Gary Stolzer, through his subordinates Chief Deputy Major Jason Schott and Jail Administrator Lt. Andrew Johnson. Compl. ¶ 17.[1] The detention center ordinarily houses pretrial state criminal detainees and civilly-detained sexually violent predators. Since mid-2025, the detention center has also housed federal immigration detainees, immigrants held civilly by ICE. Compl. ¶ 5. Approximately 3,000 individual detainees have passed through the detention center since July 2025, with approximately 150 present at any time. *Id.*; Compl. Ex. 5, Drost Decl. ¶ 2. These detainees are held at the facility pursuant to a contract with ICE, in which ICE pays the detention center $103 per diem, per detainee, for housing. *See* Compl. Ex. 6, Ste. Genevieve County Detention Center Intergovernmental Agreement (listing ICE as "Other Authorized Agency User" of the facility). The contract requires the jail to

---

[1] These county employees are proper official-capacity defendants. *Monteer v. ABL Mgmt. Inc.*, No. 4:21-CV-756, 2021 WL 3570301, at *3 (E.D. Mo. Aug. 12, 2021) (Limbaugh, J.). The county may be held officially liable through these officials because the religious liberty violations here result from an "official policy" of the county, imposed by the Sheriff, the "municipal official who has final authority regarding such matters." *Id.* at *4.

provide detainees "reasonable opportunities to participate in religious practices." *Id.* at 4.

That language comes from ICE's promulgated "National Detention Standards," which apply at facilities like this one, where ICE acknowledges its responsibility for ensuring detainees have "reasonable and equitable opportunities to participate in the practices of their faith, limited only by documented threats to safety, security, and the orderly operation of the facility." Compl. Ex. 17, ICE, *National Detention Standards (NDS)*, "Religious Practices," Standard 5.3(I) (rev'd 2026), tinyurl.com/NDS-2026. ICE also claims to audit facilities for compliance. *See Office of Professional Responsibility*, ICE, https://www.ice.gov/opr ("OPR inspects ICE detention facilities to ensure they comply" and "comprehensively assess[es] the performance of each detention facility"). Major Schott has indicated that ICE inspects the jail weekly. Compl. ¶ 84.

### B. The Detention Center Imposes A Strict Visitation Policy For Clergy But Makes Exceptions For Lawyers And Consuls.

The jail imposes a strict visitation policy with two problematic components.[2] First, the policy is "no-contact," meaning it bars contact between

---

2 The policy, as described in this section, is posted on both the Sheriff Department's website and ICE's. The county website states "Clergy must visit during regular visitation hours/days. Clergy visit will be as any other visit: 30 minutes in duration, no contact visits, first come/first served. . . . Absolutely no

a visitor and a detainee by physically separating them at all times by a glass partition. Compl. ¶ 8; Compl. Ex. 4, Schroeder Decl. ¶ 4; Compl. Ex. 9, Kiblinger Decl. ¶ 14; Compl. Ex. 10, Nord Decl. ¶ 9; Compl. Ex. 11, Olsen Decl. ¶¶ 10–11. Conversations occur over a phone line that the jail can monitor. Compl. ¶ 50; Kiblinger Decl. ¶ 13. Second, the visitation policy imposes a strict time limitation, allowing clergy visits only during a four-hour window weekly. Compl. ¶ 7; Kiblinger Decl. ¶ 7.

The visitation policy does not apply across the board. At least two categories of visitors are exempt, lawyers and consular officials. Lawyers (including public defenders representing civilly detained sexual offenders) may meet with their clients at the jail privately, in person, and at any time during business hours, simply by contacting the jail in advance. Compl. ¶ 52; Compl. Ex. 13, Chase Decl. ¶¶ 3–5; Compl. Ex. 14, Kinsky Decl. ¶¶ 5–6; *see also* Compl. Ex. 1. Additionally, "[c]onsular officials" "may meet with their detained nationals at any time," again by simply making "prior arrangements" with the

---

items . . . or religious materials, etc. will be passed during visitation." Compl. Ex. 1, *Detention Center FAQs*, tinyurl.com/SteGenPolicy; *see also id.*, *Detainee In-Facility Visitation Policy Excerpt* ("NO CONTACT VISITS ARE ALLOWED."). Interestingly, the ICE website states only that "family or other *social* visits are non-contact." Compl. Ex. 2, *Ste. Genevieve County Detention Center: Hours of Visitation*, ICE (emphasis added), tinyurl.com/ICESteGen. Either ICE deems clergy visits merely "social" or its oversight of the jail is so deficient that it has not even noticed that the jail has posted—and enforces—a different policy than that described on ICE's website.

jail. Compl. ¶ 52.

The clergy visitation policy was not always so draconian. The jail previously allowed clergy to celebrate in-person religious services, with no separation between clergy and congregation. Kinsky Decl. ¶ 4. There is no evidence this practice resulted in any security or contraband issues, *id.*, but the jail now prohibits both in-person religious services and mere *visits*.

### C. The Jail Defends The Policy As Necessary For "Safety" And To Prevent "Contraband."

The jail administration has offered the most barebones justification for the policy, explaining only that it is designed to "maintain[] the safety and security of the facility, staff, visitors, and detainees" and to "prevent illegal contraband or other prohibited items from being passed from outside individuals to detainees housed within our facility." Compl. Ex. 8, Charlie Brennan, *'No Contact' Means No Communion for Jailed Immigrants, St. Louis Bus. J.* (Aug. 26, 2026), tinyurl.com/BrennanICE (quoting Major Schott).

## II. ICE Detainees Request Visits From Catholic Priests, Priests Are Denied Access To Provide Religious Care, And Catholic Leaders Request An Accommodation.

A local non-profit group, Abide In Love Ste. Genevieve ("AIL") ministers to ICE detainees at the detention center. Compl. ¶ 60; Drost Decl. ¶ 3. AIL operates a pen pal system, through which its volunteers correspond with detainees. Drost Decl. ¶ 3. As part of that program, each AIL pen pal fills out

a weekly clergy request form for any detainee who has asked for spiritual care. *Id.* ¶ 4. Multiple detainees ask to speak to a priest each week, and several have explicitly asked to receive the sacraments. *Id.* ¶ 5. For example, a detainee recently told AIL he wanted to go to confession before being deported, because he feared what would happen after deportation. *Id.* ¶ 6. AIL conveys these requests to the Archdiocese, which provides visiting priests a list of those who have requested a pastoral visit. Kiblinger Decl. ¶ 6; Nord. Decl. ¶ 7.

Several priests, committed to Christ's command that they visit to the imprisoned, *see* Matthew 25:36, seek to minister to Catholic detainees at the jail. But they face significant hurdles.

The limited visiting hours, combined with the dilatory manner in which jailers bring detainees to meet with priests, means that, almost every week, the visiting priest is unable to meet with every detainee who requests a visit. Compl. ¶ 53; Schroeder Decl. ¶¶ 15–17; Kiblinger Decl. ¶¶ 6–8; Nord Decl. ¶ 8; Olsen Decl. ¶ 13.

Moreover, priests cannot bring detainees Catholic sacraments (confession and communion), even though detainees frequently desire to receive them, as expressed both to AIL and to priests during pastoral visits. Schroeder Decl. ¶ 7; Kiblinger Decl. ¶ 10; Nord Decl. ¶ 12. Mass also cannot be celebrated. Schroeder Decl. ¶¶ 9, 11; Kiblinger Decl. ¶ 11; Nord Decl. ¶¶ 9, 13; Olsen Decl. ¶ 12.

Detainees who request the sacrament of confession must be told that a priest cannot hear it because clergy may not hear confession over the telephone (and doubly so over a line that could be monitored by a third party), on pain of excommunication for a priest who violates the sacramental seal. Kiblinger Decl. ¶ 10; Nord Decl. ¶ 12; Drost Decl. ¶ 6; *see* Compl. Ex. 3, Ramacciotti Decl. ¶¶ 9, 22–25.

Similarly, priests cannot offer detainees—often faithful Catholics who regularly attended Mass prior to their detention—communion. Schroeder Decl. ¶¶ 10–11; Kiblinger Decl. ¶¶ 5, 14; Nord Decl. ¶¶ 9, 11; Olsen Decl. ¶¶ 7–11. Receiving communion requires physical contact between priest and practitioner, and it offends Catholic doctrine for the physical body and blood of Christ to be conveyed from a priest to anyone *but* the Catholic receiving the sacrament. Ramacciotti Decl. ¶¶ 13–15, 30–35.

In short, the no-contact policy makes it impossible for Catholic detainees to exercise the core tenets of their faith and for clergy to minister to them. Compl. Ex. 7, Lydon Decl. ¶¶ 2–3. To address these problems, Fr. Michael Lydon, the Archbishop's vicar overseeing the territory that includes the detention center, respectfully asked Lt. Johnson by phone in late 2025 for permission for clergy to visit detainees face-to-face to administer communion and confession. *Id.* ¶ 4. Lt. Johnson said this would not be possible under the

no-contact policy. *Id.*[3]

Again seeking an accommodation, on May 18, 2026, the Archbishop wrote Lt. Johnson a letter requesting (1) face-to-face visits to administer communion and confession, (2) permission to celebrate Mass, and (3) expanded visiting hours beyond the Monday, 12-4 p.m. window. He received no response. *Id.* ¶¶ 5-6 & Ex. A.

Father Lydon renewed the request *again* by voicemail in late August 2026. Lt. Johnson's supervisor, Chief Deputy Major Jason Schott, called back to say the requests were denied and would not be discussed further. *Id.* ¶ 7.

AIL has asked several detainees whether they would be willing to serve as *Doe* plaintiffs or state their desire for access to the sacraments and priestly counsel on the record. Drost Decl. ¶ 7. Every detainee declined based on a fear of retaliation for participating in a lawsuit against ICE and the jail. *Id.*; *see also* Compl. Ex. 12, Walentik Decl. ¶ 3.

## III. ICE Officials' Active Acquiescence In Denying Religious Liberty

The Missouri officials who created and enforced this unconstitutional policy were only able to do so because of ICE's deliberate indifference. ICE

---

[3] Lt. Johnson stated that the no-contact policy was imposed by ICE. *Id.* But ICE's promulgated detention standards do not contain a "no-contact" policy, for clergy or for anyone else. *See generally* Compl. Ex. 17. Major Schott has subsequently changed course, publicly stating that the "no-contact" policy is simply a jail policy, not ICE's. Compl. Ex. 8.

lowered religious-practice standards at contractor facilities and then refused to enforce the standards that remain (even as ICE faced legal challenges to these practices at other facilities nationwide). *See* Compl. ¶¶ 78, 82; Compl. Ex. 23.

The INS's original detention standards required contractor facilities to allow private clergy meetings on the same terms as attorney visits.[4] After ICE took over immigration enforcement, it retained this provision in the "Performance Based National Detention Standards" (PBNDS), which apply at ICE-run facilities, requiring that "[p]astoral visits . . . take place in a private visiting room" including "in the legal visitation area when available." ICE, *Performance-Based National Detention Standards 2011 (PBNDS)*, "Religious Practices," Standard 5.5(V)(F) (rev'd Dec. 2016), tinyurl.com/PBDNS-2016.

But at local contractor facilities like this one, ICE applies only the "streamlined" "National Detention Standards" (NDS), which cut the religious-practice standard from nine pages to four and eliminate the private-visit and attorney-area-accommodation language. Compl. ¶ 77; *see* Compl. Ex. 17,

---

[4] Compl. Ex. 15, INS, *Detention Standards*, "Religious Practice," Standard 5.5(III)(J) (Sept. 20, 2000), tinyurl.com/INS-Standard-5-5 ("If requested by a detainee, the chaplain or designee shall facilitate arrangements for pastoral visits by a clergyperson or representative of the detainee's faith . . . . Accommodation should be made *for privacy through use of the attorney/client area*[.]" (emphasis added)).

Standard 5.3. Even so, the NDS still commits ICE to "ensur[ing]" detainees "reasonable and equitable opportunities to participate in the practices of their faith, limited only by documented threats to safety, security, and the orderly operation of the facility." *See id.*, Standard 5.3(I).

In November 2025, Bishop Robert Barron raised concerns about detainees receiving the sacraments to senior DHS officials, who called the matter "under careful review." Compl. ¶ 80; Compl. Ex. 18. More than ten months later, there has been no action: two other groups of clergy have since sued ICE and obtained injunctions for access to detainees and to provide the sacraments to detainees. *See* Compl. ¶ 81; Compl. Exs. 19, 20 (citing *Coal. for Spiritual & Pub. Leadership v. Noem*, No. 25 C 14168, 2026 WL 396349, at *1 (N.D. Ill. Feb. 12, 2026); *Minn. Area Synod of the Evangelical Lutheran Church in Am. v. U.S. Dep't of Homeland Sec.*, No. 0:26-CV-01576 (D. Minn. Mar. 20, 2026), ECF No. 57).

In the face of these repeated violations, ICE's Office of Professional Responsibility has done nothing, even though it purportedly "inspects, audits and reviews ICE . . . programs to assess compliance with federal laws, applicable policies and procedures, and the agency's detention standards." *See Office of Professional Responsibility*, ICE, https://www.ice.gov/opr. The OPR has implemented no policy or procedure to inspect contractor facilities for compliance with the religious-liberty provisions of ICE's standards.

That includes the Ste. Genevieve facility, which ICE apparently audits weekly. *See* Compl. ¶ 84. On July 9, 2026, for example, ODO inspected the jail and awarded it a "Superior" rating, with only two "Deficiencies," related to medical and dental care. Compl. Ex. 22, ICE ODO Inspection Report (Ste. Genevieve Co. Jail, June 10–July 9, 2026), at 4, 6, https://tinyurl.com/SteGenInspection. No part of the evaluation references pastoral access, and the official ICE inspection form has no mechanism to record any religious-liberty "Deficiency" at all. *See generally id.*

## LEGAL STANDARD

An injunction should issue when (1) the plaintiff is likely to succeed on the merits, (2) he suffers irreparable harm, (3) the balance of the equities favors him, and (4) the public interest favors an injunction. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024). "[T]he probability of success factor is the most significant." *Id.* (citation omitted).

Two federal statutes protect religious liberty: the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, and the Religious Freedom Restoration Act (RFRA), *id.* § 2000bb-1. Both prohibit government action that substantially burdens religious exercise unless the government can establish that it furthers a compelling interest *and* is narrowly tailored. Missouri's RFRA is "more protective of religious exercise" than its federal counterpart. *See* RSMo. § 1.302.1(2); *Marianist Province of U.S. v. City*

*of Kirkwood*, 944 F.3d 996, 1003–04 (8th Cir. 2019) (It "prohibits any 'restriction' on religious exercise, not just 'substantial' burdens" and "requires that a regulation be 'essential to further a compelling governmental interest'" without being "'unduly restrictive' given the circumstances."). Finally, the First Amendment applies strict scrutiny to government action that burdens[5] religious exercise and is not neutral and generally applicable (*e.g.*, because the policy makes exceptions for secular but not religious activity). *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542–46 (1993). Thus, for all claims raised in this case, Defendants must meet an exacting test.

## ARGUMENT

The no-contact visitation policy violates the law because it amounts to a total ban on the provision of Catholic sacraments central to the practice of the Catholic faith—communion, confession, and the celebration of Mass—which require in-person (and, for confession, *private*) contact between priests and practitioners. The four-hour-a-week window for clergy visits is also illegal because it severely restricts—and in some cases totally prevents—access to spiritual counseling.

---

[5] RFRA and RLUIPA require a "substantial" burden on religious exercise. *See* 42 U.S.C. §§ 2000bb-1, 2000cc. A freestanding First Amendment claim requires only a "burden" on religious exercise. *See Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 831 (8th Cir. 2009).

The jail offers no compelling interest to support this policy. A generalized need for "security" or to prevent "contraband" is not compelling as a matter of law. Even if it were, the policy is not narrowly tailored because there are ample ways to achieve these goals while allowing in-person ministry. Most notably, the jail already allows exceptions for lawyers and consular officials. The First Amendment, the RFRAs, and RLUIPA prohibit banning religion and favoring secular activity over religious practice.

## I. Plaintiffs Are Likely To Succeed On Their Religious Liberty Claims Because The Visitation Policy Fails Strict Scrutiny.

### A. The Visitation Policy Violates Detainees' Rights Under RLUIPA.

Congress enacted RLUIPA, 42 U.S.C. § 2000cc *et seq.*, and its sister statute, RFRA, 42 U.S.C. § 2000bb *et seq.*, "to provide very broad protection for religious liberty[.]" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RLUIPA "prohibits a state or local government" that receives federal funding (like the jail here) "from taking any action that substantially burdens the religious exercise of an institutionalized person unless the government demonstrates that the action constitutes the least restrictive means of furthering a compelling governmental interest." *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). An "[i]nstitutionalized person" includes anyone "residing in or confined to" a covered institution, 42 U.S.C. § 2000cc-1(a), including federal

detainees confined in state facilities, *e.g.*, *Khatib v. County of Orange*, 639 F.3d 898, 904–05 (9th Cir. 2011) (en banc).

Plaintiffs must establish that the detainees' sincere religious beliefs are substantially burdened by the visitation policy. *Ramirez v. Collier*, 595 U.S. 411, 425 (2022). Once they do so, the burden shifts to defendants to demonstrate that the policy is "the least restrictive means of furthering a compelling governmental interest." *Id.*

1. The Visitation Policy Substantially Burdens Detainees' Sincerely Held Religious Beliefs.

RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Here, the question is easy because the desired forms of religious exercise—Mass, communion, confession, and pastoral counsel—are "central to" Catholicism. *See id.*; *see also* Ramacciotti Decl. ¶¶ 10–11, 21, 26–28. In the sacraments, Catholics "receive the very life of God—Father, Son, and Holy Spirit." Ramacciotti Decl. ¶ 10. "[T]he sacraments . . . are *necessary for salvation*." *Id.* ¶ 18. Prohibiting detainees from participating in these core aspects of their faith constitutes a substantial burden.

***Communion.*** Receiving the sacrament of the Eucharist—colloquially, receiving communion, is, for Catholics, "the source and summit of Christian Life." *Id.* ¶ 27. Receiving communion "devoutly and frequently" is not just a

preference for Catholics—as it may be in other Christian denominations—but a religious obligation. *See id.* ¶ 28. Catholic detainees have repeatedly expressed a desire to receive communion. *E.g.*, Drost Decl. ¶ 5. They have never been allowed it.

The no-contact visitation policy prohibits priests from offering and detainees from receiving communion. Communion *requires* in-person contact because the Catholic priest who transubstantiates the host must deliver it directly to the faithful (and only the faithful) receiving it. Ramacciotti Decl. ¶¶ 30–33.[6] The glass partition separating detainees from priests prevents this, so the policy operates as a total ban on communion. Obviously, a total ban on communion "significantly inhibit[s] or constrain[s] conduct or expression" of religious beliefs and "denies [Catholic detainees] reasonable opportunities to engage in those activities that are fundamental to [their] religion." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (quoting *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997)).[7]

---

6 Some lay Catholics may also be "designated" to distribute communion as an "extraordinary minister" through a "prescribed liturgical rite." *Id.* ¶ 30. This option doesn't help here, because any non-clergy visitors filling this role would also be subject to the no-contact policy.

7 Responding to a reporter, Major Schott has proposed an unworkable solution to this problem—asking a priest to pass the Eucharist, "individually wrapped," to a prison guard who would then deliver it to a detainee. *See* Compl. ¶ 31; Compl. Ex. 8. This proposal is no accommodation at all. The

***Reconciliation.*** The Sacrament of Reconciliation—confession—is likewise a core obligation for practicing Catholics: the faithful are "oblige[d] to confess . . . all grave sins," and the Church urges that confession occur regularly. Ramacciotti Decl. ¶ 21. This sacrament—in which a Catholic discloses to a priest the sins he has committed, and the priest offers forgiveness in an appropriate form—requires a confidential conversation. The "seal of confession" forbids a priest from disclosing anything said, including by allowing the exchange to be overheard or recorded. Ramacciotti Decl. ¶ 22–24.

Protecting the privacy of this conversation is "a long-recognized principle of American law" that "virtually every state has recognized [in] some form." *In re Grand Jury Investigation*, 918 F.2d 374, 381 (3d Cir. 1990); *see Trammel v. United States*, 445 U.S. 40, 51 (1980) ("The priest-penitent privilege recognizes the human need to disclose [sins] to a spiritual counselor, in total and absolute confidence[.]").

The visitation policy renders confession impossible. Confession may not be heard via telephone, and certainly not in the context of a non-private conversation. Ramacciotti Decl. ¶¶ 22–25. Because the visitation policy bans confession, it is a substantial burden. *Murphy*, 372 F.3d at 988.

---

sacrament cannot be given through a third party who is not a "designated" Catholic Eucharistic minister. Ramacciotti Decl. ¶¶ 30–31. The host must be passed *directly* from priest to participant. *See id.* ¶¶ 30–33.

***Mass.*** The Catholic faithful are also obliged to attend Mass (on pain of mortal sin). Ramacciotti Decl. ¶ 30. The policy means that detainees have not attended Mass at any point—notwithstanding that priests stand ready and willing to perform Mass at the facility, *see* Schroeder Decl. ¶¶ 9, 11; Kiblinger Decl. ¶ 11; Nord Decl. ¶¶ 9, 13; Olsen Decl. ¶ 12, and that religious services have been offered at the jail in the past, *see* Kinsky Decl. ¶ 4. This ban on the performance and attendance of Mass, too, is a substantial burden. *Murphy*, 372 F.3d at 988 (citation omitted).

***Pastoral Visits.*** In addition to the specific Catholic sacraments the policy prohibits, it also infringes the religious rights of detainees by preventing effective pastoral visits. The need for pastoral counseling by a religious leader who shares one's faith is important to Catholics (as to many others). *See* Ramacciotti Decl. ¶ 17. Cognizant of this, the priests of the Archdiocese have signed up on a rotating basis—each taking time from full-time parish duties—to provide spiritual counsel and prayer to detainees. *See generally* Schroeder Decl.; Kiblinger Decl.; Nord Decl.; Olsen Decl.

Here again, civil law recognizes that spiritual counseling is a core religious practice—even death row inmates are entitled to the care of a pastor (indeed, to the pastor's "religious touch"). *Ramirez*, 595 U.S. at 433.

The 4-hour-a-week visitation policy drastically curtails access to priests. Because of the restricted schedule and the long wait between each visit, each

priest can minister to only a limited number of detainees each Monday. Almost always, some detainees who have asked to speak to a priest miss out completely. Schroeder Decl. ¶¶ 15–17 (has not been able to see all detainees on list "[t]he majority of the time"); Kiblinger Decl. ¶¶ 6–8 ("rarely" able to do so); Nord Decl. ¶ 8; ("rarely, if ever, able to make it through to full list"); Olsen Decl. ¶ 13 ("routinely" unable to complete list). Blocking access to clergy for the week (or longer) "den[ies] [the detainees] reasonable opportunities to engage in those activities that are fundamental to [their] religion." *Murphy*, 372 F.3d at 988.[8] Practicing Catholicism is not a bi-weekly event.

Plaintiffs repeatedly requested that the detention center accommodate the need for Catholic detainees to receive—and Catholic priests to offer—sacraments and spiritual care in person, in private, and outside of the limited window, including in a letter from the Archbishop. Compl. ¶ 27. The detention center ignored his letter and has rejected every request.

2. <u>Prison "Safety" Is Not A Compelling Government Interest, And (Even If It Were) The Policy Is Not The Least Restrictive Means of Furthering It.</u>

Plaintiffs having met their burden, the government must prove two

---

[8] The religious burdens imposed by the policy do not end there. Fr. Olsen was prohibited from confirming a detained parishioner, even though the detainee had scheduled his confirmation before he was detained, and Fr. Olsen could have done so at the jail with minimal hassle. Olsen Decl. ¶¶ 9–10.

things for the policy to survive: (1) a compelling interest supports the visitation policy; and (2) the policy is the least restrictive means of achieving that interest. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006); *see also Hobby Lobby*, 573 U.S. at 726. This requires courts to "look[] beyond broadly formulated interests . . . and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales*, 546 U.S. at 431.

In the first step, the defendants must "prove"—not merely "explain"—that denying an exemption for clergy furthers a compelling interest. *Holt*, 574 U.S. at 364. In the second step, RLUIPA's least-restrictive-means standard is "exceptionally demanding": "if a less restrictive means is available for the Government to achieve its goals, the Government *must* use it." *Holt*, 574 U.S. at 364 (cleaned up) (emphasis added); *accord Ramirez*, 595 U.S. at 425. The government must meet *both* prongs for the policy to survive strict scrutiny. It meets neither, so the policy fails twice-over.

***No-Contact Visits.*** The jail has justified its ban on contact visits through general concerns about security and contraband. *See* Compl. ¶¶ 72–73. As a matter of law, a jailer's invocations of "security" or "contraband prevention," unmoored from actual evidence of harm, is precisely the kind of boilerplate "interest" the Supreme Court has repeatedly held is not "compelling." *Holt*, 574 U.S. at 363–64; *Ramirez*, 595 U.S. at 430; *see also*

*Native Am. Council of Tribes v. Weber*, 897 F. Supp. 2d 828, 853 (D.S.D. 2012), *aff'd*, 750 F.3d 742 (8th Cir. 2014) ("[N]o longer can prison officials justify restrictions on religious exercise by simply citing to the need to maintain order and security . . . . [S]ecurity concerns must be grounded on more than mere speculation, exaggerated fears, or post-hoc rationalizations."). No evidence of security or contraband concerns justify application of this blanket rule. *Holt*, 574 U.S. at 369. Because there is no compelling interest justifying the visitation policy, it fails strict scrutiny.

The no-contact policy additionally fails strict scrutiny for a second and independent reason. Even if these were compelling interests, the policy is not the least restrictive means of achieving them. Most problematically, the policy already contains exceptions—including for attorneys. A policy that bars religious activity while exempting "analogous nonreligious conduct" fails strict scrutiny because it is "substantially underinclusive." *Holt*, 574 U.S. at 366–67; *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). Allowing attorneys contact visits shows that the stated contraband and security rationales "could be achieved by narrower means," *Holt*, 574 U.S. at 367, for example by treating priests the same as lawyers.

But even if the policy contained no secular carve-outs, it would still fail strict scrutiny. *First*, the jail's prior practice proves less restrictive means exist. In the past, the jail allowed contact visits and group religious

celebrations inside the jail. Kinsky Decl. ¶¶ 4–5. That past accommodation of the very activity now prohibited shows the blanket ban is not the least restrictive means. *See Ramirez*, 595 U.S. at 428–29 ("historically and routinely allow[ing] prison chaplains to audibly pray with the condemned" showed lack of narrow tailoring in changed rule). Defendants have not "seriously considered any other alternatives" to the ban on in-person visits, such as resuming the in-person services previously allowed. *Murphy*, 372 F.3d at 989.

*Second*, comparable facilities freely allow in-person clergy visits. Fr. Olsen has regularly been allowed to visit detainees in person and celebrate Mass for them at Lincoln County Jail. Olsen Decl. ¶ 4. And he can meet in person with *criminal* detainees at the Warren County Jail. *Id.* ¶ 5. Similarly, Fr. Lydon has "frequently" met with inmates in person, including to administer the sacraments, "with no issue." Lydon Decl. ¶ 8. None of these visits have created a security or contraband problem. *Id.*; Olsen Decl. ¶ 5. The less restrictive "policies followed at" these "other well-run institutions" suggest that the detention center "could satisfy its security concerns through a means less restrictive than" its blanket ban on contact visits. *Holt*, 574 U.S. at 368–69.[9]

---

[9] Defendants also fail narrow tailoring because they refuse even to engage with Plaintiffs' requested accommodations. Their "burden" under RLUIPA "isn't to mull the claimant's proposed alternatives," but to "demonstrate" they are "ineffective." *Native Am. Council of Tribes*, 750 F.3d at 752. These defendants cannot even be bothered to "mull" over an accommodation. Compl.

***Time-Limited Visits.*** The policy's time limitations are likewise not supported by any compelling interest. Mere administrative convenience certainly does not fit the bill: RLUIPA may "require the government to expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby*, 573 U.S. at 730. Defendants have not shown that restricting clergy visitation hours serves any interest of the highest order.

Again here, even if there were a compelling reason for four-hour-once-weekly religious visits (there is not), making exceptions for lawyers and consular officials defeats any showing this is the least restrictive means of achieving the jail's aims. *Holt*, 574 U.S. at 366–67.

3. <u>Plaintiffs Have Third Party Standing To Raise These Claims on Behalf of Detainees.</u>

There is no question these priests have standing to pursue *their own* religious liberty claims, discussed below. Fr. Schroeder's "ongoing injury" (prohibiting him from performing religious ministry) is an Article III injury-in-fact, *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) (injury-in-fact where "ability to carry out . . . ministries has been impaired"), traceable to defendants' actions. Similarly, the Archbishop has suffered an injury-in-fact from the frustration of his duty to care for all souls

---

¶¶ 28–29 (ignoring the Archbishop's letter and denying Fr. Lydon's request without discussion).

within his territorial jurisdiction. Ramacciotti Decl. ¶¶ 38–39.[10]

Fr. Schroeder and the Archbishop also have third-party standing to assert the religious liberty rights of the detainees they seek to serve—including under RLUIPA, RFRA, and the First Amendment. Plaintiffs may assert the rights of another if (1) they have "suffered an injury in fact" themselves; (2) they have "a close relation to" the third party; and (3) there "exist[s] some hindrance to the [detainees'] ability to protect [their] own" rights. *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991). A lesser showing is required in the First Amendment context. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

The injury-in-fact element is satisfied, as noted. And both plaintiffs have close relationships with the detainees. Fr. Schroeder seeks to directly minister to detainees' spiritual needs (including offering the very sacraments the policy prohibits). And the Archbishop is the "pastor" for all Catholics within his diocese (including in Sainte Genevieve). Ramacciotti Decl. ¶¶ 36–39. Courts

---

[10] The Archdiocese is similarly injured in its "ministr[y]" of "service to Catholics" within its geographical boundaries. Compl. ¶ 12. The Archdiocese is also asserting the rights of its unnamed priests through associational standing. *Id.* ¶ 16. That doctrine applies properly here because (1) the individual priests whose rights have been violated have standing in the same manner as Fr. Schroeder; (2) the Archdiocese's purpose—which includes ministering to all Catholics within its territory—"relates to the interests being vindicated"; and (3) these claims do not require participation of individual priests, as injunctive relief against the defendants raises no issues particular to any one. *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011).

have found analogous close relationships establish third party standing. *See, e.g.*, *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715 (1990) (attorney/client); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (doctor/patient). Those private relationships—lawyer/client, doctor/patient—are sufficiently similar to that of priest/penitent. Indeed, the law treats these relationships analogously in other contexts (for example, by privileging communications) precisely *because* the relationships are especially close.

But the third-party standing question is easier still, because much looser relationships also suffice. *See Powers*, 499 U.S. at 414 (defendant/juror); *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020) (gun seller/potential customer); *Craig v. Boren*, 429 U.S. 190, 193 (1976) (shop owner/wannabe underage drinkers). Priests are more like lawyers, and less like liquor salesmen—yet the test allows third-party standing for both.

Finally, there is more than "some" hindrance to detainees bringing claims on their own. *Powers*, 499 U.S. at 410-11. Multiple detainees refused to participate in this litigation based on fear of retaliation from the government if they speak up or sue ICE and their jailors. Drost Decl. ¶ 7; Walentik Decl. ¶ 3. The "prudential objectives" of third-party standing are amply satisfied. *Craig*, 429 U.S. at 193.

### B. The Visitation Policy Violates The First Amendment Rights Of The Detainees, Priests, And The Archbishop.

Plaintiffs are also likely to succeed under the First Amendment, which prohibits any burden on religious exercise that is not "neutral and of general applicability" unless it survives strict scrutiny. *Church of Lukumi Babalu Aye*, 508 U.S. at 531; *Mahmoud v. Taylor*, 606 U.S. 522, 564 (2025); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).[11] This includes "even 'subtle departures from neutrality." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 638 (2018). Where the government "seek[s] to justify the differential treatment" of religious and secular activity, "[t]he question is whether *a single secular analog* is *not* regulated." *Calvary Chapel Dayton Valley v. Sisolak*, 591 U.S. 1042, 1056 (2020) (mem.) (Kavanaugh, J., dissenting from denial of a preliminary injunction) (first emphasis added) (citation omitted). Here, the policy violates the Free Exercise rights of both the detained[12] and those who seek to minister to them.

---

[11] This requires only a "burden," not—as under RLUIPA—a "substantial" one. *Gladson*, 551 F.3d at 831.

[12] As above, these rights are asserted through third-party standing by the Archbishop and priests. The deferential standard for *inmate* Free Exercise claims in *Turner v. Safley*, 482 U.S. 78 (1987), does not apply here, because *Turner* turns on the "legitimate *penological* interests" attendant to "*prison* administration," *id.* at 85, 87 (emphasis added). Civil immigration detention is "nonpunitive in purpose and effect," *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), so *Turner*'s penology-based holding is irrelevant.

1. <u>The Policy Burdens Religious Exercise.</u>

A policy burdens free exercise when it poses "a very real threat of undermining" sincerely held religious beliefs or practices. *Mahmoud*, 606 U.S. at 530 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). For the reasons set forth in Section I.A.1, *supra*, the visitation policy more than satisfies this standard for the detainees—especially given that the sacraments are totally banned.

Similarly, the policy burdens Fr. Schroeder's religious exercise and that of the other priests serving under the Archbishop. "[M]inistering to those who are imprisoned is not optional for priests." Ramacciotti Decl. ¶ 46 ("Jesus said that when we care for the imprisoned, we care for *Him*: 'I was naked and you clothed me, I was sick and you visited me, in prison and you came to me.' Matthew 25:36."). These priests share in this fundamental calling, and the policy frustrates their *personal* missions to minister to *these particular* detainees. Kiblinger Decl. ¶¶3-4; Nord Decl. ¶ 6; Schroeder Decl. ¶ 2-3; Olsen Decl. ¶ 6. These clergy are prevented from fulfilling key aspects of their religious ministry—including a total ban on providing the sacraments and a substantial curtailment of their ability to provide pastoral case. This is a burden on religious exercise. *See Mockaitis v. Harcleroad*, 104 F.3d 1522, 1531 (9th Cir. 1997); *Maisonet v. Comm'r, Ala. Dep't of Corr.*, No. 22-10023, 2022 WL 4283560, at *3 (11th Cir. Sep. 16, 2022).

The burden on the Archbishop is even more acute. As the "pastor" for "all Catholics within his diocese," he has a *duty* to ensure that Catholics under his care receive the sacraments, as they are entitled to do under Church teaching. Ramacciotti Decl. ¶¶ 16–17, 36–39. Every day that a Catholic who *wants* the sacraments in his archdiocese is *denied* them, the Archbishop is personally prevented from fulfilling this responsibility.

2. <u>The Policy Is Not Generally Applicable.</u>

A government policy that burdens religious exercise and is not neutral or generally applicable triggers strict scrutiny. *Kennedy*, 597 U.S. at 526. A policy fails "the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way[.]'" *Kennedy*, 597 U.S. at 526 (quotation omitted). Thus, strict scrutiny is triggered "whenever [government regulations] treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62–63 (2021) (per curiam); *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 542–46 ("[A law] lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."). Comparability "is concerned with the risks various activities pose, not the reasons why people gather." *Tandon*, 593 U.S. at 63. Where the government permits other activities with precautions, "it must show that the

religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Id.*

The no-contact policy treats secular activity more favorably than analogous religious exercise. Exceptions for attorney visits—based on the need for confidentiality and the exchange of information—are comparable to clergy visits: in both, an outside visitor enters the facility and interacts with a detainee to offer private counsel. These visits pose the same "risk," so their "reasons" don't matter. *Id.* The government "cannot 'assume the worst when people go to worship but assume the best when people go to work.'" *Id.* at 64 (quoting *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (per curiam)).

The limited hours component of the visitation policy is likewise not generally applicable because lawyers and consular officials may schedule visits outside a narrow time window, but clergy may not. *See Tandon*, 593 U.S. at 62–63; *see also Remmers v. Brewer*, 529 F.2d 656, 658 (8th Cir. 1976) (remanding for the trial court to consider whether a policy limiting clergy visits to two hours a week could survive strict scrutiny); *see also Abundant Life Baptist Church of Lee's Summit, Mo. v. Jackson County*, 539 F. Supp. 3d 978, 987 (W.D. Mo. 2021) (applying *Tandon* to a COVID-19 restriction).[13] Priests

---

[13] Although the policy is plainly not generally applicable, it is also subject to strict scrutiny on two other grounds. *First*, *Smith* does not apply at all when the "burden imposed" on the plaintiff's Free Exercise rights "is of the

are no more dangerous or logistically demanding than attorneys or consular officials. Common sense suggests they are less so.

3. The Policy Fails Strict Scrutiny.

Defendants must show that the policy advances "interests of the highest order" and is "narrowly tailored to achieve" them. *Fulton*, 593 U.S. at 541. The same compelling-interest and least-restrictive-means analysis in Section I.A.2, *supra*, applies with equal force here. *See Kennedy*, 597 U.S. at 525*; Fulton*, 593 U.S. at 541–42.

**C. The State And Local Defendants Are Liable Under Missouri's RFRA For Enforcing The Policy.**

Federal RFRA claims are inapplicable against state and local governments. *See City of Boerne v. Flores*, 521 U.S. 507, 532 (1997). But Missouri has passed its own RFRA. Missouri's RFRA, RSMo. § 1.302.1(1), is "more protective of religious exercise than the Federal RFRA statute" (and

---

same character as that imposed in *Yoder*." *Mahmoud*, 606 U.S. at 564–65. In such a case, "we need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Id.* The burden of completely denying a Catholic inmate access to the sacraments—the source and summit of the Christian life, *see* Ramacciotti Decl. ¶ 29—is at least as great as that imposed in *Yoder* (being denied the ability to choose how to raise one's children). *Second*, to preserve for further review on appeal if needed, Plaintiffs respectfully submit that *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), was wrongly decided, being inconsistent with the original public meaning of the Free Exercise clause, and should be overruled by the Supreme Court.

RLUIPA) because it applies whenever religious exercise is "restrict[ed]," without regard to whether the burden is "substantial." *Marianist Province*, 944 F.3d at 1003. Because the jail's visitation policy violates RLUIPA's heightened standard, the state and local defendants are necessarily liable for violating Missouri's RFRA.

## II. Plaintiffs Are Likely To Succeed On Their RFRA Claims Against the ICE Defendants.

Under (federal) RFRA, the federal government may not "substantially burden a person's exercise of religion" unless the action survives strict scrutiny. 42 U.S.C. § 2000bb-1. The "Government" includes any federal "agency" or "official," including ICE and the officials named here. The Court may enter "appropriate relief," including injunctive relief, to remedy a RFRA violation.[14] *Id.* § 2000bb-2(1). Here, ICE (through its officials sued in their

---

[14] Although monetary relief is available against federal officials who violate RFRA in their individual capacities, *see Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020), Plaintiffs seek only injunctive relief against the named ICE officials in their official capacities, which is the equivalent of a suit against ICE itself. *Cf. id.* at 45; *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022) (affirming availability of such relief under RFRA).

Further, all the ICE defendants are proper parties to Plaintiffs' official-capacity claim for injunctive relief. Although only a discrete set of officials within the Office of Professional Responsibility personally made decisions that led to the unlawful burdening of Plaintiffs' rights, "personal involvement" is a requirement only when a plaintiff seeks damages from an official in their personal capacity. *See Smith v. Muccino*, 223 F. Supp. 2d 396, 403 (D. Conn. 2002) ("[P]ersonal involvement is not a prerequisite to injunctive relief, and

official capacity) violated RFRA by showing deliberate indifference to ongoing religious liberty violations at the jail that impacted ICE's detainees housed there.

To understand how the ICE officials violated RFRA, consider the interplay between state and federal authority here. The jail is run by local Missouri officials, but ICE detainees are held there under a contract. *See* Compl. Ex. 6, ICE Contract. In making such a contract, ICE must ensure that *its own detainees'* RFRA rights are protected: "RFRA applies to *all actions* by federal administrative agencies, including . . . *contract distribution and administration*." U.S. Dep't of Justice, Justice Manual § 1-15.300 (2018) (emphasis added). So ICE officials can violate RFRA by refusing to supervise contractor facilities for compliance with RFRA.

Because Congress used the same "acting under color of law" language in RFRA as in 42 U.S.C. § 1983, RFRA "bears a consistent meaning" with § 1983, *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020), including when it comes to determining whether a federal agency violates RFRA when supervising a

---

such relief may be had against officers in their official capacity."). Injunctive relief may be sought against an official in their official capacity when the official has the "authority and power" to remedy the violation. *Cf. Randolph v. Rodgers*, 253 F.3d 342, 346 (8th Cir. 2001) (MDOC director "has authority over the entire MDOC and an injunction against her would have effect no matter where in the MDOC system Randolph is incarcerated").

contractor detention facility, *see Patel v. Bureau of Prisons*, 125 F. Supp. 3d 44, 56 (D.D.C. 2015). In that context, RFRA's "color of law" language incorporates the § 1983 supervisory-liability theory of *Rizzo v. Goode*, 423 U.S. 362 (1976). *Patel*, 125 F. Supp. 3d at 56. Thus, a plaintiff must show an "affirmative link between the occurrence of" unlawful conduct and "the adoption of any plan or policy by" the federal agency "showing [its] authorization or approval of such misconduct." *Id.* (quoting *Rizzo*, 423 U.S. at 371).[15]

Adapting *Rizzo*'s standard to this setting, *Patel* held that a plaintiff asserting RFRA supervisory liability must show that the federal actor's "failure to supervise" the contractor facility "was highly likely, given the circumstances of the case, to give rise to" a constitutional violation. *Id.* This maps onto the Eighth Circuit's standard of § 1983 supervisory liability, under which "the supervisor's 'corrective inaction' must constitute deliberate indifference to the violation," including where the supervisor "turn[s] a blind eye for fear of what he might see." *Partridge v. City of Benton, Arkansas*, 157 F.4th 970, 973 (8th Cir. 2025).

---

[15] Because *Patel* involved an individual-capacity suit for damages, *id.* at 49, its "affirmative link" standard may actually be more demanding than what is required in an official-capacity suit for injunctive relief. Applying the statute literally, *any* action by the agency that is the but-for cause of a substantial burden on religious exercise violates RFRA and should be enjoined. 42 U.S.C. § 2000bb-1(a). Regardless, plaintiffs easily satisfy *Patel*'s standard.

There is ample evidence that ICE—specifically through the Office of Professional Responsibility headed by Associate Director Fenton, which is supposed to inspect contractor facilities for compliance with federal law—*at least* turned a blind eye to RFRA violations occurring at the Ste. Genevieve detention center (and at other detention centers nationwide). Under *Patel*, the ICE Officials violated RFRA because their failure to supervise the detention center "was highly likely, given the circumstances of the case, to give rise to" a burden on free exercise that violates RFRA. 125 F. Supp. 3d at 56. Several sources demonstrate that ICE was aware of just such a likelihood of religious liberty violations at detention facilities here.

First, ICE's own promulgated standards are damning. In the Performance-Based National Detention Standards (PBNDS) that apply to ICE's own federal facilities, the detention standard regarding "Religious Practice" contains *explicit* protection for private meetings with clergy, on the same terms as visits with attorneys. Compl. Ex. 16, Standard 5.5(V)(F) ("Pastoral visits shall ordinarily take place in a *private visiting room*," such as "the legal visitation area" (emphasis added)). By promulgating this standard, ICE showed that it knew the *lack* of private visitation was likely to lead to religious liberty violations.

Yet when it comes to contractor facilities, ICE disregards this known concern. ICE promulgated a different "streamlined" standard for "Religious

Practice" in the contractor-specific National Detention Standards (NDS) to "reduce the burden" on contractor facilities, including by removing any reference to private clergy visitation (or to pastoral visits of any type). Removing protections for religious liberty to ease an administrative burden is an implicit concession that ICE favors expediency over the Constitution.

After lowering the standard, ICE then refused to meaningfully enforce it, through inspection or otherwise. Even though the NDS still acknowledge ICE's responsibility for "ensur[ing]" that "detainees of various religious beliefs have reasonable and equitable opportunities to participate in the practices of their faith, limited only by *documented* threats to safety, security, and the orderly operation of the facility," Compl. Ex. 17, Standard 5.3(I) (emphasis added)), ICE's actual practice and policy has been to allow contractor facilities to violate detainees' religious liberty rights at will without any mechanism for oversight or correction. This deliberate indifference has caused a widespread, well-documented pattern of religious liberty violations at ICE-run and contractor facilities. *See* Compl. ¶ 82.

On sacramental access for Catholic detainees, the record is especially bleak. ICE has known of the problem—denying detainees the sacraments nationwide—because they were told about it and then sued over it. In November 2025, Bishop Barron raised exactly these concerns with senior DHS officials, who assured him the matter was 'under careful review.'" Compl. Ex.

8, Kate Scanlon, *Barron: Administration 'Assured' Him Detainees' Access to Sacraments 'Under Careful Review'*, OSV News (Nov. 4, 2025), tinyurl.com/Barron-Careful-Review. Ten months later, that "careful review" has produced no action.

Far from fixing the known issue, ICE has doubled down on denying access to the sacraments. Two other groups of clergy (including one in this circuit) have had to sue ICE—and obtain preliminary injunctions—to enter ICE detention facilities and provide the sacraments to detainees. *See Coal. for Spiritual & Pub. Leadership v. Noem*, 2026 WL 396349, at *1 (N.D. Ill. Feb. 12, 2026); *Minn. Area Synod of the Evangelical Lutheran Church in Am. v. U.S. Dep't of Homeland Sec.*, No. 0:26-CV-01576 (D. Minn. Mar. 20, 2026), ECF No. 57. These are not the first examples of religious liberty violations at ICE facilities. The examples are myriad. *See* Compl. ¶ 82; Compl. Ex. 23 (cataloguing 24 examples).

Even after these litigation losses, ICE continues to ignore the problem and has implemented no policy or procedure to "inspect ICE detention facilities to ensure they comply with ICE national detention standards" on religious liberty, as it claims to do through its Office of Professional Responsibility. *See Office of Professional Responsibility*, ICE, www.ice.gov/opr.

This jail is just the latest example. According to Major Schott, ICE inspects the Detention Center "on a weekly basis." Compl. ¶ 84 (quoting

Compl. Ex. 21, tinyurl.com/Sheriff-speaks). Despite the religious-liberty violations documented above—all of which violate ICE's stated requirement of providing detainees "reasonable and equitable opportunities to participate in the practices of their faith," Compl. Ex. 17, Standard 5.3(I)—the Detention Center has received glowing reviews by ICE inspectors. This includes a "Superior" rating in the most recent published inspection with only two "Deficiencies," both relating to medical and dental screening. Compl. Ex. 22, at 4, 6. Neither the narrative description nor the topic-by-topic evaluation references detainees' religious rights or indicates that inspectors checked compliance with Standard 5.3. And the official ICE inspection form has no mechanism to record a "Deficiency" based on a constitutional violation at all. *See generally id.*

ICE cannot turn a blind eye to the egregious free exercise problems the visitation policy creates. The policy is readily ascertainable and, if weekly audits are happening as local officials claim, it would require a blind eye *and* a deaf ear to miss the import of what is happening on the ground. The detention center's illegal policies are publicly posted, in detail, on the County's website. *See* Compl. ¶ 6. ICE's webpage on the Detention Center, however tells a different story, claiming that the "non-contact" policy applies only to "family and social visits" and that clergy are not restricted to the regular visitation window but may "visit detainees at any time." Compl. ¶ 7 n.2.

Apparently, ICE's weekly inspections ignored religious practice so completely that they did not even detect these fundamental discrepancies.

Given ICE's knowledge of the widespread religious liberty violations in ICE detention facilities, including the specific, repeatedly-litigated issue of facilities denying ICE detainees the sacraments, ICE's refusal to ensure that detention facilities comply with Standard 5.3 constitutes "deliberate indifference" to these religious liberty violations. ICE's choice not to adequately supervise the Sainte Genevieve detention center satisfies *Patel*'s (and the Eighth Circuit's) test for supervisory liability under RFRA.

This deliberate indifference "substantially burdened" Plaintiffs' exercise of religion. 42 U.S.C. § 2000bb-1(a). Had ICE simply done what it claims to do—implemented the inspection protocol ICE's own standards contemplate—it would have identified these violations months ago (just as it has identified medical and dental shortfalls) and used its contractual leverage to compel correction. ICE's inaction is thus a proximate cause of the ongoing violations. And as shown above, the jail policy allowed by ICE's indifference substantially burdens the religious exercise of detainees and priests.

Finally, ICE's interest here—as plainly stated with its posting of the NDS: to "reduce the burden on" contractor facilities, *2026 National Detention Standards*, ICE, tinyurl.com/ICE-NDS-posting—is not "a compelling governmental interest" pursued by "the least restrictive means." 42 U.S.C.

§ 2000bb-1(b). To state the stunningly obvious, the government cannot substantially burden religious exercise simply to *reduce* the burden on government contractors. *Holt*, 574 U.S. at 363–64; *Ramirez*, 595 U.S. at 430. And the explicit protections for private visitation on the same terms as attorneys in the INS standards and PBNDS show that enforcing that standard nationwide is a feasible alternative to turning a blind eye to save contractor facilities the time and effort of complying with RFRA.

## III. Plaintiffs Have Suffered Irreparable Harm, and the Balance of the Equities And Public Interest Favor an Injunction.

Plaintiffs' "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quotation omitted); *see also Religious Sisters of Mercy*, 55 F.4th at 609 ("[I]ntrusion upon the Catholic Plaintiffs' exercise of religion is sufficient to show irreparable harm.").

The balance of the equities and the public interest "merge" when the government is the party opposing a preliminary injunction. *See Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). In any event, both factors favor an injunction.

First, it "is always in the public interest to prevent the violation of a party's [religious liberty] rights[,]" so "the balance of harms and public interest

weigh in favor of" an injunction upon a showing of likelihood of success on these claims. *Cath. Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1028 (D.N.D. 2024) (quoting *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022)). Moreover, there is little if any harm to the government in simply requiring it treat clergy the way it treats lawyers and consul staff.

## CONCLUSION

Plaintiffs request that the Court enjoin the defendants as follows.

***Against the Missouri Defendants.*** Enjoin the Missouri Defendants, and their agents and successors, from:

(a) enforcing the no-contact policy to prevent priests from meeting face-to-face and in private with detainees who request a clergy visit, and instead allow priests access to detainees on the same terms as attorneys;

(b) enforcing the 4-hour time-restriction to limit clergy visits, and instead allow clergy visits during business hours, on the same terms as lawyers and consular officials; and

(c) enforcing the visitation policy to prevent the celebration of Mass on reasonable terms.

This relief tracks the accommodations the Archbishop requested on May 18, 2026, and does not require defendants to adopt any particular means of accommodation, so long as they eliminate the substantial burden on Plaintiffs' religious exercise.

***Against the ICE Defendants.*** Enjoin the ICE Defendants, and their agents and successors, from:

(a) paying any federal funds to the Ste. Genevieve detention center for housing ICE detainees until the detention center has implemented the religious accommodations requested above;

(b) housing new ICE detainees at the Ste. Genevieve detention center until the detention center has implemented the religious accommodations requested above;

(c) relocating any Catholic ICE detainee who is currently within or who enters the territorial boundaries of the Archdiocese of St. Louis to any other detention facility that does not provide substantially the same religious accommodations requested above;

(d) paying any federal funds for housing ICE detainees to any detention facility to which an ICE detainee described in (c) might be transferred unless that facility allows substantially the same religious accommodations requested above; and

(e) omitting religious-liberty criteria—including criteria regarding the availability of private, in-person pastoral visits—from the inspection protocol applicable to the Ste. Genevieve detention center and to any other detention facility to which the detainees described in (c) may be transferred.

Ultimately, this relief asks ICE to do no more than stop turning a blind eye to the highly likely religious-liberty violations it is aware of and claims to enforce against under its published religious-liberty standards.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Barbara Smith Tyson*

Christopher J. Schmidt #53362 (MO)
Barbara Smith Tyson #66237 (MO)
Edward G. Houser #77733 (MO)*
BRYAN CAVE LEIGHTON PAISNER LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102
Phone: (314) 259-2000
christopher.schmidt@bclplaw.com
barbara.smith@bclplaw.com
ed.houser@bclplaw.com

Clayton Buckner #72730 (MO)*
BRYAN CAVE LEIGHTON PAISNER LLP
1200 Main St Ste 3800,
Kansas City, MO 64105
Phone: (816) 374-3200
clayton.buckner@bclplaw.com

Caleb T. Mathena, *pro hac vice forthcoming*
BRYAN CAVE LEIGHTON PAISNER LLP
1201 Third Ave., Suite 5000
Seattle, WA 98104
Phone: (206) 600-6641
caleb.mathena@bclplaw.com

**Application for admission forthcoming*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with the Summons and Complaint, will be served on Defendants, on or about October 5, 2026, as follows: (i) upon Sheriff Gary Stolzer, Major Jason Schott, and Lieutenant Andrew Johnson by personal service at the Ste. Genevieve County Detention Center, 5 Basler Drive, Ste. Genevieve, MO 63670; (ii) upon Secretary Markwayne Mullin by service on the U.S. Department of Homeland Security, Office of the General Counsel, in accordance with Fed. R. Civ. P. 4(i)(2); and (iii) upon Acting Director David J. Venturella and Associate Director Jennifer M. Fenton by service on U.S. Immigration and Customs Enforcement, Office of the Principal Legal Advisor, in accordance with Fed. R. Civ. P. 4(i)(2); in each case together with service on the United States in accordance with Fed. R. Civ. P. 4(i)(1), by certified mail addressed to the United States Attorney for the Eastern District of Missouri and the Attorney General of the United States.

*/s/ Barbara Smith Tyson*