**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| ARCHBISHOP MITCHELL T. ROZANSKI, *et al.,* | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:26CV00224 MTS |
| SHERIFF GARY STOLZER, *in their official capacities*, *et al.,* | ) | |
| Defendants. | ) | |

**FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

COME NOW Markwayne Mullin, Secretary of the Department of Homeland Security, David J. Venturella, Acting Director, U.S. Immigration and Customs Enforcement, and Jennifer M. Fenton, Associate Director, Office of Professional Responsibility, in their official capacities (collectively Federal Defendants), by and through their counsel, and for their Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction state:

# TABLE OF CONTENTS

**Page**


**I. Introduction** ..... 1

**II. Facts** ..... 2

**III. Argument** ..... 7

**A. This Court Should Deny Plaintiffs' Motion for a Preliminary Injunction Because They are Not Likely to Succeed on the Merits** ..... 7

**1. Preliminary Injunction Standards** ..... 7

**2. The First Amendment and RFRA Standards** ..... 8

**a. Plaintiffs' Claims Are Analyzed in the Context of the Prison Setting** ..... 8

**b. This Court Should Deny Plaintiffs' RFRA Claim Against the Federal Defendants Because the Modified Regulations Do Not Impose A Substantial Burden on the Exercise of Their Religious Rights or, Alternatively, the Modified Regulations are the Least Restrictive Means of Furthering a Compelling Governmental Interest.** ..... 9

**B. The Center's Modified Regulations Do Not Substantially Burden Plaintiffs' Ability to Exercise their Religious Freedom or, Alternatively, the Modified Regulations are the Least Restrictive Means to Allow Plaintiffs to Exercise their Religious Freedoms** ..... 10

**1. Mass** ..... 11

**2. Confession** ..... 17

**3. Communion** ..... 18

**4. Pastoral Visits** ..... 19

**5. Future Concerns** ..... 22

**IV. Conclusion** ..... 23

**CERTIFICATE OF SERVICE** ..... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Card v. Dugger*, 709 F. Supp. 1098 (M.D. Fla. 1988) .......... 21

*Crawford v. Clarke*, 578 F.3d 39 (1st Cir. 2009) .......... 16

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) .......... 12

*DePaola v. Ray*, 2013 WL 6055253 (W.D. Va. Nov. 15, 2013) .......... 16, 17

*Ealy v. Keen*, 2015 WL 1471577 (E.D. Pa. Mar. 31, 2015) .......... 18, 21

*Fowler v. Crawford*, 534 F.3d 931 (8th Cir. 2008) .......... 10, 14, 15

*Greenhill v. Clarke*, 944 F.3d 243 (4th Cir. 2019) .......... 16

*Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir. 1996) .......... 8, 10, 18

*Paulino v. Zenk*, 2008 W.L. 356849 (S.D.N.Y. Feb. 7, 2008) .......... 21

*Rogers v. Scurr*, 676 F.2d 1211 (8th Cir. 1982) .......... 21

*Roudachevski v. All-American Care Ctr., Inc.*, 648 F.3d 701 (8th Cir. 2011) .......... 7

*Shockley v. Adams*, 155 F.4th 985 (8th Cir. 2025) .......... 10

*Thorbus v. Bowen*, 848 F.2d 901 (8th Cir. 1988) .......... 7

*Trump v. Casa, Inc.*, 145 S. Ct. 2540 (2025) .......... 22

*United States v. Ali*, 682 F.3d 705 (8th Cir. 2012) .......... 9

*Van Wyhe v. Reisch*, 581 F.3d 639 (8th Cir. 2009) .......... 10

*Walker v. Artus*, 998 F. Supp.2d 18 (N.D.N.Y. 2014) .......... 16

*Weir v. Nix*, 114 F.3d 817 (8th Cir. 1997) .......... 8, 17

*Wildhawk Inv., LLC v. Brava I.P.*, 27 F.4th 587 (8th Cir. 2022) .......... 7

**Statutes**

42 U.S.C. § 2000bb-1 .......... 2, 9

**Regulations**

28 C.F.R. § 115.42(a) .......... 3

## I. Introduction

Plaintiffs' Motion fails because they cannot establish a likelihood of success on the merits as to the Federal Defendants. Sheriff Gary Stoltzer, Major Jason Schott and Lieutenant Andrew Johnson (collectively State Defendants) – with Federal Defendants' input – have already Ste. Genevieve Detention Center's (the Center) rules and regulations to address Plaintiffs' complaints. The modifications are consistent with the State Defendants' efforts – facilitated by the Office of the Missouri Attorney General – to resolve the dispute before Plaintiffs stopped discussions and filed this lawsuit, and the modifications comply with federal law. These modifications, in summary, are:

| | **Complaint** | **Summary Response** |
|---|---|---|
| **1** | Communion (pp. 15-16)[1] | Following confession, priests provide hand-to-mouth or hand-to-hand Communion through pass through door or face-to-face. |
| **2** | Reconciliation/Confession (p. 17) | Saturday (9 a.m. to 4 p.m.) face-to-face clergy visits in attorney-client visiting rooms. |
| **3** | Mass (p. 18) | Livestreamed Mass on Mondays using tablets followed by Communion. |
| **4** | Pastoral Visits (pp. 18-19) | Available in person, Monday through Friday, 9am to 4pm, using 10 visiting booths or 3 attorney client rooms on the same basis as attorneys and consular officials |
| **5** | Future Concerns | Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) contact information so Archdiocese can relay concerns directly when they arise. |

Consequently, Plaintiffs cannot establish the Center's modified requirements substantially burden Plaintiffs' exercise of their religious rights or, alternatively, the modified regulations are the least

[1] The Federal Defendants refer to pages in Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction [Doc. 8].

restrictive means of furthering a compelling governmental interest under the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1, *et seq.* (RFRA).[2]

## II. Facts

The Center is a detention facility in Ste. Genevieve, Missouri which houses approximately 480 individuals (with capacity to house a total of approximately 550), including an average of 150 ICE detainees, 7 civil sex offender detainees, 270 U.S. Marshals Service (USMS) detainees, 30 Bureau of Prison (BOP) detainees, and 25 local detainees. Affidavit of Chief Deputy Major Schott (Exhibit A) at ¶¶ 6-7. USMS detainees are being held either at the pre-trial stage of their proceedings, or at the post-trial but pre-sentencing stage of their proceedings. *Id.* at ¶ 8. The Center is staffed by the Ste. Genevieve County Sheriff's Office and approximately 36 sheriff's deputies work at the Center with shifts consisting of 9 deputies per shift, including 1 deputy in the Center's control room and 8 deputies who perform the remaining duties, including processing new detainees, preparing detainees for transportation, distributing meals to detainees, moving detainees to visiting rooms (guest visits, mental health, medical appointments, rec time, attorney visits, clergy visits, etc.), and ensuring the general security of the facility. *Id.* at ¶ 9-11. To move one detainee, two deputies are required. *Id.* at ¶ 12. The maximum group of detainees that can be moved through the halls at any one time is five, which requires two deputies. *Id.*at ¶¶ 13-14.

Housing detainees according to federal regulations requires a detailed matrix and specific security protocols to which deputies must adhere. The Center has 17 cell blocks plus one block that is used for incoming/processing individuals until they are placed in another block. *Id.* at ¶ 19. Each block contains approximately 15-30 individuals. *Id.*at ¶ 20. All federal detainees are

---

[2] Federal Defendants reserve the right to challenge Plaintiffs' standing on the ICE detainees' behalf at or before a trial on the merits of this case.

required to be classified by risk classification as designated by either ICE or the USMS, with classifications ranging from low, medium-low, medium, medium-high, and high. *Id.* at ¶ ¶ 15-16. Per the USMS, Prisoner Operations Divisions Federal Performance Based Detention standards, only individuals in similar classifications may mix at any time, for example, low and medium low detainees may mix; high and medium high may mix. *Id.* at G. Services and Programs, G.1 Classification and Housing. This regulation applies to all interactions in the Center, from the cell block, passing in the hallways, transport, rec time, and at various appointments. Exhibit A at ¶ 17. Civil sex offender detainees are held on a long-term basis and must be kept separate from all other types of detainees at all other times. *Id.* at ¶ 18. Additionally, the Prison Rape Elimination Act (PREA) requires that all federal detainees be classified based on their propensity to be either a victim or a predator, and those two classifications may never mix at any time, including passing in the hallway, at rec time, during transport, or at visiting times. 28 C.F.R. § 115.42(a). Finally, detainees affiliated with the USMS who are co-defendants may not be mixed at any time, including when passing in the hallway to medical, legal, or clergy appointments or at any other time. Exhibit A at ¶ 17.

Because of the various regulations and the PREA, recreation time in the small yard area must be strictly scheduled and monitored to prevent mixing of various classifications. *Id.* at ¶ 24. The Yard area is approximately 20 feet long and 10 feet wide, and can accommodate approximately 18-20 individuals at one time, though with that number of individuals, it would be difficult for individuals to move around at all. *Id.* at ¶ 23. The Yard is the largest area where detainees are permitted to congregate outside of the cell blocks. *Id.* at ¶ 22.

There are ten visiting booths which inmates and visitors may use to speak to each other. The visiting booths have telephones installed. *Id.* at ¶ 25. Those telephones are monitored and

recorded by Center staff. *Id.* at ¶ 26. Visting hours are on Sundays, from noon to 4 p.m. and visitors may come and speak with a detainee on a first-come, first-serve basis. *Id.* at ¶ 28. Separately, the Center has expanded clergy visiting hours to be on Saturdays from 9 a.m. to 4 p.m. *Id.* at ¶ 44. Clergy may use either the three attorney-client rooms or the ten visiting booths, depending on the purpose of their visit (confession may take place in the attorney-client rooms as described below, or pastoral counseling may take place in the ten booths as it does not need to be face-to-face per the dictates of Plaintiffs' Catholic faith). *Id.* at ¶ 45.

In addition, there are three attorney-client meeting rooms at the Center. *Id.* at ¶ 29. Each of these attorney-client rooms is located in a different wing of the Center (i.e., they are not lined up next to each other). *Id.* at ¶ 30. Attorneys may contact the Center to schedule a meeting with their client at a specified time, and that meeting takes place via Zoom or WebEx. *Id.* at ¶ 33. In other words, the detainee is present in the room, but the attorney appears for the scheduled meeting by Zoom or WebEx. *Id.*at ¶ 34. An attorney may expect to wait an average of 10 business days before a scheduled appointment time is available for them to visit with their client via Zoom or WebEx. *Id.* at ¶ 35. The attorney-client rooms do not have recording devices in them. *Id.* at ¶ 31. If an attorney wishes to speak face-to-face with their client they may appear at the facility during business hours and request to speak with their client on a first-come, first-serve basis. *Id.* at ¶ 36. If an attorney requires other accommodations or circumstances for their visit (i.e., to be in the same room as their client), they must obtain and submit a court order with the requirements to the Center. *Id.* at ¶ 38. Consular officials may see ICE detainees on the same basis as attorneys, with the same wait times. *Id.* at ¶¶ 39-40.

As of the date of this filing, all three of the attorney client rooms have a screen installed below the glass window to accommodate a face-to-face discussion (i.e., the parties do not need use

of a telephone or other electronic device to speak to each other). *Id.* at ¶¶ 47-53. Additionally, one of the attorney client rooms has been outfitted with a small metal pass-through door to accommodate passing of communion from hand-to-hand or hand-to-mouth (much like the doors in doctors' offices when samples are provided). *Id.* at ¶¶ 58-61. The configuration of the second and third attorney client rooms does not permit installing a door (due to the configuration of the window and cinderblock walls) and thus, the Center is in the process of modifying the door to contain a pass through flap (colloquially known as a "chuck hole") which will require welding the door. *Id.* at ¶¶ 62-64. This welding process may take 2-3 weeks, but, while the modification is happening, when a priest or clergy member provides communion using that room, two deputies will open the door, bring the priest around to the detainee to permit the hand-to-hand or hand-to-mouth passing of communion, and then bring the priest back to his side of the visiting room to complete the visit. *Id.* at 65-67.

Historically, the Center housed a much smaller number of detainees. For example, in the late 1980s and early 1990s, the Center housed 50 to 80 local inmates and at the request of a local Priest, offered Mass. *Id.* at ¶¶ 87-88. Since the 1990s, the Center has been renovated, and the room in which Mass was provided no longer exists; the Yard is now the largest space where detainees may congregate outside of cell blocks. *Id.* at ¶¶ 22, 91. Mass has not been offered at the Center since the mid-1990s. *Id.* at ¶ 93. Additionally, until recently, no one has requested Mass. *Id.* at ¶ 94.

A 2025 contract between the USMS and the Center includes ICE as a rider and governs the relationship between the Federal Defendants and the State Defendants. Office of Detention Services Intergovernmental Agreement (Doc. 1-6); *see also* Declaration of Steven L. Fontanazza Jr. (Exhibit B) at ¶ 3. That Agreement provides that the Center:

> shall comply with Congressional mandates, federal laws, Executive Orders and all existing Sainte Genevieve County Detention Center policies.
>
> * * *
>
> shall prohibit discrimination on the basis of disability, race, sex, sexual orientation, religion, and national origin in the provision of services, programs, and activities.
>
> shall provide prisoners with reasonable opportunities to participate in religious practices, exercise, and access to mail, telephone, personal legal materials and legal reference material or confidential counsel.

*Id.* at pp. 3, 4. Furthermore, ICE officials inspect the Center weekly, including interviewing detainees. In the last six months, the detainees inquired about: (1) Voluntary Departure (19 inquiries); (2) Case Information (9 inquiries); (3) Medical Concerns (1 inquiry); (4) Property (2 Inquires; (5) Other/Miscellaneous, *i.e.*, request to see the judge, talk to an attorney or depart with family (11 inquiries). Exhibit B at ¶¶ 5-6. Despite the detainees' willingness to share these concerns, no detainee complained that the Center's policies denied them the opportunity to practice his or her religion. *Id.* at ¶ 6.

Federal Defendants first received notice that any detainee or Catholic priest believed the Center's policies denied them the right to practice their Catholic faith when it received this lawsuit—in other words, Federal Defendants were not part of any discussions between State Defendants and the Missouri Attorney General's Office attempting to resolve these issues and prior to the filing of this case, none of the Plaintiffs contacted Federal Defendants concerning this issue. Exhibit A at ¶ 7. The Center's policies have been modified to address the concerns raised in the Complaint. The modified policies permit detainees to: (1) attend Mass; (2) receive face-to-face Confession without using an electronic device; (3) receive Communion either hand-to-hand or hand-to mouth from a priest; and (4) receive spiritual counseling. Furthermore, to address the Archdiocese's concerns of future issues, ICE Enforcement and Removal Operations (ERO) agrees

to provide contact information for the ERO manager overseeing ICE custody management in the State of Missouri. The ERO contact will act as a liaison to the Archdiocese should future concerns arise.

## III. Argument

### A. This Court Should Deny Plaintiffs' Motion for a Preliminary Injunction Because They are Not Likely to Succeed on the Merits.

#### 1. Preliminary Injunction Standards

"A district court weighs four factors when deciding a motion for preliminary injunction: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Wildhawk Inv., LLC v. Brava I.P.*, 27 F.4th 587, 593 (8th Cir. 2022) (citations and quotations omitted). "A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-American Care Ctr., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citation omitted).

Furthermore, "[l]ikelihood of success on the merits is the most important factor and requires a movant to demonstrate at least a fair chance of prevailing." *Id.* (citations and quotations omitted). However, it "is not a 'wooden' criterion to be examined on a prayer for injunctive relief. The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of relative injuries to the parties and the public." *Thorbus v. Bowen*, 848 F.2d 901, 904 (8th Cir. 1988) (citations and quotations omitted).

### 2. **<u>The First Amendment and RFRA Standards</u>**

#### a. **Plaintiffs' Claims Are Analyzed in the Context of the Prison Setting.**

Federal Defendants acknowledge that confinement alone does not result in the detainees – or those attending to them – losing all their Constitutional rights.

> Prison inmates do not forfeit all constitutional protections by reason of their conviction and confinement in prison. Moreover, federal courts must take cognizance of the valid constitutional claims of prison inmates, which include actions based on free exercise rights protected by the First Amendment.

*Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996) (citations and quotations omitted). However, Courts also consider the context in which the detainees and others assisting them bring the First Amendment and RFRA claims. *Id.* at 1552-53. As former Senator – and Episcopal Minister – John Danforth said, "'RFRA mandates a uniform test, not a uniform result." *Id.* at 1554 (quoting 139 Cong.Rec. S14467 (daily ed. Oct. 27, 1993)).

> [L]awful incarceration brings about the necessary withdrawal limitation of many privileges and rights, a retraction justified by considerations underlying our penal system. The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration. Furthermore, issues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-situated to judicial resolution, and accordingly, courts should be loath to substitute their judgement for that of prison officials and administrators.

*Id.* at 1550 (citations and quotations omitted); *see also id.* at 1553 (RFRA "should be interpreted with regard to the relevant circumstances of each case"); *Weir v. Nix,* 114 F.3d 817, 822 (8th Cir. 1997) (the Court "remind[s plaintiff] that incarceration necessarily, and constitutionally, entails restrictions, discomforts, and a loss of privileges that complete freedom affords") (citations and quotations omitted).

**b. This Court Should Deny Plaintiffs' Motion for Preliminary Injunction Because the RFRA Claim Against the Federal Defendants Will Fail Because the Modified Regulations Do Not Impose A Substantial Burden on the Exercise of Their Religious Rights or, Alternatively, the Modified Regulations are the Least Restrictive Means of Furthering a Compelling Governmental Interest.**

Plaintiffs claim that Federal Defendants violate their religious rights under RFRA. "As an initial matter, a person claiming that a government policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief." *United States v. Ali*, 682 F.3d 705, 709 (8th Cir. 2012) (citations and quotations omitted). Under RFRA, "substantially burdens"

> extends free exercise rights even to religious practices that are not compelled by or central to a particular belief system. Thus, in a RFRA analysis, a rule imposes a substantial burden on the free exercise of religion if it prohibits a practice that is both sincerely held by and rooted in the religious beliefs of the party asserting the claim . . . .

*Id.* at 710 (citations and quotations omitted). Once a plaintiff establishes a "substantial burden," the government action is enforceable – notwithstanding the substantial burden – if it "demonstrates that the application of the burden to [the plaintiff] is the least restrictive means of furthering a compelling government interest." *Id.* at 711 (quoting 42 U.S.C. § 2000bb-1(b)) (cleaned up). However, while RFRA requires the government

> to meet a higher burden than the rational test applicable in constitutional claim cases, [courts] nevertheless accord a significant degree of deference to the expertise of prison officials in evaluating whether they meet that burden. This deference is necessary because Congress intended the RFRA test to be adjusted for the different contexts in which free exercise claims arise, the prison context being one of the specials needs.

*Id.* at 711 (citations and quotations omitted). For example, "prison officials ordinarily must have wide latitude within which to make appropriate limitations to maintain institutional security. This is because central to all other correctional goals in the institutional consideration of internal

security within the corrections facilities themselves." *Hamilton*, 74 F.3d at 1554 (citations and quotations omitted).

Finally, once the government provides evidence that its action is the least restrictive means, a plaintiff "must demonstrate what, if any less restrictive means remain unexplored." *Hamilton*, 74 F.3d at 1556.

> It would be a herculean burden to require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA. Moreover, such an onerous requirement would be irreconcilable with the well-established principle, recognized by the Supreme Court and RFRA's history, that prison administrators must be accorded due deference in creating regulations and policies directed at the maintenance of prison safety and security.

*Id.* (citations and quotations omitted). Prison officials must demonstrate that they considered alternative means. *Fowler v. Crawford*, 534 F.3d 931, 940 (8th Cir. 2008).

### B. The Center's Modified Regulations Do Not Substantially Burden Plaintiffs' Ability to Exercise their Religious Freedom or, Alternatively, the Modified Regulations are the Least Restrictive Means to Allow Plaintiffs to Exercise their Religious Freedoms.

"The prison must permit a reasonable opportunity for an inmate to engage in religious activities but need not provide unlimited opportunities." *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009). Furthermore, where the parties agree as to the "what", *i.e.*, the religious right the prisoner seeks to exercise, the government wins when – after offering the proposed least restrictive means – the prisoner insists that his suggested means for exercising that right is the *only* means for exercising that right. *Shockley v. Adams*, 155 F.4th 985, 987 (8th Cir. 2025) (prison did not object to prisoner receiving communion, anointment, and prayer but prisoner insisted that *only* his daughter could administer the sacraments and did not indicate that another minister could not); *Hamilton*, 74 F.3d at 1556 ("Hamilton's all-or-nothing position supports the prison officials'

contention that an outright prohibition against a sweat lodge ceremony is the least restrictive means of achieving the compelling interest of prison safety and security in this case").

Here, the modified regulations recognize the Plaintiffs' right to exercise their rights, *i.e.*, the "what". The parties agree that Plaintiffs – including the detainees – have the right to: (1) Communion from the priest to the detainee; (2) face-to-face confession unencumbered by any electronic device; (3) attend Mass; (4) receive spiritual counseling/meet with clergy; and (5) a means to report violations short of another lawsuit. The issue before the Court is the *means* for Plaintiffs to exercise these rights. Notwithstanding the modified regulations that balance, in the least restrictive manner, the Center's concerns with the Plaintiffs' need to exercise their religious rights, Plaintiffs continue to insist that their suggested means are the *only* suggested means to exercise their religious rights. Because the Federal Defendants have provided the least restrictive means for the detainees and priests to exercise their religious rights, their claims are not likely to succeed on the merits, and Plaintiff's Motion for a Preliminary Injunction should be denied.

**1. Mass**

Plaintiffs contend that "[t]he Catholic faithful are also obliged to attend Mass (on pain of mortal sin). … and that religious services have been offered at the jail in the past." Doc. 8 at p. 18. This is true—between 30 and 40 years ago, when the Center had a different building configuration and a different number of inmates, the Center offered Mass to detainees. Exhibit A at ¶¶ 87-92. The fact that the Center previously offered Mass (and even the manner in which it was offered) is not probative of the Center's method and ability to offer Mass now because the Center has been renovated in the 30-40 years since Mass was last offered and the room previously used does not now exist, and the Center houses more inmates and is now subject to federal regulations that prohibit the mixing of various classifications of inmates.

Importantly, the Center has offered a solution to offer Mass to detainees that satisfies strict scrutiny, and thus, Plaintiffs cannot prevail on their RFRA claim. When determining that certain restrictions are the least restrictive means of advancing a compelling governmental interest, courts owe "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). In considering the Center's proposal to offer Mass, this Court should give due deference to the Center's regulations and requirement to follow federal regulations, and its interest in security, as well as costs and limited resources of proposed solutions.

To facilitate Mass, the Center proposes to provide a room on Monday mornings for the celebrant (i.e., Catholic Priest) to conduct Mass that is live streamed via a YouTube channel to the detainees on their tablets (each detainee has already been issued a tablet). The Center understands that those following a Catholic faith are required to attend weekly Mass, but Plaintiffs have not expressed that their Catholic faith requires that the Mass be attended on any particular day. Holding the Mass on Monday alleviates a security concern – because the Priest must be escorted by two deputies when he is taken to the pods to provide communion, those deputies cannot be engaged in the security of the facility or escorting detainees to visiting hours, medical, legal, clergy, or mental health appointments, nor can they be engaged in the distribution of meals to the pods. On Saturdays and Sundays, there are visiting times for clergy and general visitors – this busy time requires all deputies to be engaged in the movement of detainees throughout the facility, or, at appropriate times, the distribution of meals. On Mondays, detainees may choose to tune in on their tablet to watch Mass, and at the close of Mass, the Priest will be taken to each of the pods to offer

communion to those who wish to partake.[3] This approach is the least restrictive means to allow the detainees and the priest conducting Mass and distributing Communion to exercise their religious rights. In coming to this conclusion, the Center balanced the costs and security concerns associated with moving prisoners for a group Mass with similar considerations associated with moving 1 or 2 priests to serve Communion, as well as with the provision of other services to the detainees (i.e., medical visits/medication, meals, legal visits, and other visits) and the existing internet infrastructure available to provide Mass.

The Center considered other options for offering Mass to detainees, including the possibility of providing in-person, large group meetings. However, the physical layout of the Center, coupled with state and federal regulations, makes this option infeasible. The Yard is the only location within the Center that could hold more than a few detainees at one time, and it can hold up to 20 individuals (though it would be a tight fit). Assuming that it was possible to comply with the ICE, U.S. Marshals, and PREA regulations concerning the mixing of various classifications of prisoners, the detainees would have to be moved in groups of no larger than five at a time. Assuming 20 individuals from the same classification all requested to attend Mass, the Center would need to make 8 moves per Mass – 4 moves to take the detainees to the Mass and 4 moves to return the detainees to their cells after the Mass. Additionally, there may be situations where due to the classifications, a group of smaller than 20 individuals would hear Mass, or if, for example, 25 individuals of the same classification requested to attend Mass, two masses would need to be held, to prevent mixing and to comport with the size of the Yard. Considering only the ICE detainees, to move all 150 detainees – not to mention any other individual who wanted to

[3] Because the priest will be taken to the pods to distribute Mass, he will be subject to the search protocol for the facility. Federal Defendants request that the name(s) of the priests coming to say Mass and distribute communion be provided to the Center ahead of time.

attend Mass – would require the Center to make 60 moves for 7 Masses of 20 and 1 Mass of 10. Given the time it takes to conduct such moves through multiple airlock doors, a total of 8 Masses, even if they lasted only an hour each, would likely take two full days, to account for the lag time between Masses while detainees are being moved and also for meal times, which require all 8 deputies to be engaged in the provision of food, three times per day. Additionally, this time estimate does not account for any unexpected medical emergencies, security events, or other interruptions which cannot be anticipated. Once again, while deputies are engaged in the movement of individuals to Mass, they cannot also be moving individuals to see clergy, mental health professionals, lawyers, or medical professionals—in other words, this would burden the exercise of legal rights and the provision of medical and mental health care to detainees. Additionally, Mass cannot be provided in the cell blocks because not all detainees in any given cell block may wish to partake in Mass and could not avoid being part of it were it to be conducted in the cell block. Finally, it presents a security concern for a priest to be in a cell block with up to 30 detainees at any one time.

Each move is a drain on manpower and presents safety concerns. Each move would require 6 of the 8 available sheriff's deputies to move the detainees – 2 to move the detainees to the Mass, 2 to wait in the Yard, and 2 to move the detainees from the Mass. This means that only 2 sheriff's deputies are available during Mass times "if unrest arises in one part of the prison while [Mass] is ongoing elsewhere" during the multiple Masses. *Fowler*, 534 F.3d at 939. A drain on manpower is a legitimate consideration. *Id.* Moreover, to avoid any fights and to comply with federal regulations, deputies segregate detainees of different security levels so that both during the move and while waiting for each Mass to begin, higher level security detainees are not co-mingled with lower security level detainees. "Prison officials charged with managing such a volatile

environment need [not] present evidence of actual problems to justify security concerns." *Id.* at 939. Finally, in-person Masses ignores the Center's investment in wiring the facility for internet as it would not be used.

Plaintiffs insist Mass must be in-person, though they do not rely on a sincerely held religious belief to support their demand. First, they claim that "comparable facilities freely allow in-person clergy visits" to, among other things, celebrate Mass. Doc. 8 at p. 22 (citing Doc. 1-11 at ¶ 4). However, simply because one facility provides an accommodation does not require other facilities to provide the same accommodation. *Fowler*, 534 F.3d at 940 (the fact that Potosi Correctional Center provided a sweat lodge did not also require the Jefferson City Correctional Center to provide a sweat lodge). Further, when considering what other facilities have done to accommodate religious practices, a probative question is whether other facilities have larger rooms or Yard areas, the same mix of prisoner classifications, the same security concerns, and the same number of deputies, to permit such group meetings – the particular physical environment and safety considerations of each prison must be considered. Second, Plaintiffs argue that in-person Mass is required because the Center previously "allowed contact visits and group religious celebrations inside the jail." Doc. 8 at pp. 21-22 (citing Doc. 1-14 at ¶ ¶ 4, 5). Several years ago, the Center only held up to 80 individuals and was not wired for internet. Exhibit A at ¶¶ 87, 89. Now, the facility holds approximately 500 individuals and is wired for internet. *Id.* at ¶¶ 6, 90. The past conditions under which the Center operated are not probative of the environment in which it currently operates.

By contrast, conducting Mass over the internet and moving a priest through the pods involves lower costs and addresses security concerns. First, only two deputies are required to accompany the priests through the pods. This means that 6 other deputies are available to address

concerns in other areas of the Center, move detainees to other appointments, and distribute meals. Additionally, security concerns are further diminished because less time is necessary to move 1 or 2 priests through the pods than 150 detainees, 5 at a time, for 8 different Masses.

Furthermore, using the internet will decrease the costs and security concerns because moving the detainees will not be necessary. In identifying the least restrictive means, prison officials may balance the cost of associated with streaming or access to videos with alternative means of allowing a prisoner to exercise his religious rights. *Walker v. Artus*, 998 F. Supp.2d 18, 27 (N.D.N.Y. 2014) (prison could consider substantial costs for installing video-feed in denying prisoner's request for audio or video feed rather than participating in group Jumu'ah services). Courts recognize that video access or live streaming may be the least restrictive means to allow a prisoner to exercise his religious rights. *Greenhill v. Clarke*, 944 F.3d 243, 251 (4th Cir. 2019) (television access required to permit plaintiff to satisfy his Jum'ah obligations); *Crawford v. Clarke*, 578 F.3d 39, 44 (1st Cir. 2009) ("the district court found that providing closed-circuit broadcasting was the least intrusive means to alleviate the burden on the Plaintiffs" when they were denied the right to attend mandatory Jum'ah services); *DePaola v. Ray*, 2013 WL 6055253, at *2 (W.D. Va. Nov. 15, 2013) (plaintiff was "housed in a cell in which he has access to a personal television on which to view and listen to weekly Jumu'ah service"). In fact, the Archdiocese itself permits parishioners to satisfy their obligation by viewing Mass through the internet. *See* Immaculate Conception Dardenne Prairie Mass 10:15am Sunday live stream. https://www.icdparish.org/mass.

Because the Center has offered Mass in a manner that satisfies strict scrutiny, Plaintiffs are unlikely to prevail on their claim and their Motion for Preliminary Injunction should be denied.

### 2. Confession

Plaintiffs maintain that their Catholic faith requires that Confession be done face-to-face, in a private setting. Doc. 8 at p. 17. Confession, according to Plaintiffs, "may not be heard via telephone, and certainly not in the context of a non-private conversation." *Id.* The modifications the Center has made, and is making, to the attorney-client rooms comport with the requirements for Plaintiffs to practice their Catholic faith and therefore, their claim is unlikely to succeed on the merits and this Court should deny their Motion for Preliminary Injunction.

The modified policies permit clergy visits on Saturday from 9am to 4pm. Using all 3 attorney/client visiting rooms to permit unmonitored visits, the clergy will have, potentially, 21 hours to conduct Confession. In the visiting room, a glass partition and wall separate the priest/penitent Exhibit A at ¶¶ 50-56. Mesh exists at the bottom of the glass – much like a confessional – in which the priest and penitent can speak to directly to each other without any electronic devices. *Id.* at ¶¶ 48-49.

Plaintiffs might argue that 21 hours per week is an insufficient amount of time to administer the sacrament of Confession. However, limiting the number of hours for confidential confession is not a substantial burden on Plaintiffs' exercise of their religious rights. *Weir*, 114 F.3d at 821. In the declaration provided for this case, Rev. Msgr. James J. Ramacciotti's (Doc. 1-3) discussion of canon law does not indicate a minimum number of hours is necessary for Confession. Indeed, at least one of the larger parishes (approximately 11,570 members) in the Archdiocese – Immaculate Conception of Dardenne Prairie – only allots 3.16 hours of Confession per week – nearly 7 times less than the Center's modified regulations provide. (https://www.integraavl.com/portfolio-item/immaculate-conception-dardenne/; https://www.icdparish.org/mass). Furthermore, if the Plaintiffs believe additional time is

necessary, they can request it – as discussed below – by requesting an attorney/client room on a "first come, first served" basis during the week.

Because the Center's modifications comport with strict scrutiny, Plaintiffs are unlikely to succeed on the merits of their claim, and this Court should deny their Motion for Preliminary Injunction.

**3. Communion**

Plaintiffs maintain that "Communion *requires* in-person contact because the Catholic priest who transubstantiates the host must deliver it directly to the faithful (and only the faithful) receiving it." Doc. 8 at p. 16. Delivery, as Plaintiffs state, means "placing the consecrated host directly in the hands or mouth of the person receiving communion." Declaration of Rev. David Kiblinger, S.J. (Doc. 1-9) at ¶ 14.

The modified regulations meet Plaintiffs' requirements in the least restrictive means and allow the Center to address safety and security concerns. Prison officials have a legitimate interest in prohibiting contraband from being introduced into the prison system. *Hamilton*, 74 F.3d at 1554. This includes limited use of religious paraphernalia necessary for a religious service. *Ealy v. Keen*, 2015 WL 1471577, at *7 (E.D. Pa. Mar. 31, 2015) (prayer oils initially denied based on concerns "that the oils could mask the scent of the contraband; be used for illicit trades or purposes; be used to threaten other inmates, as perfumes and like products are not allowed in the facility; or provide a means for inmates to slide out of restraints"). Ultimately, prison officials permitted the use of oils, but they "retained the oils . . . in the chapel . . and administered [them] at the beginning of services." *Id.*

Similarly, the modified policies permit priests to give in-person, hand-to-hand or hand-to-mouth Communion following Confession and Mass. First, the Center proposes that it will, with

the Archdiocese's assistance, directly obtain the unconsecrated host and sacramental wine from an agreed upon supplier such as Catholic Supply. This minimizes the potential for contraband being introduced into the Center. Second, the priest will consecrate the host and wine before meeting with the penitent or parishioner. Following Confession, the priest will be able to provide the penitent with Communion using a pass-through door on each of the cell blocks. Separately, during clergy visiting hours, if there are detainees who wish to receive communion, they may do so through one of the pass through doors on the attorney-client rooms. To allay concerns about communion being provided immediately and during the pendency of this lawsuit, until all three pass-through doors are installed, the Center will move the priest from his room to the room in which the penitent sits to provide the penitent with Communion directly. Finally, to address concerns with remaining consecrated hosts after Mass on Mondays, following Communion, the priest will consume the remaining wine and take the consecrated host with him using a pyx or other small vessel. Exhibit 3 at ¶ 35.

The Center has offered a solution to provide Communion to all detainees who wish to partake, in the least restive means necessary. Thus, Plaintiffs are unlikely to succeed on the merits of their claim, and their Motion for Preliminary Injunction should be denied.

**4. Pastoral Visits**

Plaintiffs also contend that "[t]he need for pastoral counseling by a religious leader who shares one's faith is important to Catholics (as to many others)." Doc. 8 at p. 18. Accordingly, "the priests of the Archdiocese have signed up on a rotating basis – each taking time from full-time parish duties – to provide spiritual counsel and prayer to detainees." *Id.* Moreover, Plaintiffs maintain that "[t]he 4-hour-a-week visitation policy" and the waiting time between each visit limits the number of detainees a priest can visit. *Id.* at pp. 18-19.

The modified regulations address Plaintiffs' concerns and do not place a substantial burden on the Plaintiffs' exercise of their religious rights. First, Federal Defendants understand that spiritual counseling does not have the same "in person" sacramental requirement that Communion and Confession require, and that there is no prohibition on receiving spiritual counseling via electronic communication or in a visiting booth that uses a telephone. Thus, during the expanded visiting hours on Saturdays from 9 a.m. to 4 p.m., the Plaintiffs may send as many as 10 priests who could visit with detainees at any one time using the visitor booths, in addition to 3 priests who could use the attorney-client rooms for Confession and Communion. Note that clergy hours are open to clergy of any faith, and so priests, along with imams, pastors, ministers, rabbis, and the like will be permitted to visit detainees on a first-come, first-serve basis. Each detainee possesses a tablet, and we understand that Abide in Love pays the connection fees for the detainees to send emails to priests, should detainees wish to communicate in that manner. Furthermore, a priest may also choose to meet with a detainee on Sunday during regular visiting hours, 12 p.m. to 4 p.m. If the spiritual advisor chooses to meet with the detainee from 12 p.m. to 4 p.m., he/she will need to follow the same visitor process as others.

Plaintiffs contend that the Center should treat them like lawyers and consular officials because "[l]awyers can arrange contact visits with their clients on demand to speak face-to-face, in private, and to pass legal papers back and forth" and consular officials "can see foreign nationals on demand." Doc. 18 at pp. 1-2. However, Plaintiffs are mistaken on both counts.

First, priests are not like lawyers or consular officials. "[T]he state bar thoroughly screens attorneys before they are admitted to the bar, and the state bar disbars attorneys for various reasons, including criminal offenses. Therefore, the consequences are great if an attorney violates the law or regulations of the [Center]. The [Center] cannot rely on the fact that a visiting priest or minister

has been screened by the state." *Card v. Dugger*, 709 F. Supp. 1098, 1106-07 (M.D. Fla. 1988). Moreover, unlike priests, consular officials derive their authority to visit their nationals from the Vienna Convention. *Paulino v. Zenk*, 2008 W.L. 356849, at *12 (S.D.N.Y. Feb. 7, 2008) (citing Vienna Convention, Article 36.1(c) "consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation").

Second, neither lawyers nor consular officials see detainees on demand, and all visitors may experience delays during their visits. If a lawyer or consular official wants an in-person detainee visit, the lawyer or consular official may appear at the jail and request such a visit in one of the three attorney-client visiting rooms. However, these rooms are assigned on a "first come, first served" basis. Once a lawyer or consular official meets with one detainee, the individual returns to the end of the line to wait for another room to become available to meet with another detainee. The lawyer or consular official must wait until a room is available before meeting with the detainee. Alternatively, the attorney or consular official may schedule an appointment to meet with the detainee on Zoom in the attorney-client room. However, these appointments, generally, must be scheduled approximately 10-days ahead of time. Moreover, meeting times with religious leaders or others "is subject to occasional interruptions, delays, or cancelations due to security needs, including, *inter alia*, emergency head-counts, fights between inmates, medical emergencies, and short staffing." *Ealy*, 2015 WL 1471577, at *4; *see also Rogers v. Scurr*, 676 F.2d 1211, 1216 (8th Cir. 1982) ("[n]o constitutional right of a prisoner is violated when he is not allowed to see visitors during an emergency lockdown, even if the requested visitor is a religious adviser").

The Center's modified policies offer detainees the freedom to practice their religion, including through visits from clergy and religious advisers. Because the modified policies pass

constitutional muster, Plaintiff's claims are likely to fail. This Court should therefore deny Plaintiffs' Motion for a Preliminary Injunction.

**5. Future Concerns**

Finally, in their Complaint, Plaintiffs seek an Order imposing on Federal Defendants the duties to

> (2) enjoin ICE Defendants, including their officers and agents, to . . . (b) implement inspection policies and procedures reasonably designed to detect religious-liberty violations at contractor detention facilities, including the denial of private clergy visits and the denial of access to the sacraments; and (c) issue deficiencies to contractor detention facilities found not to comply with applicable religious-liberty detention standards, subjecting non-compliant facilities to loss of funding.

Complaint at "WHEREFORE" Clause, pp. 37-38. Plaintiff's injunction request is not limited to the Center because it seeks nationwide relief as to the Federal Defendants. Yet plaintiffs have not brought a class action claim, do not describe with particularity any other federal facility or contracted facility, and do not purport to speak on behalf of all ICE detainees nationwide, or even those detained at other facilities. Instead, based only on facts related to one contract at one facility in the Eastern District of Missouri, Plaintiff ask this Court to impose such an injunction "known as 'universal injunctions' – [that] exceed the equitable authority that Congress has granted to federal courts." *Trump v. Casa, Inc.*, 145 S. Ct. 2540, 2548 (2025). Because the relief Plaintiffs' seek cannot be issued by this Court, their claim fails as to the Federal Defendants and their Motion for a Preliminary Injunction should be denied on that basis alone. Further, at least part of the relief Plaintiffs request is already provided through the inspection policies and procedures already in place, which permit detainees to make requests concerning their religious practice. And finally, because the modified policies comply with federal law, Plaintiffs are unlikely to succeed on the merits of their claims as to the Federal Defendants.

Nevertheless, Federal Defendants are sympathetic to Plaintiffs' demand that all facilities – whether contractor detention facilities or ICE detention facilities – must allow for the exercise of religious rights. Indeed, the Federal Defendants agree that a detainee's right to practice their faith does not stop at the prison doors. To address Plaintiffs' concerns that the Center and similar institutions into which other detainees may be housed, or similar institutions to which they may be transferred to in the future abide by federal law and any contractual obligations concerning free exercise of religion, ICE Enforcement and Removal Operations (ERO) will provide the contact information for the ERO manager overseeing ICE custody management in the State of Missouri. This ERO contact will act as a liaison to the Archdiocese should future concerns with other contractor facilities be identified. The Archdiocese can contact this ERO manager to relay any concerns it has identified at the Center or similar institutions so that the ERO manager can work with the Archdiocese and the Center or similar institutions to resolve.

Because the relief Plaintiffs seek as to the federal defendants cannot be issued by this Court, their Motion for Preliminary Injunction should be denied.

## IV. Conclusion

This Court should deny Plaintiffs' preliminary injunction motion. The Center's modified regulations do not substantially burden the exercise of Plaintiffs' religious rights or, alternatively, are the least restrictive means of furthering a compelling governmental interest. Because the Center's policies pass constitutional muster, Plaintiffs are unlikely to succeed on the merits of their claim, and their motion should therefore be denied.

Respectfully submitted by,

THOMAS C. ALBUS
United States Attorney

/s/ *Roger A. Keller, Jr.*
ROGER A. KELLER, JR., #42541MO
ONALEE YOUSEY IRWIN, #72742MO
Assistant United States Attorney
Thomas F. Eagleton U.S. Courthouse
111 South Tenth Street, 20th Floor
St. Louis, Missouri 63102
Phone: (314) 539-2200
Fax: (314) 539-2196
E-mail: Roger.Keller@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I certify that I served the foregoing document to all attorneys of record via the Court's CM/ECF electronic notification system on October 27, 2026.

/s/ Roger A. Keller, Jr.
ROGER A. KELLER, JR.
Assistant United States Attorney