UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ARCHBISHOP MITCHELL T. ROZANSKI,<br>FR. CHRISTOPHER SCHROEDER,<br>ARCHDIOCESE OF ST. LOUIS,<br><br>Plaintiffs,<br><br>vs.<br><br>SHERRIFF GARY STOLZER, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:26-CV-00224-MTS |

# *MISSOURI DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION*

COME NOW, Defendants Sheriff Gary Stolzer, Major Jason Schott, and Lieutenant Andrew Johnson, in their official capacities (collectively, the "Missouri Defendants"), and for their Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction (Doc. 7), state as follows:

**Table of Contents**

Table of Authorities ....................2
I. Factual Background ....................3
II. Standard of Review ....................7
III. Argument ....................8
A. Plaintiffs lack standing to assert their own claims and the rights of detainees. ....................8
1. Plaintiffs do not have standing to assert their own religious-liberty claims. ....................9
a. Article III Standing ....................9
b. Count II – First Amendment Free Exercise Claim ....................12
c. Count III – Missouri RFRA ....................13
2. Archbishop Rozanski and Fr. Schroeder lack third-party standing to assert the religious-liberty rights of the detainees. ....................14

3. The Archdiocese of St. Louis has not established associational standing to assert the rights of unnamed priests. ....18
4. Plaintiffs' request for preliminary injunctive relief is moot because the Detention Center has adopted accommodations addressing the Plaintiffs' religious concerns. ....19
B. Even if the Court reaches the preliminary-injunction factors, Plaintiffs cannot establish that the requested relief is warranted. ....23
1. Plaintiffs have not established a likelihood of success on the merits. ....23
a. Count I – RLUIPA Claim....24
b. Count II – First Amendment Free Exercise Claim....26
c. Count III – Missouri RFRA Claim....27
2. Plaintiffs are not likely to suffer irreparable harm in light of the accommodations adopted or being implemented by the Detention Center....30
3. The balance of the equities and public interest weigh against the requested injunction. ....31
C. Plaintiffs should be ordered to post security in connection with any injunctive relief, and the Court should stay any relief. ....33
IV. Conclusion ....33

**Table of Authorities**

**Cases**

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)....20
*Anderson v. United States*, 612 F.2d 1112 (9th Cir. 1979)....8
*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014)....8
*Bell v. Wolfish*, 441 U.S. 520 (1979)....26, 32
*Brooks v. Smith,* No. 1:24-cv-00378-CEA-CHS, 2025 LX 497971 (E.D. Tenn. Sep. 4, 2025).. 12, 26
*Cutter v. Wilkinson*, 544 U.S. 709 (2005)....25
*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981)....7, 31, 33
*Eggers v. Evnen*, 48 F.4th 561 (8th Cir. 2022)....32
*FBI v. Fikre*, 601 U.S. 234 (2024)....19, 20
*Hodak v. City of St. Peters*, 535 F.3d 899 (8th Cir. 2008)....9, 15, 16
*Holt v. Hobbs*, 574 U.S. 352 (2015)....24
*Home Instead, Inc. v. Florance*, 721 F.3d 494 (8th Cir. 2013)....7
*Kowalski v. Tesmer*, 543 U.S. 125 (2004)....15
*Los Angeles v. Lyons*, 461 U.S. 95 (1983)....10
*Lowe v. Whistler*, No. 1:25-cv-00086-SNLJ, 2026 LX 46742 (E.D. Mo. Feb. 22, 2026)....12
*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)....9

*McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029 (8th Cir. 2004) .................... 23
*Medalie v. Bayer Corp.*, 510 F.3d 828 (8th Cir. 2007) .................... 9
*Minn. Mining & Mfg. Co. v. Meter*, 385 F.2d 265 (8th Cir. 1967) .................... 7
*MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010 (8th Cir. 2020) .................... 7
*Murthy v. Missouri*, 603 U.S. 43 (2024) .................... 10, 11, 19
*Nken v. Holder*, 556 U.S. 418 (2009) .................... 23
*O'Shea v. Littleton*, 414 U.S. 488 (1974) .................... 10
*O'Malley v. Brierley*, 477 F.2d 785 (3d Cir. 1973) .................... 12, 26
*Powers v. Ohio*, 499 U.S. 400 (1991) .................... 15, 16
*Rogers v. Scurr*, 676 F.2d 1211 (8th Cir. 1982) .................... 8
*Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005) .................... 8
*Shqeir v. Equifax, Inc.*, 636 S.W.2d 944 (Mo. banc 1982) .................... 14
*Singleton v. Wulff*, 428 U.S. 106 (1976) .................... 16
*Singson v. Norris*, 553 F.3d 660 (8th Cir. 2009) .................... 32
*Troiano v. Supervisor of Elections*, 382 F.3d 1276 (11th Cir. 2004) .................... 22
*United Food & Commer. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544 (1996) .................... 18
*United States v. Mohr*, Case No. 4:26-cr-00074-MTS-PLC, Doc. 37 (E.D. Mo. Oct. 13, 2026). 17
*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) .................... 30, 31

**Statutes**

42 U.S.C. § 1983 .................... 12
42 U.S.C. § 2000 .................... 24
RSMo § 1.302 .................... passim
RSMo § 1.307 .................... 13, 14, 28, 29

**Rules**

Fed. R. Civ. P. 62 .................... 33
Fed. R. Civ. P. 65 .................... 33

## I. FACTUAL BACKGROUND

This matter concerns the ability of Catholic clergy to provide religious services and pastoral care to detainees housed at the Ste. Genevieve County Detention Center (the "Detention Center"). Plaintiffs Archbishop Mitchell T. Rozanski, Fr. Christopher Schroeder, and the Archdiocese of St. Louis (collectively, the "Plaintiffs") challenge the Detention Center's clergy visitation policy, contending that the policy prevents Catholic detainees from receiving confession and communion,

prevents the celebration of Mass, and provides insufficient opportunities for pastoral counseling. Doc. 1 ¶¶ 2, 6–10. Based on those alleged restrictions, Plaintiffs assert claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the Free Exercise Clause of the First Amendment, and Missouri's Religious Freedom Restoration Act (the "Missouri RFRA") against Sheriff Gary Stolzer, Major Jason Schott, and Lieutenant Andrew Johnson. *Id.* at ¶¶ 86–108.

Plaintiffs seek a preliminary injunction requiring the Missouri Defendants to substantially alter the manner in which clergy access is provided to detainees at the Detention Center. *See* Doc. 8, p. 40. Specifically, Plaintiffs ask the Court to prohibit enforcement of the no-contact visitation policy as applied to priests, require private clergy access on the same terms afforded to attorneys, eliminate the existing four-hour limitation on clergy visitation, and permit the celebration of Mass. *Id.*

The circumstances underlying Plaintiffs' request for preliminary relief, however, have materially changed. In response to the concerns raised by Plaintiffs, the Detention Center has undertaken concrete steps to provide accommodations for the religious practices identified in Plaintiffs' Motion. Those measures expand clergy visitation; provide accommodations for confession and the direct administration of communion; and include steps to facilitate the livestreaming of Mass to detainees followed by the direct distribution of communion. Ex. 7, Affidavit of Major Jason Schott ¶¶ 41–84 ("Aff. Major Schott").

For confession, the Detention Center has implemented clergy-visitation hours on Saturdays from 9:00 a.m. to 4:00 p.m. *Id.* at ¶¶ 43–44. During that period, clergy may use all three attorney-client visiting rooms for confession, communion, spiritual or pastoral counseling, providing up to twenty-one room-hours for clergy visitation. *Id.* at ¶ 45, Exs. 1–2. The dedicated clergy-visitation period is available to clergy of different faiths on a first-come, first-served basis. *Id.* at ¶¶ 45–46.

In the attorney-client visiting rooms, the priest and detainee remain physically separated by a glass partition, but a screen mesh opening permits them to speak directly without using the telephone system. *Id.* at ¶¶ 32, 47–48, Exs. 1, 3. Because the attorney-client visiting rooms contain no recording devices, communications conducted directly through the mesh openings are not recorded. *Id.* at ¶¶ 31, 49. This arrangement facilitates the practice of confession while maintaining physical separation between the priest and detainee. *See id.* at ¶ 50.

For communion, the Detention Center has already modified one of the attorney-client visiting rooms to include a pass-through opening through which a priest may administer communion directly hand-to-hand or hand-to-mouth to a detainee. *Id.* at ¶¶ 57–61, Ex. 4. The physical configurations of the second and third attorney-client visiting rooms did not permit installation of the same type of pass-through opening because of the configurations of the glass windows and cinderblock walls. *Id.* at ¶ 62. The Detention Center therefore has modified the door to the second attorney-client visiting room to create a pass-through flap through which communion may be administered directly and is in the process of modifying the third attorney-client visiting room to add the same pass-through flap. *Id.* at ¶¶ 63–64.[1] The modifications to add these pass-through flaps require welding. *Id.* at ¶ 65. While the modification is completed in the third attorney-client visiting room, two deputies will escort the priest to the detainee's side of the visiting room so that the priest may administer communion directly hand-to-hand or hand-to-mouth and then escort the priest back to the visitor side of the room. *Id.* at ¶¶ 66–67. The Detention Center

[1] Major Jason Schott's Affidavit accurately reflected the status of the Detention Center's accommodations at the time it was executed. On the date of this filing, undersigned counsel learned that the welding process described in the Affidavit had since been completed in the second attorney-client visiting room and that the pass-through flap had been installed. The third attorney-client visiting room is still in the process of being modified with the pass-through flap. The Missouri Defendants will be submitting a supplemental affidavit from Major Jason Schott to establish the completion of the modification to the second attorney-client visiting room and the present configuration of that second visiting room in Exhibits 8 through 11.

anticipates that the physical modifications to the third attorney-client visiting room will be completed by the date of the hearing on Plaintiffs' Motion for a Preliminary Injunction. *Id.* at ¶ 68.

The Detention Center has likewise taken steps to facilitate the celebration of Mass. Detainees have already been issued electronic tablets, which will be used to provide access to livestreamed Mass. *Id.* at ¶¶ 69–70. The Detention Center is currently working with Ministry Brands to establish an account for the ChurchStreaming.tv application and will test the system after the account and technical setup are completed. *Id.* at ¶¶ 71–72. The Detention Center will provide an appropriate room from which a priest may celebrate Mass for livestreaming to detainees on their tablets. *Id.* at ¶ 74. Livestreamed Mass will be made available on Mondays from 9:00 a.m. to 9:45 a.m. *Id.* at ¶ 75. Following the livestreamed Mass, Detention Center personnel will escort the priest to the appropriate housing pods so that communion may be distributed directly to detainees who wish to receive it through the housing block's chuck-hole door. *Id.* at ¶ 76. The priest will be required to comply with applicable identification, screening, search, and security requirements before entering secure portions of the Detention Center. *Id.* at ¶ 77. The Detention Center anticipates that the livestreaming accommodation will be operational by the date of the hearing on Plaintiffs' Motion for a Preliminary Injunction. *Id.* at ¶ 73.

Based upon the work completed to date, the modifications presently underway, and the arrangements being made with applicable service providers, the Detention Center anticipates that the accommodations described above will be fully implemented, to the extent they are not already implemented, by the date of the hearing on Plaintiffs' Motion for a Preliminary Injunction. *Id.* at ¶ 42. The accommodations are intended to remain in effect after resolution of Plaintiffs' Motion and are not temporary measures limited to the pendency of this litigation. *Id.* at ¶ 102.

Taken together, these measures address each of the religious concerns identified by Plaintiffs, including confession, communion, Mass, and pastoral counseling, while retaining appropriate measures for the safe and orderly operation of the Detention Center. Accordingly, the Missouri Defendants' actions in undertaking these accommodations materially alter the circumstances upon which Plaintiffs base their request for preliminary injunctive relief.

## II. STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy, and the party seeking injunctive relief bears the burden of proving that the relevant factors weigh in its favor. *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020) (internal quotations omitted). The Eighth Circuit has established a four-factor test for determining whether to grant the extraordinary relief of a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties []; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

A preliminary injunction is a provisional remedy designed to preserve the status quo until the case can be heard upon the merits. *Minn. Mining & Mfg. Co. v. Meter*, 385 F.2d 265, 273 (8th Cir. 1967). The status quo is the last uncontested status which preceded the pending controversy. *Id.* However, there are two types of injunctions. "A mandatory injunction orders a responsible party to take action, while a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a final resolution on the merits." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (internal citations and quotations omitted). A mandatory injunction goes well beyond simply maintaining the status quo and is particularly

disfavored. *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979). Mandatory preliminary relief should not be issued unless the facts and law clearly favor the moving party. *Id.*

Courts have stated that "such disfavored injunctions must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005). Thus, Plaintiffs must demonstrate that "a cognizable danger of future violation exists and that danger must be more than a mere possibility" for the Court to intervene. *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).

## III. ARGUMENT

Plaintiffs' Motion for a Preliminary Injunction should be denied for several reasons. First, Section A addresses the threshold issues of standing and mootness. Plaintiffs have not established Article III standing to obtain the prospective relief they seek, Archbishop Rozanski and Fr. Schroeder have not established third-party standing to assert the religious-liberty rights of detainees, and the Archdiocese of St. Louis has not established associational standing to assert the rights of unnamed priests. Section A further explains why the Detention Center's subsequent accommodations render Plaintiffs' request for preliminary injunctive relief moot. Next, Section B addresses the preliminary injunction factors and demonstrates that Plaintiffs cannot establish a likelihood of success on their RLUIPA, First Amendment, or Missouri RFRA claims, a likelihood of irreparable harm, or that the balance of equities and public interest favor the requested injunction. Finally, Section C addresses the security and stay that should accompany any injunctive relief if the Court nevertheless grants Plaintiffs' Motion for a Preliminary Injunction.

### A. Plaintiffs lack standing to assert their own claims and the rights of detainees.

As an initial matter, the Court may wish to understand whose rights are at issue. In Count I, Archbishop Rozanski and Fr. Schroeder seek to assert, through third-party standing, the RLUIPA rights of Catholic detainees housed at the Detention Center. Doc. 1, ¶¶ 86–93. In Counts II and III, Plaintiffs rely both on alleged injuries to their own religious exercise under the Free Exercise Clause of the First Amendment and the Missouri RFRA and on alleged injuries to the detainees through third-party standing. *Id.* at ¶¶ 94–108. The Archdiocese also seeks to assert the rights of unnamed priests through associational standing. *Id.* at ¶¶ 16, 99, 106. As discussed below, Plaintiffs have not established Article III standing to obtain the prospective relief they seek; Archbishop Rozanski and Fr. Schroeder have not satisfied the requirements for third-party standing on behalf of the detainees; and the Archdiocese of St. Louis has not established associational standing on behalf of unnamed priests. Moreover, the Detention Center's subsequent accommodations have materially changed the circumstances underlying Plaintiffs' Motion and render the requested preliminary injunctive relief moot.

**1. Plaintiffs do not have standing to assert their own religious-liberty claims.**

**a. Article III Standing**

Standing is a threshold inquiry and jurisdictional prerequisite that must be resolved before reaching the merits of a suit. *Hodak v. City of St. Peters*, 535 F.3d 899, 903 (8th Cir. 2008) (citing *Medalie v. Bayer Corp.*, 510 F.3d 828, 829 (8th Cir. 2007)) (internal quotations omitted). In order to have standing, a party must have a "case or controversy" under Article III of the Constitution. *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). The irreducible constitutional minimum of standing consists of three elements. *Id.* First, a party must have suffered an "injury in fact," an actual or imminent concrete and particularized invasion to a legally protected interest;

second, the injury must be fairly traceable to the challenged action of the defendant; and third, the injury must be redressable by a favorable decision. *Id.*

To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to conduct by the defendants that is likely to occur or continue, and likely to be redressed by an injunction against them. *Murthy v. Missouri*, 603 U.S. 43, 69 (2024). At the preliminary injunction stage, the plaintiffs must show that they are likely to succeed in carrying that burden. *Id.* Past exposure to allegedly unlawful conduct, standing alone, does not establish a present controversy for injunctive relief absent continuing adverse effects. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Rather, the threatened future injury must be "real and immediate," not "conjectural" or "hypothetical." *Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983). It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. *Id.* at 107 n.8 (emphasis in original). The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant. *Id.*

Plaintiffs cannot establish a substantial risk of future injury necessary to obtain prospective injunctive relief. The prospective relief requested in their Motion is premised upon the continuation of the visitation policy they challenge. Since Plaintiffs sought that relief, however, the Detention Center has adopted or begun implementing accommodations addressing the religious practices at issue, including expanded clergy visitation, confession, direct administration of communion, and livestreamed Mass. Aff. Major Schott ¶¶ 41–84. The Detention Center anticipates that the accommodations will be fully implemented, to the extent they are not already implemented, by the date of the hearing on Plaintiffs' Motion for a Preliminary Injunction, and the accommodations are intended to remain in effect after resolution of Plaintiffs' Motion. *Id.* at ¶¶

42, 102. In light of those changed circumstances, Plaintiffs cannot establish a substantial risk of future injury. Any contention that Plaintiffs will again suffer those injuries necessarily depends on speculation that the Detention Center will abandon the accommodations now available or being implemented and return to the challenged practices. That speculative possibility does not establish the actual or imminent injury necessary for prospective relief.

The same absence of a likely future injury also undermines Plaintiffs' ability to establish traceability. For prospective relief, Plaintiffs must establish a substantial risk of future injury that is traceable to conduct of the Missouri Defendants that is likely to occur or continue. *Murthy*, 603 U.S. at 69. Here, the practices upon which Plaintiffs base their requested injunction have been materially altered by the accommodations now available or being implemented. *See* Aff. Major Schott ¶¶ 41–84. Plaintiffs therefore have not identified a sufficiently likely future injury that is fairly traceable to the Missouri Defendants' conduct. Rather, the asserted causal chain depends upon the additional assumption that the Detention Center will discontinue the accommodations and return to the practices Plaintiffs challenge. *See id.* at ¶¶ 42, 102.

The changed circumstances at the Detention Center also bear directly upon redressability. Plaintiffs must show that the injunction they request is likely to redress an otherwise impending injury. *Murthy*, 603 U.S. at 69. But where the Detention Center has undertaken measures addressing the religious practices upon which Plaintiffs base their request for relief, Plaintiffs have not shown that an injunction would remedy any injury that is otherwise likely to occur. Rather, the requested injunction principally addresses practices that have already been modified or are presently being modified through the accommodations described above. Aff. Major Schott ¶¶ 41–84. Accordingly, Plaintiffs have not established the Article III standing that is needed to obtain the prospective injunctive relief they seek.

**b. Count II – First Amendment Free Exercise Claim**

Plaintiffs' claim of direct injury under Count II rests principally on their assertion that the Detention Center's visitation policy interferes with their ability to provide religious ministry to detainees. Doc. 1, ¶ 96. Specifically, Plaintiffs contend that the clergy have an independent right under the Free Exercise Clause to perform sacramental and pastoral functions for detainees and that the visitation policy burdens the exercise of that right. *Id.* at ¶¶ 96, 100. Plaintiffs seek to vindicate that alleged injury through 42 U.S.C. § 1983. *See id.* at Count II.

Section 1983 is a remedial statute which does not itself create independent substantive legal rights. *See* 42 U.S.C. § 1983. Rather, Section 1983 simply provides a vehicle for vindicating rights secured by the Constitution and laws of the United States. *See id*. To state a claim under § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation of that right was committed by a person acting under color of state law. *Lowe v. Whistler*, No. 1:25-cv-00086-SNLJ, 2026 LX 46742, at *4–5 (E.D. Mo. Feb. 22, 2026).

The Free Exercise Clause of the First Amendment protects one's ability to practice their religion, not one's ability to administer communion in a jail (with all of its attendant security concerns) or engage in ministry for others. *Brooks v. Smith,* No. 1:24-cv-00378-CEA-CHS, 2025 LX 497971, at *10 (E.D. Tenn. Sep. 4, 2025). Courts have consistently held that clerics do not have an unfettered right to enter correctional institutions to perform religious services. *See Brooks v. Smith*, No. 1:24-cv-378, 2025 LX 416418, at *8 (E.D. Tenn. Sep. 25, 2025); *see also O'Malley v. Brierley*, 477 F.2d 785, 793 (3d Cir. 1973) ("[T]here is no principle in the law granting to clerics an absolute right to enter a prison, and Fathers O'Malley and Taylor have no constitutional right to enter Western Penitentiary.").

Thus, while Plaintiffs contend that their religious beliefs obligate them to minister to incarcerated persons, the existence of that religious obligation does not itself establish a corresponding constitutional right to enter the Detention Center and provide religious services. Plaintiffs must identify a legally protected right under the First Amendment belonging to them that the Missouri Defendants have invaded. The authorities cited above show that clergy do not have a right under the First Amendment to access a correctional institution for the purpose of providing religious services to others.

Instead, much of the injury identified by Plaintiffs concerns the detainees' exercise of religion. Those alleged deprivations concern rights purportedly belonging to the detainees; they do not, without more, establish an invasion of a constitutional right belonging to Plaintiffs themselves. Accordingly, Plaintiffs cannot establish standing to pursue their own claim under Count II merely by relying upon alleged violations of the detainees' religious rights. Whether Plaintiffs may assert those rights on the detainees' behalf is a separate question governed by the requirements of third-party standing, addressed below.

**c. Count III – Missouri RFRA**

Plaintiffs have not established that Missouri RFRA authorizes the private cause of action they assert in Count III. The Missouri RFRA prohibits a governmental authority from restricting a person's free exercise of religion unless the restriction is in the form of a rule of general applicability and does not discriminate against religion. RSMo § 1.302.1. The governmental authority must also demonstrate that the restriction is essential to further a compelling governmental interest and is not unduly restrictive considering the relevant circumstances. *Id.* But § 1.302 does not expressly authorize a private civil action, identify an available civil remedy, or provide that a person may obtain injunctive relief for an alleged violation. *See id.* Nor does § 1.307,

which addresses the applicability and limitations of Missouri RFRA and defines the circumstances relevant to its application, expressly create a private cause of action or provide a remedy. *See* RSMo § 1.307.

The Missouri Supreme Court has treated legislative intent as the dispositive question in determining whether a statute creates a private cause of action. *See Shqeir v. Equifax, Inc.*, 636 S.W.2d 944, 946–47 (Mo. banc 1982). Moreover, Missouri courts do not favor implying a private cause of action where the legislature has not expressly created one. *Id*. at 947. As the Missouri Supreme Court explained, "[t]he creation of a private right of action by implication is not favored, and the trend is away from judicial inferences that a statute's violation is personally actionable." *Id.*

Thus, the relevant inquiry is whether the language and structure of §§ 1.302 and 1.307 demonstrate that the Missouri General Assembly intended to create the private cause of action asserted. *See id.* at 947–49. Here, nothing in the statutory language of §§ 1.302 or 1.307 clearly indicates that the General Assembly intended to create the private cause of action that Plaintiffs assert. Section 1.302 specifies what governmental authorities may and may not do and identifies the substantive standard governing restrictions on religious exercise. RSMo § 1.302. Section 1.307 addresses the Act's applicability, limitations, and relevant circumstances. RSMo § 1.307. But neither section states that an aggrieved person may sue or specifies the judicial remedies available for a violation. *See* RSMo §§ 1.302, 1.307. In light of Missouri's disfavor of implied private causes of action and the absence of language in §§ 1.302 and 1.307 creating a civil remedy, Plaintiffs have not established that the General Assembly intended the Missouri RFRA to create the privately enforceable cause of action they assert in Count III.

**2. Archbishop Rozanski and Fr. Schroeder lack third-party standing to assert the religious-liberty rights of the detainees.**

In Count I, Archbishop Rozanski and Fr. Schroeder seek to assert the detainees' rights under RLUIPA. Doc. 1, ¶ 91. In Counts II and III, Archbishop Rozanski and Fr. Schroeder likewise seek to assert the detainees' rights under the Free Exercise Clause of the First Amendment and the Missouri RFRA. Doc. 1, ¶¶ 99, 106. Their ability to pursue those claims therefore depends upon whether they satisfy the requirements for third-party standing.

It is a well-established rule that a party generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Third-party standing is an exception to the general rule that a plaintiff may only assert his own injury in fact and permits a litigant who lacks a legal claim to assert the rights of a third party. *Hodak*, 535 F.3d at 904.

Third-party standing is limited to cases where (1) "the party asserting the right has a 'close' relationship with the person who possesses the right" and (2) "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

Plaintiffs contend that both requirements are satisfied. Doc. 1, ¶¶ 91, 99, 106. Archbishop Rozanski and Fr. Schroeder rely upon their asserted religious and pastoral relationship with Catholic detainees to establish the requisite close relationship and contend that the detainees are hindered from asserting their own rights because certain detainees allegedly declined to participate in this litigation based upon a fear of retaliation. Doc. 1, ¶¶ 15, 65, 91; Doc. 8, pp. 24–25. However, Archbishop Rozanski and Fr. Schroeder fail to satisfy both requirements.

First, Archbishop Rozanski and Fr. Schroeder have not established the requisite close relationship with the detainees whose rights they seek to assert. The close-relationship inquiry considers whether there is sufficient "congruence of interests" between the litigant and the holder

of the right such that the litigant will be "fully, or very nearly, as effective a proponent of the right" as the right holder. *Powers*, 499 U.S. at 413; *Singleton v. Wulff*, 428 U.S. 106, 115 (1976).

Although Archbishop Rozanski and Fr. Schroeder rely upon their religious and pastoral relationship with Catholic detainees, a shared religious affiliation does not necessarily establish congruence as to the particular religious-liberty rights asserted. Religious exercise is inherently individualized, and individual detainees may differ as to the religious practices they seek to observe and the accommodations necessary to permit those practices. The detainees themselves are therefore best positioned to identify the particular exercise allegedly burdened and the relief necessary to protect their own interests. Archbishop Rozanski and Fr. Schroeder have not shown that they are fully, or nearly as effective, proponents of those individualized interests as the detainees themselves.

Second, Archbishop Rozanski and Fr. Schroeder have not established a sufficient hindrance to the detainees' ability to protect their own interests. The test for hindrance in the context of third-party standing is a question of the likelihood and ability of the third parties to assert their own rights. *Hodak*, 535 F.3d at 904 (internal quotations omitted). A party must show that some barrier or practical obstacle prevents or deters the third party from asserting his or her own interest. *Id.* (internal parenthetical omitted). No practical barriers exist if the third party actually asserts [their] own rights. *Id.*

Archbishop Rozanski and Fr. Schroeder contend that the hindrance requirement is satisfied because certain detainees approached about participating in this litigation allegedly declined to do so based upon a fear of retaliation. Doc. 1, ¶¶ 15, 65, 91; Doc. 8, p. 25. That allegation, however, does not establish that detainees at the Detention Center are practically unable to assert their own religious-liberty rights. The Detention Center maintains an established General Request and

Grievance Request procedure through which detainees may raise concerns regarding Detention Center policies and circumstances, including concerns regarding religious services, clergy access, and religious accommodations. Aff. Major Schott ¶¶ 103–106, Ex. 6. The relevant excerpts from the Detention Center's Operational Procedures & Policy setting forth the General Request and Grievance Request procedures are contained within Exhibit 6 and highlighted in blue.[2] *Id.* at ¶¶ 107–108, Ex. 6. A detainee may submit a General Request through the Detention Center's kiosk system and, if the response does not resolve the detainee's concern, may submit a Grievance Request for review by Detention Center Administration. *Id.* at ¶¶ 105–06, Ex. 6. Thus, detainees have an established administrative means through which to raise and pursue concerns regarding policies affecting their religious exercise.

Detainees have also demonstrated the ability to pursue their religious-liberty rights through judicial proceedings. On October 13, 2026, Michael W. Mohr, a federal pretrial detainee housed at the Detention Center, filed a motion in the Eastern District of Missouri seeking a judicial order permitting religious accommodation. *See United States v. Mohr*, Case No. 4:26-cr-00074-MTS-PLC, Doc. 37 (E.D. Mo. Oct. 13, 2026). In that motion, Mohr expressly invoked RLUIPA and RFRA and sought an order permitting him to receive communion from a Lutheran pastor. *Id.* at p. 7, 10. Mohr alleged that the Detention Center's policies burdened his religious exercise and sought judicial relief to vindicate the very type of religious-liberty interest Plaintiffs seek to assert here on behalf of other detainees. *Id.*

Considered together, the formal grievance procedure and Mohr's actual pursuit of judicial relief undermine Plaintiffs' contention that detainees face a practical obstacle to asserting their

---

[2] Exhibit 6 also contains part of the Detention Center's prior visitation policy that preceded the clergy-visitation procedures and religious accommodations described in Major Schott's Affidavit. The prior clergy-visitation provisions have been superseded by the accommodations described in the Affidavit and no longer govern clergy access at the Detention Center. *See* Aff. Major Schott ¶¶ 41–84, 102.

own religious-liberty rights. The allegation that certain unidentified detainees declined to participate in this particular litigation because of an asserted fear of retaliation does not establish that detainees are unable to raise or pursue those rights themselves. Indeed, detainees have an established procedure through which to challenge Detention Center policies and circumstances, and the record contains an example of a detainee at the same facility independently seeking judicial relief concerning religious accommodation. The decision of certain detainees not to participate in this particular lawsuit therefore does not, without more, establish the hindrance necessary to permit Archbishop Rozanski and Fr. Schroeder to litigate those detainees' rights in their stead.

For these reasons, Archbishop Rozanski and Fr. Schroeder have demonstrated neither the requisite close relationship with the detainees nor a sufficient hindrance to the detainees' ability to protect their own interests. Because third-party standing requires both, Archbishop Rozanski and Fr. Schroeder have not established third-party standing to pursue the detainees' religious-liberty claims.

**3. The Archdiocese of St. Louis has not established associational standing to assert the rights of unnamed priests.**

An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *United Food & Commer. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996).

Here, the Archdiocese of St. Louis (the "Archdiocese") attempts to invoke associational standing in Counts II and III to assert the Free Exercise and Missouri RFRA rights of unnamed priests. Doc. 1, ¶¶ 16, 99, 106. To satisfy the first requirement for associational standing, the Archdiocese must establish that at least one priest on whose behalf it seeks relief would

independently possess Article III standing. Because the relief sought is prospective, that requires a substantial risk of future injury that is traceable to conduct by the Missouri Defendants that is likely to occur or continue and likely to be redressed by the requested injunction. *See Murthy*, 603 U.S. at 69.

For the reasons discussed above, the accommodations now available or being implemented materially change the circumstances underlying the claimed injury. *See* Aff. Major Schott ¶¶ 41–84. The accommodations are expected to be fully implemented, to the extent they are not already implemented, by the date of the hearing on Plaintiffs' Motion for a Preliminary Injunction and are intended to remain in effect after resolution of Plaintiffs' Motion. *Id.* at ¶¶ 42, 102.

The Archdiocese therefore must establish that at least one priest faces a sufficiently likely future injury notwithstanding the circumstances presently governing clergy access at the Detention Center. Yet the Archdiocese has not identified a priest who faces such a future injury and has not demonstrated how any priest is likely to be subjected to any injury in light of the Detention Center's accommodations. Thus, the Archdiocese cannot establish that at least one of its members would have standing to sue in his own right and therefore cannot establish the necessary associational standing to assert the Free Exercise and Missouri RFRA claims on behalf of unnamed priests.

**4. Plaintiffs' request for preliminary injunctive relief is moot because the Detention Center has adopted accommodations addressing the Plaintiffs' religious concerns.**

Sometimes, events in the world overtake those in the courtroom, and a complaining party manages to secure outside of litigation all the relief he might have won in it. *FBI v. Fikre*, 601 U.S. 234, 240 (2024). When that happens, a federal court must dismiss the case as moot. *Id.* A case becomes moot—and therefore no longer a "Case" or "Controversy" for purposes of Article III of

the U.S. Constitution—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

A defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur. *Fikre*, 601 U.S. at 241. To show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to its old ways. *Id.* (internal quotations omitted). Once it is absolutely clear that challenged conduct cannot reasonably be expected to recur, the fact that some individuals may base decisions on conjectural or hypothetical speculation does not give rise to the sort of concrete and actual injury necessary to establish Article III standing. *Already*, 568 U.S. at 97 (internal quotations and citations omitted).

Here, the circumstances upon which Plaintiffs base their request for preliminary relief have materially changed. Plaintiffs ask the Court to enjoin the no-contact visitation policy as applied to priests, require private clergy access on terms comparable to attorney access, eliminate the existing four-hour limitation on clergy visitation, and permit the celebration of Mass. Doc. 8, p. 40. However, since the filing of this action, and as discussed above, the Detention Center has undertaken specific measures directed to each of the religious practices underlying that requested relief. Aff. Major Schott ¶¶ 41–84.

First, the Detention Center has addressed Plaintiffs' concerns regarding confession and clergy access. The Detention Center has implemented dedicated clergy-visitation hours on Saturdays from 9:00 a.m. to 4:00 p.m., during which clergy may use all three attorney-client visiting rooms, providing up to twenty-one room-hours for clergy visitation. *Id.* at ¶¶ 43–46, Exs. 1–2. The visitation periods are available to clergy of different faiths, and availability for the rooms is on a first-come, first-served basis. *Id.* at ¶¶ 45–46. In the attorney-client visiting rooms, a screen

mesh opening permits the priest and detainee to communicate directly without using the telephone system, and communications through the mesh openings are not recorded. *Id.* at ¶¶ 31, 47–50. This arrangement therefore facilitates the practice of confession while directly addressing Plaintiffs' assertion that the former visitation policy interfered with detainees' ability to partake in confession. *See* Doc. 8, p. 8.

Second, the Detention Center has addressed Plaintiffs' concern regarding the direct administration of communion. One attorney-client visiting room has already been equipped with a pass-through opening through which communion may be administered directly hand-to-hand or hand-to-mouth. Aff. Major Schott ¶¶ 57–61, Ex. 4. Because the physical configurations of the second and third attorney-client visiting rooms did not permit installation of the same type of pass-through opening, the Detention Center modified the door to the second visiting room to create a pass-through flap, and is in the process of modifying the third visiting room to add the same pass-through flap. *Id.* at ¶¶ 62–65. Significantly, direct administration of communion does not depend upon completion of the physical modifications to the third room. While the remaining modifications is completed in the third attorney-client visiting room, two deputies will escort the priest to the detainee's side of the visiting room so that communion may be administered directly. *Id.* at ¶¶ 66–67. Plaintiffs therefore are no longer confronted with the alleged categorical inability to administer communion upon which their request for preliminary relief was premised. *See* Doc. 8, p. 7–8.

Third, the Detention Center has taken concrete steps to address Plaintiffs' request concerning Mass. Detainees already have been issued electronic tablets that will be used to provide access to livestreamed Mass. *Id.* at ¶¶ 69–70, 78–79, Ex. 5. The Detention Center is working with Ministry Brands to establish an account for the ChurchStreaming.tv application and will test the

system after the technical setup is completed. *Id.* at ¶¶ 71–72. The Detention Center also will provide an appropriate room from which a priest may celebrate Mass for livestreaming to detainees on their tablets. *Id.* at ¶ 74. Livestreamed Mass will be made available on Mondays from 9:00 a.m. to 9:45 a.m. *Id.* at ¶ 75. Following Mass, personnel will escort the priest to the appropriate housing pods to distribute communion directly to detainees who wish to receive it through the housing block's chuck-hole door. *Id.* at ¶ 76. The Detention Center anticipates that the livestreaming accommodation will be operational by the date of the hearing on Plaintiffs' Motion for a Preliminary Injunction. *Id.* at ¶ 73. The accommodation therefore addresses Plaintiffs' concerns regarding participation in Mass, while retaining necessary controls over access to secure areas of the Detention Center. *See* Doc. 8, p. 7.

These accommodations directly address the religious practices underlying Plaintiffs' request for preliminary injunctive relief, including confession, communion, Mass, and clergy access. *See* Doc. 8, p. 40, Aff. Major Schott ¶¶ 41–84. Thus, the circumstances upon which Plaintiffs seek prospective judicial intervention no longer correspond to those presently governing at the Detention Center.

Furthermore, there is no reasonable expectation that the Detention Center will return to the challenged practices. *See* Aff. Major Schott ¶¶ 102, 109–111. The accommodations are intended to remain in effect after resolution of Plaintiffs' Motion and are not temporary measures limited to the pendency of this litigation. *Id.* at ¶ 102. Additionally, when the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur. *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1283 (11th Cir. 2004) (emphasis in original). That principle further supports nonrecurrence here, where the Missouri Defendants have not merely ceased the challenged practices but have adopted accommodations intended to remain

in effect after this litigation. Aff. Major Schott ¶¶ 102, 109–111. Any contention that the Detention Center nevertheless will abandon those accommodations and return to the challenged policy is speculative. And "[a] speculative possibility is not a basis for retaining jurisdiction over a moot case." *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1036 (8th Cir. 2004).

Because the accommodations address the practices underlying Plaintiffs' requested injunction and the record demonstrates that the challenged practices cannot reasonably be expected to recur, Plaintiffs' request for preliminary injunctive relief no longer presents a live controversy. The Court should therefore deny the requested preliminary injunction as moot.

**B. Even if the Court reaches the preliminary-injunction factors, Plaintiffs cannot establish that the requested relief is warranted.**

Even if Plaintiffs overcome the threshold issues discussed above, the preliminary injunction factors independently require denial of their Motion. Plaintiffs cannot establish a likelihood of success on the merits of their RLUIPA, First Amendment, or Missouri RFRA claims. The accommodations now available or being implemented materially change the circumstances upon which Plaintiffs' claims are based. *See* Aff. Major Schott ¶¶ 41–84. Plaintiffs likewise cannot demonstrate a likely and imminent irreparable injury absent an injunction. Finally, the balance of equities and the public interest weigh against imposing the broader institutional access Plaintiffs request where the Detention Center has undertaken accommodations for the religious practices at issue while retaining measures necessary for the safe and orderly operation of the facility.

**1. Plaintiffs have not established a likelihood of success on the merits.**

"It is not enough that the chance of success on the merits be better than negligible. . . [as] [M]ore than a mere possibility of relief is required." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Here, Plaintiffs have failed to show more than a mere possibility of relief regarding each of their

claims, particularly when those claims are evaluated in light of the additional religious accommodations now being made available at the Detention Center.

**a. Count I – RLUIPA Claim**

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that the burden "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a). The detainees therefore bear the initial burden of establishing that the challenged policy substantially burdens their religious exercise. *See Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015).

Plaintiffs' substantial-burden theory is premised upon their contention that the Detention Center's visitation policy prevents detainees from receiving confession and communion, prevents participation in Mass, and provides insufficient opportunity for pastoral counseling. *See* Doc. 8, p. 15–19. But the circumstances upon which that theory rests have materially changed. As discussed above, the Detention Center has expanded clergy visitation and undertaken accommodations directed to each of the particular religious practices Plaintiffs identify, including confession, communion, Mass, and pastoral counseling. Aff. Major Schott ¶¶ 41–84.

Those accommodations materially alter Plaintiffs' substantial-burden theory. Plaintiffs cannot establish a likelihood of success by evaluating the former visitation procedures in isolation from the means now available or being implemented for detainees to engage in the particular religious practices identified in Plaintiffs' Motion. Clergy now have expanded access to detainees; confession may occur through the mesh openings in the attorney-client visiting rooms; communion may be administered directly through the existing pass-through door in the first visiting room, the pass-through flap in the second visiting room, or the interim administration procedure for the third

visiting room; and the Detention Center is implementing livestreamed Mass followed by direct distribution of communion. *Id.* at ¶¶ 43-77, 101. Plaintiffs, therefore, have not demonstrated at this stage that the Detention Center's current practices impose the substantial burden necessary to trigger RLUIPA's strict-scrutiny inquiry.

Additionally, the accommodations must be considered in the context of the Detention Center's compelling interests in institutional safety, security, and orderly administration. RLUIPA requires courts to apply its protections with "due deference to the experience and expertise of prison and jail administrators" in establishing regulations necessary to maintain good order, security, and discipline. *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). The Detention Center's physical configuration and security requirements bear directly on those interests. Detainee movement is affected by security classifications and separation requirements, and the facility lacks a chapel, auditorium, or other dedicated space capable of accommodating a large group of detainees for religious services. Aff. Major Schott ¶¶ 12–24. In developing the accommodations, the Detention Center considered its physical configuration, detainee population and classifications, separation requirements, staffing, detainee movement, meal schedules, medical and mental-health needs, attorney visits, and institutional security. *Id.* at ¶¶ 95–100.

Here, the Missouri Defendants have not simply maintained the challenged restrictions. Instead, the Detention Center has developed accommodations directed to each religious practice identified by Plaintiffs while retaining measures governing physical separation, access to secure areas, and the safe and orderly operation of the facility. Aff. Major Schott ¶¶ 41–84, 95–100.

Accordingly, even assuming Plaintiffs may pursue the detainees' RLUIPA rights, they have not demonstrated the likelihood of success on Count I necessary to obtain preliminary injunctive relief.

**b. Count II – First Amendment Free Exercise Claim**

Plaintiffs likewise have not demonstrated a likelihood of success on their First Amendment claim. Plaintiffs contend that the Detention Center's visitation practices burden both the detainees' free exercise of religion under the First Amendment and Plaintiffs' free exercise. Doc. 1, ¶¶ 94–101. But the Free Exercise Clause of the First Amendment does not provide clergy an unfettered constitutional right to enter a correctional institution and conduct religious ministry. *See Brooks*, 2025 U.S. Dist. LEXIS 416418, at *8; *O'Malley*, 477 F.2d at 793.

Nor do the circumstances presently existing at the Detention Center amount to a prohibition on Plaintiffs' religious ministry or the detainees' exercise of religion. As discussed above, the Detention Center has provided or is implementing accommodations for the particular religious practices Plaintiffs identify, including confession, communion, Mass, pastoral counseling, and expanded clergy visitation. Aff. Major Schott ¶¶ 41–84. Clergy have dedicated Saturday visitation hours; confession may occur through the mesh openings in the attorney-client visiting rooms; communion may be administered directly through an existing pass-through door in the first visiting room, the existing pass-through flap for the second visiting room, or the interim administration procedure for the third visiting room; and the Detention Center is implementing livestreamed Mass followed by the direct distribution of communion. *Id.* at ¶¶ 43–77, 101.

Furthermore, the accommodations must be considered in the context of a secure detention facility. Maintaining institutional security and preserving internal order and discipline are essential objectives of detention administration, and correctional officials are afforded "wide-ranging deference" in adopting and executing policies and practices necessary to preserve those interests. *Bell v. Wolfish*, 441 U.S. 520, 546–47 (1979). Even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in

the light of the central objective of prison administration, safeguarding institutional security. *Id.* at 547. The conditions retained by the Detention Center address physical access to secure areas, detainee movement, and separation within the facility. Moreover, the Detention Center lacks a chapel, auditorium, or other dedicated space capable of accommodating a large group of detainees for religious services, and detainee movement is affected by classification and separation requirements. Aff. Major Schott ¶¶ 12–24. In developing the accommodations, the Detention Center considered its physical configuration, detainee population and classifications, separation requirements, staffing, detainee movement, other necessary services, and institutional security. *Id.* at ¶¶ 95–100.

Against that record, Plaintiffs have not shown that the Free Exercise Clause requires the Missouri Defendants to eliminate the remaining security and operational conditions or provide the particular form of clergy access Plaintiffs prefer. Rather, the Detention Center has expanded opportunities for Plaintiffs to engage in religious ministry while retaining measures associated with the safe and orderly operation of the facility. Aff. Major Schott ¶¶ 41–84, 95–101.

As a result, Plaintiffs have not demonstrated that the conditions presently governing their religious ministry or the detainees' exercise of religion violate the First Amendment and therefore have not established a likelihood of success on Count II sufficient to support preliminary injunctive relief.

**c. Count III – Missouri RFRA Claim**

Plaintiffs are also unlikely to succeed on the merits of their Missouri RFRA claim. The Missouri RFRA prohibits a governmental authority from restricting a person's free exercise of religion unless the restriction is in the form of a rule of general applicability and does not discriminate against religion. RSMo. § 1.302.1. The governmental authority must also demonstrate

that the restriction is essential to further a compelling governmental interest and is not unduly restrictive *considering the relevant circumstances*. *Id.* (emphasis added).

Even assuming Plaintiffs' provision of sacramental and pastoral ministry constitutes protected religious exercise under § 1.302.2, Plaintiffs have not demonstrated a likelihood of establishing that the Missouri Defendants presently restrict that exercise in the manner alleged in their Motion. The Detention Center has expanded clergy access and undertaken specific accommodations directed to confession, communion, Mass, and pastoral counseling. Aff. Major Schott ¶¶ 41–84. Those accommodations permit Plaintiffs to engage in the religious ministry they identify, subject to measures governing the manner in which that ministry occurs within a secure detention facility.

The Missouri RFRA expressly makes that institutional context relevant. Section 1.307 provides that the "relevant circumstances" considered under the statute may include "legitimate penological interests needed to protect the safety and security of incarcerated persons and correctional facilities." RSMo. § 1.307.4. At the same time, § 1.307.4 provides that "relevant circumstances" shall not include certain reasonable requests by incarcerated individuals, including requests for "the opportunity to pray" and "reasonable access to clergy." *Id.*

The accommodations adopted by the Detention Center provide the type of reasonable clergy access contemplated by § 1.307.4. Clergy have dedicated Saturday visitation hours from 9:00 a.m. to 4:00 p.m., during which all three attorney-client visiting rooms are available for confession, communion, spiritual or pastoral counseling, and other clergy visits. Aff. Major Schott ¶¶ 43–45. This period provides up to twenty-one room-hours for clergy visitation, with availability on a first-come, first-served basis, and the designated clergy-visitation period is also available to clergy of different faiths. *Id.* at ¶¶ 45–46. The statute requires "reasonable access to clergy"; it

does not state that incarcerated individuals or clergy are entitled to any particular form, location, or manner of access. *See* RSMo. § 1.307.4.

The remaining conditions on that access must therefore be evaluated together with the legitimate penological interests that § 1.307.4 expressly makes relevant. The Detention Center does not have a chapel, auditorium, or other dedicated space capable of accommodating a large group of detainees for religious services; its largest available common area safely accommodates approximately eighteen to twenty detainees at one time. Aff. Major Schott ¶¶ 21–24. Detainee movement is also affected by security classifications and separation requirements, and no more than approximately five detainees may be moved through the hallways together at one time. *Id.* at ¶¶ 12–18. In developing the accommodations, the Detention Center considered these physical and security limitations, staffing, detainee movement, other necessary services, and institutional security. *Id.* at ¶¶ 95–100.

Against that institutional backdrop, Plaintiffs have not shown that the remaining conditions are "unduly restrictive considering the relevant circumstances" within the meaning of § 1.302.1. The Detention Center has not categorically excluded clergy or prohibited the religious practices Plaintiffs identify. Instead, it has expanded clergy access and developed specific means for confession, direct administration of communion, livestreamed Mass followed by communion, and pastoral counseling while retaining restrictions associated with physical access to and movement within a secure detention facility. Aff. Major Schott ¶¶ 41–84.

Accordingly, Plaintiffs have not demonstrated that the accommodations and remaining limitations, considered together and in light of the circumstances expressly made relevant by Missouri RFRA, are unduly restrictive under § 1.302.1. As such, Plaintiffs have not demonstrated

a likelihood of success on the merits of their Missouri RFRA claim and therefore cannot satisfy the likelihood-of-success factor necessary for preliminary injunctive relief.

**2. Plaintiffs are not likely to suffer irreparable harm in light of the accommodations adopted or being implemented by the Detention Center.**

Plaintiffs do not face a genuinely imminent threat of any irreparable injury that would support entering the broad injunction they seek. Whatever chance of success Plaintiffs have on the merits, the Court cannot enter an injunction absent a showing that irreparable harm will likely occur without the injunction. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (emphasis in original) (citations omitted)).

Plaintiffs cannot make that showing under the circumstances presently existing at the Detention Center. Their claim of irreparable harm is premised upon the contention that the challenged visitation policy prevents or materially interferes with confession, communion, Mass, and pastoral counseling. But, as discussed above, the Detention Center has undertaken accommodations directed to each of those religious practices, including expanded clergy access and specific means of facilitating the sacramental and pastoral activities identified by Plaintiffs. Aff. Major Schott ¶¶ 41–84. The accommodations include dedicated Saturday clergy-visitation hours, a means for direct communication during confession, direct administration of communion, and implementation of livestreamed Mass followed by communion. *Id.* at ¶¶ 43–77, 101.

Those changed circumstances substantially diminish the likelihood of the injury upon which Plaintiffs' request for emergency relief depends. Plaintiffs cannot establish irreparable harm

merely by pointing to restrictions that existed previously; they must demonstrate that, absent an injunction, they are likely to suffer an injury that is both imminent and irreparable. *See Winter*, 555 U.S. at 22. The Detention Center anticipates that the accommodations will be fully implemented, to the extent they are not already implemented, by the date of the hearing on Plaintiffs' Motion for a Preliminary Injunction, and the accommodations are intended to remain in effect after resolution of Plaintiffs' Motion. Aff. Major Schott ¶¶ 42, 102. In light of the accommodations now available or being implemented, Plaintiffs have not shown that the alleged inability to provide or receive the religious services identified in their Motion is likely to continue in the absence of an injunction.

Nor does Plaintiffs' preference for broader access establish irreparable harm. The relevant question is whether the conditions presently governing clergy access are likely to cause an irreparable injury before the Court can resolve the merits, not whether Plaintiffs have received every aspect of the institutional access they request. Here, the Detention Center has taken affirmative steps to facilitate the religious practices underlying Plaintiffs' Motion while maintaining measures necessary for the safe and orderly operation of the facility. Aff. Major Schott ¶¶ 41–84, 95–101.

Therefore, Plaintiffs have not demonstrated a likely and imminent irreparable injury that will occur in the absence of a preliminary injunction. Because irreparable harm is an indispensable prerequisite to preliminary injunctive relief, this factor independently weighs against the requested relief.

**3. The balance of the equities and public interest weigh against the requested injunction.**

The remaining *Dataphase* factors—the balance of equities and the public interest—merge because Plaintiffs seek an injunction against government activity. *See Eggers v. Evnen*, 48 F.4th

561, 564–65 (8th Cir. 2022). These factors do not weigh in favor of any injunction at all, let alone the broad relief Plaintiffs seek.

The Detention Center's interests in maintaining institutional security, preserving internal order, and safely managing access to detainees and secure areas of the facility are compelling government interests. *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009). Those interests are particularly significant in the correctional setting, where prison administrators are afforded "wide-ranging deference" in adopting and executing policies and practices necessary to preserve internal order, discipline, and security. *Bell*, 441 U.S. at 547–48. Detainee movement is affected by security classifications and separation requirements, the number of detainees who may move through the facility together is limited, and the Detention Center lacks a chapel, auditorium, or other dedicated space capable of accommodating a large group of detainees for religious services. Aff. Major Schott ¶¶ 12–24.

In developing the accommodations, the Detention Center considered those physical and security limitations together with staffing, detainee movement, other necessary services, and institutional security. *Id.* at ¶¶ 95–100. Plaintiffs' requested injunction would require the Court to alter the conditions governing clergy access to the Detention Center and substitute judicially mandated procedures for the accommodations developed by officials responsible for the facility's day-to-day operation.

At the same time, the record does not present a choice between preserving institutional security and permitting religious exercise. As discussed above, the Detention Center has undertaken accommodations addressing the particular religious practices identified by Plaintiffs, including confession, communion, Mass, pastoral counseling, and expanded clergy visitation. Aff. Major Schott ¶¶ 41–84. Those accommodations facilitate the religious practices at issue while

retaining measures governing access to and movement within a secure detention facility. The balance of equities and the public interest therefore point in the same direction: neither favors compelling broader institutional access where the Detention Center has already adopted or is implementing accommodations for the religious practices at issue while preserving measures necessary for institutional security and orderly administration.

The accommodations provide means for confession, direct administration of communion, participation in livestreamed Mass, pastoral counseling, and expanded clergy visitation while preserving security and operational safeguards. *Id.* An injunction imposing Plaintiffs' preferred form of access would displace the balance of equities, as it would weigh against the Detention Center's compelling security concerns.

Thus, considered together, the balance of equities and the public interest weigh against preliminary injunctive relief. Plaintiffs have not demonstrated that these remaining *Dataphase* factors favor the extraordinary relief they seek.

**C. Plaintiffs should be ordered to post security in connection with any injunctive relief, and the Court should stay any relief.**

For the reasons stated above, the Missouri Defendants submit that the Court can and should deny Plaintiffs' Motion for a Preliminary Injunction in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See* Fed. R. Civ. P. 65(c).

In addition, to the extent the Court issues injunctive relief, the Missouri Defendants respectfully request that such relief be stayed pending the disposition of any appeal. *See* Fed. R. Civ. P. 62(d).

## IV. CONCLUSION

WHEREFORE, the Missouri Defendants respectfully request that this Court enter an Order denying Plaintiffs' Motion for a Preliminary Injunction, and for such further relief this Court deems just and proper.

/s/ Robert T. Plunkert
Robert T. Plunkert #62064 (MO)
PITZER SNODGRASS, P.C.
Attorney for Defendants Sheriff Gary Stolzer, Major Jason Schott, and Lt. Andrew Johnson (in their official capacities)
100 South Fourth Street, Suite 400
St. Louis, Missouri 63102-1821
(314) 421-5545
Email: plunkert@pspclaw.com

**Certificate of Service**

I hereby certify that a copy of the foregoing filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following or U.S. mail for parties not registered with CM/ECF, on this 27th day of October, 2026:

Christopher J. Schmidt
Barbara Smith Tyson
Edward G. Houser
BRYAN CAVE LEIGHTON PAISNER LLP
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
Phone: 314-259-200
christopher.schmidt@bclplaw.com
barbara.smith@bclplaw.com
ed.houser@bclplaw.com
*Attorneys for Plaintiffs*

Clayton Buckner
BRYAN CAVE LEIGHTON PAISNER LLP
1200 Main St., Ste. 3800
Kansas City, Missouri 64105
Phone: 816-374-3200
clayton.buckner@bclplaw.com
*Attorney for Plaintiffs*

Caleb T. Mathena
BRYAN CAVE LEIGHTON PAISNER LLP
1201 Third Ave., Suite 5000
Seattle, Washington 98104
Phone: 206-600-6641
caleb.mathena@bclplaw.com
*Attorney for Plaintiffs*

Roger A. Keller, Jr.
UNITED STATES ATTORNEYS OFFICE
111 S. Tenth Street
20th Floor
St. Louis, Missouri 63102
Phone: 314-539-2200
Fax: 314-539-7695
oger.Keller@usdoj.gov
*Attorney for Defendants Acting Director, U.S. Customs Enforcement, David J. Venturella; Associate Director, Office of Professional Responsibility, Jennifer M. Fenton; and Secretary of the Department of Homeland Security Markwayne Mullin*

/s/ Phillip B. Schatz